**HUNTON ANDREWS KURTH LLP**
Jason J. Kim (SBN 221476)
kimj@Hunton.com
Brandon M. Marvisi (SBN 329798)
bmarvisi@Hunton.com
550 South Hope Street, Suite 2000
Los Angeles, California 90071
Telephone: (213) 532-2000
Facsimile: (213) 532-2020

Attorneys for Defendant,
ILUKA RESOURCES, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| LAURENCE J. GRAHAM; and BETTY PATRICK GRAHAM,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>DUPONT DE NEMOURS, INC.; THE DOW CHEMICAL COMPANY; DOW, INC.; CORTEVA, INC.; THE CHEMOURS COMPANY; OCCIDENTAL PETROLEUM CORPORATION; ILUKA RESOURCES, INC.; ILUKA RESOURCES LIMITED; TRONOX, LLC; TRONOX HOLDINGS PLC; TRONOX LIMITED; HUNTSMAN CORPORATION; KRONOS (US), INC.; KRONOS WORLDWIDE, INC.; NATIONAL INDUSTRIALIZATION COMPANY; VENATOR MATERIALS, LLC; VENATOR MATERIALS, PLC; INEOS GROUP LIMITED; TITANIUM METALS | CASE NO.:  3:25-cv-6296<br><br>[Removed from Alameda Superior Court, Case No. 25CV127524]<br><br>**DEFENDANT ILUKA RESOURCES, INC.'S NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. §§ 1332, 1441, AND 1446**<br><br>*[Civil Cover Sheet; Corporate Disclosure Statement; Certification of Interested Entities or Persons; Notice of Related Cases; and Certificate of Service Filed Concurrently Herewith]* |

*Hunton Andrews Kurth LLP*
*550 South Hope Street, Suite 2000*
*Los Angeles, California 90071-26271*

1  CORPORATION; PRECISION
2  CASTPARTS CORP.; INEOS
   PIGMENTS USA INC.; INEOS
3  ENTERPRISES US HOLDCO LLC;
4  KINDER MORGAN, INC.; HUNTON
   ANDREWS KURTH, LLP; HUNTON
5  & WILLIAMS; HUNTON &
6  WILLIAMS LLP; JM EAGLE; J-M
   MANUFACTURING COMPANY,
7  INC.; BERKSHIRE HATHAWAY
8  INC.; CHARLES O. HOLLIDAY, JR.;
   KENNETH REED MAYO; REED
9  MAYO LAW FIRM, P.C.; SAM
10 ALEXANDER; FREDERICK L.
   PIRKLE; BANK OF AMERICA
11 CORPORATION; ILUKA
12 RESOURCES (TN) LLC; AND DOES
   1-25,
13
14        *Defendants.*
15

**Hunton Andrews Kurth LLP**
**550 South Hope Street, Suite 2000**
**Los Angeles, California 90071-26271**

16
17
18
19
20
21
22
23
24
25
26
27
28

1    TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE

2    NORTHERN DISTRICT OF CALIFORNIA:

3        **PLEASE TAKE NOTICE** that Defendant Iluka Resources, Inc. ("Iluka")

4    hereby removes the state court action described below to this Court pursuant to 28

5    U.S.C. §§ 1332, 1441, and 1446.  In support thereof, Iluka states as follows:

6        1.    Pro se Plaintiffs Laurence J. Graham and Betty Patrick Graham

7    commenced this action against Defendants DuPont de Nemours, Inc., The Dow

8    Chemical Company, Dow, Inc., Corteva, Inc., The Chemours Company, Occidental

9    Petroleum Corporation, Iluka Resources, Inc., Iluka Resources Limited, Tronox, LLC,

10   Tronox Holdings plc, Tronox Limited, Huntsman Corporation, Kronos (US), Inc.,

11   Kronos Worldwide, Inc., National Industrialization Company, Venator Materials, LLC,

12   Venator Materials, plc, Ineos Group Limited, Titanium Metals Corporation, Precision

13   Castparts Corp., Ineos Pigments USA Inc., Ineos Enterprises US Holdco LLC, Kinder

14   Morgan, Inc., Hunton Andrews Kurth, LLP, Hunton & Williams, Hunton & Williams

15   LLP, JM Eagle, J-M Manufacturing Company, Inc., Berkshire Hathaway Inc., Charles

16   O. Holliday, Jr., Kenneth Reed Mayo, Reed Mayo Law Firm, P.C., Sam Alexander,

17   Frederick L. Pirkle, Bank of America Corporation, Iluka Resources (TN) LLC, and

18   "Does 1-25" on June 26, 2025, by filing a civil complaint in the Superior Court of

19   Alameda County, California, captioned *Laurence J. Graham, et al. v. DuPont de*

20   *Nemours, Inc., et al.*, Case No. 25CV127524.  Iluka Resources, Inc. was served a copy

21   of the Complaint on June 27, 2025.  A copy of the Complaint is attached hereto as

22   **Exhibit A**.

23       2.    This is Plaintiffs' *fifth* attempt at bringing the same lawsuit against most of

24   the named Defendants concerning the same core allegations.

25       3.    In January 2024, Plaintiffs filed a case in San Francisco Superior Court

26   against Defendants DuPont de Nemours, Inc., The Dow Chemical Company, Dow, Inc.,

27   Corteva, Inc., The Chemours Company, Occidental Petroleum Corporation, Iluka

28   Resources, Inc., Tronox, LLC, Tronox Holdings plc, Huntsman Corporation, Kronos

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

(US), Inc., Kronos Worldwide, Inc., Venator Materials, LLC, Venator Materials, plc, Titanium Metals Corporation, Ineos Pigments USA Inc., and Kinder Morgan, Inc.  Iluka removed that case to federal court.  *See Laurence J. Graham v. DuPont de Nemours, Inc.*, Case No. 3:24-cv-01551-RFL (N.D. Cal., removed Mar. 13, 2024) ("First Northern District Action"), *appeal docketed*, No. 25-4020 (9th Cir. June 27, 2025).  By order dated April 8, 2025, Judge Rita F. Lin established that no personal jurisdiction exists in California to support Plaintiffs' case against all of the named defendants in the First Northern District Action (except Titanium Metals), and, for that reason dismissed the case against those defendants.  First Northern District Action, Dkt. 202.  On June 20, 2025, Judge Lin dismissed the case against Titanium Metals.  *Id.*, Dkt. 212.  Plaintiffs have noted an appeal of those decisions.  *Id.*, Dkt. 215.  The Ninth Circuit docketed the appeal on June 27, 2025.  *Graham v. DuPont de Nemours, Inc.*, No. 25-4020.  Plaintiffs' opening brief is due on August 6, 2025.  *See also* Notice of Related Cases, filed concurrently herewith.

4.    While the First Northern District Action was pending, on September 30, 2024, Plaintiffs filed a second case alleging the same claims in the Superior Court of Los Angeles.  Iluka removed that case to federal court.  *See Laurence J. Graham v. DuPont de Nemours, Inc.*, Case No. 2:24-cv-09444-FLA (C.D. Cal., removed Oct. 31, 2024) ("First Central District Action").  That action was brought against the same group of defendants, as well as three new defendants also named here—Hunton Andrews Kurth, LLP ("Hunton"), JM Eagle, and National Industrialization Company.  The Plaintiffs added Hunton and JM Eagle in a transparent attempt to insulate the case from federal court jurisdiction.  On February 11, 2025, following removal, Judge Fernando L. Aenlle-Rocha affirmed diversity jurisdiction, finding that Hunton and JM Eagle were "sham defendants," and dismissed the case as duplicative of the First Northern District Action.  First Central District Action, Dkt. 301 at 7-9 & n.3.  Plaintiffs did not appeal that decision and the case is now closed.  *See also* Notice of Related Cases, filed concurrently herewith.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

5.      Prior to filing the present action in Alameda County Superior Court, Plaintiffs filed *two other* duplicative lawsuits against the same defendants named here (except Bank of America) in Los Angeles Superior Court—one on June 2 and another on June 20.  Iluka has removed the case filed on June 2 to the Central District and moved to dismiss it.  *See Laurence J. Graham v. DuPont de Nemours, Inc.*, Case No. 2:25-cv-6135 (C.D. Cal., removed July 7, 2025); *see also* Notice of Related Cases, filed concurrently herewith.

## REMOVAL IS PROPER BECAUSE THE COURT HAS DIVERSITY JURISDICTION

6.      Plaintiffs Laurence J. Graham and Betty Patrick Graham are citizens of California.  Ex. A ¶ 27 & Cover Page (listing California addresses); First Central District Action, Dkt. 301 at 7-8.

7.      Defendant Iluka Resources, Inc. is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Prince George, Virginia.  For purposes of diversity jurisdiction Iluka Resources, Inc. is a citizen of Delaware and Virginia.

8.      Defendant DuPont de Nemours, Inc. is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Delaware. For purposes of diversity jurisdiction DuPont de Nemours, Inc. is a citizen of Delaware. DuPont de Nemours, Inc. consents to removal of this action to federal court.

9.      Defendant The Dow Chemical Company is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Midland, Michigan.  For purposes of diversity jurisdiction The Dow Chemical Company is a citizen of Delaware and Michigan.  The Dow Chemical Company consents to removal of this action to federal court.

10.     Defendant Dow, Inc. is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Midland, Michigan.  For purposes

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

DEFENDANT ILUKA RESOURCES, INC.'S NOTICE OF REMOVAL OF ACTION
PURSUANT TO 28 U.S.C. §§ 1332, 1441, AND 1446

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

of diversity jurisdiction Dow, Inc. is a citizen of Delaware and Michigan. Dow, Inc. consents to removal of this action to federal court.

11. Defendant Corteva, Inc. is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Indianapolis, Indiana. For purposes of diversity jurisdiction Corteva, Inc. is a citizen of Delaware and Indiana. Corteva, Inc. consents to removal of this action to federal court.

12. Defendant The Chemours Company is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Delaware. For purposes of diversity jurisdiction The Chemours Company is a citizen of Delaware. The Chemours Company consents to removal of this action to federal court.

13. Defendant Occidental Petroleum Corporation is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Houston, Texas. For purposes of diversity jurisdiction Occidental Petroleum Corporation is a citizen of Delaware and Texas. Occidental Petroleum Corporation has not been served with the Complaint, and therefore need not consent to removal of this action to federal court. *See* 28 U.S.C. 1446(b)(2)(A); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1193 n.1 (9th Cir. 1988). Occidental Petroleum Corporation would nevertheless consent to removal of this action to federal court.

14. Defendant Iluka Resources Limited is an entity organized and existing under the laws of Australia, and has its principal place of business in Australia. For purposes of diversity jurisdiction Iluka Resources Limited is a citizen of Australia. Iluka Resources Limited has not been served with the Complaint, and therefore need not consent to removal of this action to federal court. *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1. Iluka Resources Limited nevertheless consents to removal of this action to federal court.

15. Defendant Tronox, LLC is a limited liability company. For purposes of diversity jurisdiction, the citizenship of a limited liability company is determined by the citizenship of all of its members. *Voltage Pictures, LLC v. Gussi, S.A. de C.V.*, 92 F.4th

815, 822 (9th Cir. 2024).    Tronox, LLC's sole member, Tronox Incorporated, is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Oklahoma City, Oklahoma.    Accordingly, for purposes of diversity jurisdiction Tronox, LLC is a citizen of Delaware and Oklahoma.    Tronox, LLC consents to removal of this action to federal court.

16.    Defendant Tronox Holdings plc is an entity organized under the laws of England and Wales.    For purposes of diversity jurisdiction Tronox Holdings plc is a citizen of England and Wales.    Tronox Holdings plc has not been served with the Complaint, and therefore need not consent to removal of this action to federal court. *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1.    Tronox Holdings plc nevertheless consents to removal of this action to federal court.

17.    Defendant Tronox Limited is an entity organized and existing under the laws of Australia, and has its principal place of business in Australia.    For purposes of diversity jurisdiction Tronox Limited is a citizen of Australia.    Tronox Limited has not been served with the Complaint, and therefore need not consent to removal of this action to federal court.    *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1.    Tronox Limited nevertheless consents to removal of this action to federal court.

18.    Defendant Huntsman Corporation is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Texas.    For purposes of diversity jurisdiction Huntsman Corporation is a citizen of Delaware and Texas.    On information and belief, Huntsman Corporation has not been served with the Complaint, and therefore need not consent to removal of this action to federal court. *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1.    On information and belief, Huntsman Corporation would nevertheless consent to removal of this action to federal court.

19.    Defendant Kronos (US), Inc. is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Dallas, Texas.    For purposes of diversity jurisdiction Kronos (US), Inc. is a citizen of Delaware and Texas.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

Kronos (US), Inc. has not been served with the Complaint, and therefore need not consent to removal of this action to federal court. *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1. Kronos (US), Inc. nevertheless consents to removal of this action to federal court.

20.     Defendant Kronos Worldwide, Inc. is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Dallas, Texas. For purposes of diversity jurisdiction Kronos Worldwide, Inc. is a citizen of Delaware and Texas. Kronos Worldwide, Inc. has not been served with the Complaint, and therefore need not consent to removal of this action to federal court. *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1. Kronos Worldwide, Inc. nevertheless consents to removal of this action to federal court.

21.     Defendant National Industrialization Company is an entity organized and existing under the laws of Saudi Arabia, and has its principal place of business in Saudi Arabia. For purposes of diversity jurisdiction National Industrialization Company is a citizen of Saudi Arabia. On information and belief, National Industrialization Company has not been served with the Complaint, and therefore need not consent to removal of this action to federal court. *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1. On information and belief, National Industrialization Company would nevertheless consent to removal of this action to federal court.

22.     Defendant Venator Materials, LLC is a limited liability company. For purposes of diversity jurisdiction, the citizenship of a limited liability company is determined by the citizenship of all of its members. *Voltage Pictures.*, 92 F.4th at 822. Venator Materials, LLC's sole member, Venator Materials, plc, is an entity organized and existing under the laws of the United Kingdom, and has its principal place of business in the United Kingdom. Accordingly, for purposes of diversity jurisdiction Venator Materials, LLC is a citizen of the United Kingdom. Venator Materials, LLC consents to removal of this action to federal court.

23.    Defendant Venator Materials, plc is an entity organized and existing under the laws of the United Kingdom, and has its principal place of business in the United Kingdom.  For purposes of diversity jurisdiction Venator Materials, plc is a citizen of the United Kingdom.  Venator Materials, plc consents to removal of this action to federal court.

24.    Defendant Ineos Group Limited is an entity organized and existing under the laws of the Isle of Man, and has its principal place of business on the Isle of Man. For purposes of diversity jurisdiction Ineos Group Limited is a citizen of the Isle of Man.  Ineos Group Limited has not been served with the Complaint, and therefore need not consent to removal of this action to federal court.  *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1.  Ineos Group Limited would nevertheless consent to removal of this action to federal court.

25.    Defendant Titanium Metals Corporation is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Oregon. For purposes of diversity jurisdiction Titanium Metals Corporation is a citizen of Delaware and Oregon.  Titanium Metals Corporation consents to removal of this action to federal court.

26.    Defendant Precision Castparts Corp. is a corporation organized and existing under the laws of Oregon, and has its principal place of business in Oregon. For purposes of diversity jurisdiction Precision Castparts Corp. is a citizen of Oregon. Precision Castparts Corp. consents to removal of this action to federal court.

27.    Defendant Ineos Pigments USA Inc. is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Ohio. For purposes of diversity jurisdiction Ineos Pigments USA Inc. is a citizen of Delaware and Ohio.  Ineos Pigments USA Inc. has not been served with the Complaint, and therefore need not consent to removal of this action to federal court.  *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1.  Ineos Pigments USA Inc. nevertheless consents to removal of this action to federal court.

DEFENDANT ILUKA RESOURCES, INC.'S NOTICE OF REMOVAL OF ACTION
PURSUANT TO 28 U.S.C. §§ 1332, 1441, AND 1446

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

28. Defendant INEOS Enterprises US Holdco LLC is a limited liability company. For purposes of diversity jurisdiction, the citizenship of a limited liability company is determined by the citizenship of all of its members. *Voltage Pictures.*, 92 F.4th at 822. INEOS Enterprises US Holdco LLC's members have the following names and citizenship statuses: INEOS Enterprises Holdings Newco Limited (United Kingdom), INEOS Enterprises Holdings II Limited (United Kingdom), INEOS Enterprises Holdings Limited (United Kingdom), INEOS AG (Switzerland), INEOS Limited (Isle of Man). Accordingly, for purposes of diversity jurisdiction INEOS Enterprises US Holdco LLC is a citizen of the United Kingdom, Switzerland, and the Isle of Man. INEOS Enterprises US Holdco LLC has not been served with the Complaint, and therefore need not consent to removal of this action to federal court. *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1. INEOS Enterprises US Holdco LLC nevertheless consents to removal of this action to federal court.

29. Defendant Kinder Morgan, Inc. is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Houston, Texas. For purposes of diversity jurisdiction Kinder Morgan, Inc. is a citizen of Delaware and Texas. Kinder Morgan, Inc. consents to removal of this action to federal court.

30. Defendant Hunton Andrews Kurth, LLP ("Hunton") is a limited liability partnership. For the purposes of diversity jurisdiction, the citizenship of a limited liability partnership is determined by the citizenship of all of its partners. *Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). Hunton has partners in several states, including California. In assessing diversity jurisdiction, however, courts "disregard the citizenship of a non-diverse defendant who has been fraudulently joined." *Grancare, LLC v. Thrower*, 889 F.3d 543, 548 (9th Cir. 2018). As the Central District has already determined, Hunton has been fraudulently joined, is a sham defendant in this case, and its citizenship is therefore disregarded for purposes of removal. First Central District Action, Dkt. 301 at 8 & n.3. Hunton also was not a defendant in the First Northern District Action. *Laurence J. Graham v. DuPont de*

8

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

*Nemours, Inc., et al.*, Case No. 3:24-cv-01551-RFL (N.D. Cal.). Hunton consents to removal of this action to federal court. Plaintiffs also name Hunton legacy entities Hunton & Williams and Hunton & Williams LLP in the caption of their Complaint. Ex. A at 2, 4. The foregoing applies to these entities as well.

31.     Defendant JM Eagle is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Los Angeles, California. For purposes of diversity jurisdiction JM Eagle is a citizen of Delaware and California. In assessing diversity jurisdiction, however, courts "disregard the citizenship of a non-diverse defendant who has been fraudulently joined." *Grancare*, 889 F.3d at 548. As the Central District has already determined, JM Eagle has been fraudulently joined, is a sham defendant in this case, and its citizenship is therefore disregarded for purposes of removal. First Central District Action, Dkt. 301 at 8 & n.3. JM Eagle also was not a defendant in the First Northern District Action. *Laurence J. Graham v. DuPont de Nemours, Inc., et al.*, Case No. 3:24-cv-01551-RFL (N.D. Cal.). JM Eagle has not been served with the Complaint, and therefore need not consent to removal of this action to federal court. *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1. JM Eagle would nevertheless consent to removal of this action to federal court. Plaintiffs also name J-M Manufacturing Company, Inc. as a Defendant. Ex. A at 2, 4. On information and belief, J-M Manufacturing Company, Inc. merged with another company to form Defendant JM Eagle, so the forgoing analysis with respect to JM Eagle applies to J-M Manufacturing Company, Inc. as well.

32.     Defendant Berkshire Hathaway Inc. is a corporation organized and existing under the laws of Delaware, and has its principal place of business in Omaha, Nebraska. For purposes of diversity jurisdiction Berkshire Hathaway Inc. is a citizen of Delaware and Nebraska. Berkshire Hathaway Inc. consents to removal of this action to federal court.

33.     Plaintiffs allege that Defendant Charles O. Holliday, Jr. is a "resident" of Washington, D.C. *See* Am. Compl., Caption. On information and belief, Charles O.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

Holliday, Jr. has not been served with the Complaint, and therefore need not consent to removal of this action to federal court.  *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1.  On information and belief, Charles O. Holliday, Jr. would nevertheless consent to removal of this action to federal court.

34.    Defendant Kenneth Reed Mayo is a citizen of Virginia.  Kenneth Reed Mayo has not been served with the Complaint, and therefore need not consent to removal of this action to federal court.  *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1.  On information and belief, Kenneth Reed Mayo would nevertheless consent to removal of this action to federal court.

35.    Defendant Reed Mayo Law Firm, P.C. is a citizen of Virginia.  Reed Mayo Law Firm, P.C. has not been served with the Complaint, and therefore need not consent to removal of this action to federal court.  *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1.  On information and belief, Reed Mayo Law Firm, P.C. would nevertheless consent to removal of this action to federal court.

36.    Plaintiffs allege that Defendant Sam Alexander is a "resident" of Mississippi.  *See* Am. Compl., Caption.  On information and belief, Sam Alexander, has not been served with the Complaint, and therefore need not consent to removal of this action to federal court.  *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1. On information and belief, Sam Alexander would nevertheless consent to removal of this action to federal court.

37.    Plaintiffs allege that Defendant Frederick L. Pirkle is a "resident" of Florida.  *See* Am. Compl., Caption.  On information and belief, Frederick L. Pirkle, has not been served with the Complaint, and therefore need not consent to removal of this action to federal court.  *See* 28 U.S.C. 1446(b)(2)(A); *Emrich*, 846 F.2d at 1193 n.1.  On information and belief, Frederick L. Pirkle would nevertheless consent to removal of this action to federal court.

38.    Defendant Iluka Resources (TN) LLC is a limited liability company.  For purposes of diversity jurisdiction, the citizenship of a limited liability company is

10

1

2

3

4

5

6

determined by the citizenship of all of its members. *Voltage Pictures.*, 92 F.4th at 822. Iluka Resource, Inc. is the sole member of Iluka Resources (TN) LLC. Iluka Resources, Inc. is organized and existing under the laws of Delaware, and has its principal place of business in Prince George, Virginia. Therefore, Iluka Resources (TN) LLC is a citizen of Virginia and Delaware. Iluka Resources (TN) LLC consents to removal of this action to federal court.

7

8

9

10

11

39.    Defendant Bank of America Corporation[1] ("BAC") is a Delaware Corporation with its principal place of business in Charlotte, North Carolina. Thus, Bank of America Corporation is a citizen of the states of Delaware and North Carolina for jurisdictional purposes. *See* 18 U.S.C. § 1332(c)(1). BAC consents to removal of this action to federal court.

12

13

14

15

16

17

40.    Although the Complaint names "Does 1-25," it does not allege any citizenship for Does 1-25 and "in determining whether a civil action is removable on the basis of the jurisdiction under section 1332(a) of this title [*i.e.*, diversity jurisdiction], the citizenship of defendants sued under fictitious names shall be disregarded." 28 U.S.C. § 1441(b)(1). Accordingly, any citizenship of Does 1-25 is disregarded for purposes of removal.

18

19

41.    Plaintiffs seek $22,396,800,000.00, as well as other forms of relief. *See* Ex. A ¶¶ 128-130, 135, Prayer for Relief.

20

21

22

42.    This Court has subject matter jurisdiction over this action because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332.

23

24

**ILUKA RESOURCES INC. HAS SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL**

25

26

43.    Removal is timely and proper under 28 U.S.C. § 1446. The 30-day removal period prescribed by 28 U.S.C. § 1446(b) begins to run upon receipt by the

27

28

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

---

[1] BAC is a holding company and not a bank. BAC does not maintain consumer or business accounts.

11

1    defendant, through service or otherwise, of a copy of the initial pleading setting forth

2    the claim for relief upon which such action or proceeding is based.   28 U.S.C.

3    § 1446(b)(1); *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347–48

4    (1999).  Iluka Resources, Inc. was served on June 27, 2025.  This Notice of Removal,

5    filed within 30 days of receipt through service of the Complaint, is timely.

6        44.    *Divisional Assignment*.  Pursuant to Local Rules 3-2(d) and 3-5(b), this

7    case is assigned to the San Francisco Division because it was filed in Alameda County

8    and is substantively identical to a related case pending on appeal from Judge Lin in the

9    San Francisco Division.  L.R. 3-2(d) ("Except as provided in Civil L.R. 3-2(c), all civil

10   actions which arise in the counties of Alameda, Contra Costa, Marin, Napa, San

11   Francisco, San Mateo or Sonoma shall be assigned to the San Francisco Division or the

12   Oakland Division."); *see* First Northern District Action, Case No. 3:24-cv-01551-RFL

13   (N.D. Cal., removed Mar. 13, 2024), *appeal docketed*, No. 25-4020 (9th Cir. June 27,

14   2025).  Defendant, however, reserves the right to seek dismissal for improper venue and

15   does not concede that Plaintiffs' original choice of state court venue was proper.

16       45.    In accordance with 28 U.S.C. § 1446(d), written notice of the filing of this

17   Notice of Removal will be served on Plaintiffs, and a copy of this Notice of Removal

18   will be filed with the Clerk of the Superior Court for Alameda County, California.

19       46.    Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and

20   orders served upon Iluka Resources, Inc. are attached as follows:

21           a.   **Exhibit A** – Plaintiffs' Summons and Complaint.

22       47.    With this removal, Iluka Resources, Inc. does not waive any defense,

23   including but not limited to lack of personal jurisdiction.  *See Cantor Fitzgerald, L.P.*

24   *v. Peaslee*, 88 F.3d 152, 157 n.4 (2d Cir. 1996) ("Removal does not waive any Rule

25   12(b) defenses."); *Fields v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 301 (9th

26   Cir. 1986) (defendants may raise the question of personal jurisdiction upon removal to

27   federal court); *Freeney v. Bank of Am. Corp.*, No. CV1502376MMMPJWX, 2015 WL

28

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

DEFENDANT ILUKA RESOURCES, INC.'S NOTICE OF REMOVAL OF ACTION
PURSUANT TO 28 U.S.C. §§ 1332, 1441, AND 1446

1 | 4366439, at *20 (C.D. Cal. July 16, 2015) (collecting cases) ("A defendant's election
2 | to remove a case to federal court does not waive a personal jurisdiction defense.").

3 |      THEREFORE, Iluka Resources, Inc. removes this action from the Superior Court
4 | of Alameda County, California, to the San Francisco Division of the United States
5 | District Court for the Northern District of California.

7 | Dated: July 28, 2025           **HUNTON ANDREWS KURTH LLP**

9 | By: _____/s/ Jason J. Kim_____
10 |      Jason J. Kim
     Attorney for Defendant
11 |      ILUKA RESOURCES, INC.

**Hunton Andrews Kurth LLP**
550 South Hope Street, Suite 2000
Los Angeles, California 90071-26271

# Exhibit A

## Plaintiffs' Summons and Complaint

## Alameda County Superior Court, No. 25CV127524

Wolters Kluwer

**CT Corporation**
**Service of Process Notification**
06/27/2025
CT Log Number 549479040

## Service of Process Transmittal Summary

**TO:**    Joseph Mullins, Us Corporate Counsel Secretary
ILUKA Resources Inc.
4701 OWENS WAY STE 500
PRINCE GEORGE, VA 23875-2369

**RE:**    **Process Served in Delaware**

**FOR:**    Iluka Resources Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | LAURENCE J. GRAHAM AND BETTY PATRICK GRAHAM vs. DuPont de Nemours, Inc. |
| **CASE #:** | 25CV127524 |
| **PROCESS SERVED ON:** | The Corporation Trust Company, Wilmington, DE |
| **DATE/METHOD OF SERVICE:** | By Process Server on 06/27/2025 at 14:30 |
| **JURISDICTION SERVED:** | Delaware |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification,  Joseph Mullins  joe.mullins@iluka.com |
| | Email Notification,  Donna Huff  donna.huff@iluka.com |
| **REGISTERED AGENT CONTACT:** | The Corporation Trust Company |
| | 1209 Orange Street |
| | Wilmington, DE 19801 |
| | 877-467-3525 |
| | SmallBusinessTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                              Fri, Jun 27, 2025
**Server Name:**                       Wilmington Drop Serve

| Entity Served | Iluka Resources Inc. |
|---|---|
| Case Number | 25CV127524 |
| Jurisdiction | DE |

| Inserts | | |
|---|---|---|
| | | |



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:** *(AVISO AL DEMANDADO):* DuPont de Nemours, Inc., a Delaware Corporation; and, (See Attachment) | **FOR COURT USE ONLY** *(SOLO PARA USO DE LA CORTE)* **ENDORSED FILED ALAMEDA COUNTY JUN 26 2025 CLERK OF THE SUPERIOR COURT** By YOLANDA COPES Deputy |

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Laurence J. Graham and Betty Patrick Graham

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* Alameda County Superior Court 1225 Fallon Street, Oakland, CA 94612 | **CASE NUMBER:** *(Número del Caso):* **25 CV 127524** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Laurence J. Graham and Betty Patrick Graham PO Box 222 Oakland CA 94604

| DATE: *(Fecha)* JUN 26 2025 | Clerk, by *(Secretario)* YOLANDA COPES | Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Iluka Resources Inc., a Delaware Corporation    CHAD FINKE EXECUTIVE OFFICER/CLERK

   under: ☒ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☒ by personal delivery on *(date):* 06/27/2025

[SEAL] SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA

Page 1 of 1

Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

Date Served: 6/27/2025
Time Served: 3:30pm
Server: NP 1361216S7

SUM-200(A)

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Graham vs. DuPont de Nemours, Inc., et al. | 25 CV 127524 |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

The Dow Chemical Company, a Delaware Corporation; and, Dow Inc., a Delaware Corporation; and, Corteva, Inc., a Delaware Corporation; and, The Chemours Company, a Delaware Corporation; and, Occidental Petroleum Corporation, a Delaware Corporation; and, Iluka Resources Inc., a Delaware Corporation; and, Iluka Resources Limited, an Australian public company; and, Tronox, LLC, a US limited liability company; and, Tronox Holdings plc, an Australian company; and, Tronox Limited, an Australian public company; and Huntsman Corporation, a Delaware Corporation; and, Kronos (US), Inc., a Delaware Corporation; and, Kronos Worldwide, Inc., a Delaware Corporation; and, National Industrialization Company, a limited company organized, existing, and doing business under, and by virtue of, the laws of the Kingdom of Saudi Arabia; and, Venator Materials, LLC, a US limited liability corporation; and, Venator Materials, plc, a United Kingdom company; and, Ineos Group Limited, a private limited company organized under the laws of the United Kingdom; and, Titanium Metals Corporation, a Delaware Corporation; and, Precision Castparts Corp., an Oregon Corporation; and, Berkshire Hathaway Inc., a Delaware Corporation; and, Ineos Pigments USA Inc, a Delaware Corporation.; and, INEOS Enterprises US Holdco LLC, a limited liability corporation organized in Delaware; and, Kinder Morgan, Inc., a Delaware Corporation; and, Charles O. Holliday, Jr., an individual person and resident of Washington, DC; and, Hunton Andrews Kurth LLP, a Limited Liability Partnership; and Kenneth Reed Mayo, an individual person and resident of Virginia; and, Reed Mayo Law Firm, P.C., a Virginia professional corporation; and, Hunton & Williams, a Virginia company; and, Hunton & Williams LLP, a limited liability partnership; and, J-M Manufacturing Company, Inc., a Delaware Corporation; and, Sam Alexander, an individual person and resident of Mississippi; and, Frederick L. Pirkle, and individual person and resident of Florida; and, Bank of America Corporation, a Delaware Corporation; and, Iluka Resources (TN) LLC, a Tennessee Limited Liability Company; and, DOES 1-25, inclusive,
Defendants.

Page _____ of _____

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

1  Laurence J. Graham
2  PO Box 222 Oakland, CA 94604
   Telephone: (510) 435-5707
3  E-mail: lg.legal25@gmail.com
   Betty Patrick Graham
4  c/o Laurence J. Graham
   PO Box 222 Oakland, CA 94604
5  Telephone: (510) 435-5707
   E-mail: lg.legal25@gmail.com
6  Pro se,
7

**ENDORSED**
**FILED**
**ALAMEDA COUNTY**

JUN 2 6 2025

CLERK OF THE SUPERIOR COURT
By ____ YOLANDA COPES ____
                                    Deputy

8

9              SUPERIOR COURT OF CALIFORNIA

10                 COUNTY OF ALAMEDA

11

12

13

14  <u>VERIFIED COMPLAINT FOR RELIEF BASED UPON RESCISSION OF CONTRACTS</u>
              <u>AND DEMAND FOR JURY TRIAL</u>
15

16

17
    LAURENCE J. GRAHAM AND BETTY        Case No.: Case No:  **25 C V 1 2 7 5 2 4**
18  PATRICK GRAHAM
19         Plaintiffs,
                                         VERIFIED COMPLAINT FOR RELIEF
20  vs.                                  UNDER CAL. CIVIL CODE SEC. 1692
                                         BASED UPON RESCISSION OF
21  DuPont de Nemours, Inc., a Delaware  CONTRACTS BASED ON FAILURE OF
22  Corporation; and, The Dow Chemical   CONSIDERATION CAL. CIVIL CODE SEC.
    Company, a Delaware Corporation; and, Dow  1689(B)(2); BREACH OF FIDUCIARY
23  Inc., a Delaware Corporation; and, Corteva,  DUTIES; FRAUD (CAL. CIVIL CODE
    Inc., a Delaware Corporation; and, The  SECTION 1572); CONCEALMENT (CACI
24  Chemours Company, a Delaware Corporation;  NO. 1901); CONSPIRACY (CACI NO. 3600);
    and, Occidental Petroleum Corporation, a  AND, ONGOING CONSPIRACY (CACI
25  Delaware Corporation; and, Iluka Resources  3601)
26  Inc., a Delaware Corporation; and, Iluka
    Resources Limited, an Australian public
27  company; and, Tronox, LLC, a US limited
28                                              1

liability company; and, Tronox Holdings plc, an Australian company; and, Tronox Limited, an Australian public company; and, Huntsman Corporation, a Delaware Corporation; and, Kronos (US), Inc., a Delaware Corporation; and, Kronos Worldwide, Inc., a Delaware Corporation; and, National Industrialization Company, a limited company organized, existing, and doing business under, and by virtue of, the laws of the Kingdom of Saudi Arabia; and, Venator Materials, LLC, a US limited liability corporation; and, Venator Materials, plc, a United Kingdom company; and, Ineos Group Limited, a private limited company organized under the laws of the United Kingdom; and, Titanium Metals Corporation, a Delaware Corporation; and, Precision Castparts Corp., an Oregon Corporation; and, Berkshire Hathaway Inc., a Delaware Corporation; and, Ineos Pigments USA Inc, a Delaware Corporation.; and, INEOS Enterprises US Holdco LLC, a limited liability corporation organized in Delaware; and, Kinder Morgan, Inc., a Delaware Corporation; and, Charles O. Holliday, Jr., an individual person and resident of Washington, DC; and, Hunton Andrews Kurth LLP, a Limited Liability Partnership; and, Kenneth Reed Mayo, an individual person and resident of Virginia; and, Reed Mayo Law Firm, P.C., a Virginia professional corporation; and, Hunton & Williams, a Virginia company; and, Hunton & Williams LLP, a limited liability partnership; and, J-M Manufacturing Company, Inc., a Delaware Corporation; and, Sam Alexander, an individual person and resident of Mississippi; and, Frederick L. Pirkle, and individual person and resident of Florida; and, Bank of America Corporation, a Delaware Corporation; and, Iluka Resources (TN) LLC, a Tennessee Limited Liability Company; and, DOES 1-25, inclusive,

Defendants.

2

1     VERIFIED COMPLAINT FOR RELIEF UNDER CALIFORNIA CIVIL CODE
2 SECTION 1692 BASED ON RESCISSION OF CONTRACTS AND DEMAND FOR JURY
                                  TRIAL
3

4 Laurence J. Graham (also known as: Laurence John Graham, Laurence Graham, and Larry

5 Graham) on behalf of himself, and as attorney-in-fact for Betty P. Graham (also known as: Betty

6 Patrick Graham, Betty Graham), and Laurence John Graham as Agent and attorney-in-fact for

Betty P. Graham); and, Betty Patrick Graham (also known as: Betty P. Graham).
7
Pro Se,
8
Plaintiffs,
9
vs.

10 DuPont de Nemours, Inc., a Delaware Corporation ("Dupont"); and, The Dow Chemical

11 Company; a Delaware Corporation ("Dow"); and, Dow Inc., a Delaware Corporation ("Dow

12 Chemical"); and, Corteva, Inc., a Delaware Corporation ("Corteva, Inc."); and, The Chemours

13 Company, a Delaware Corporation ("Chemours"); and, Iluka Resources Inc., a Delaware

14 Corporation ("Iluka"); and, Iluka Resources Limited, an Australian public company ("Iluka

15 AUS"); and, Tronox Limited, a public company organized, existing, and doing business under,

and by virtue of the laws of Western Australia, ("Tronox Limited"); and, Tronox, LLC, a US
16
limited liability corporation ("Tronox LLC"); and, Tronox Holdings plc, a public company
17
organized, existing, and doing business under, and by virtue of the laws of Western Australia
18
("Tronox Holdings plc"); and, Huntsman Corporation, a Delaware Corporation ("Huntsman");

19 and, Kronos (US), Inc., a Delaware Corporation ("Kronos US"); and, Kronos Worldwide, Inc., a

20 Delaware Corporation ("Kronos Worldwide"); and, Titanium Metals Corporation, a Delaware

21 Corporation ("Timet"); and, Precision Castparts Corp., an Oregon Corporation ("Precision

22 Castparts Corp."); and, Berkshire Hathaway Inc., a Delaware Corporation ("BH"); and, Venator

23 Materials, LLC, a limited liability company organized in Delaware ("Venator LLC"); and;

Venator Materials, plc, an entity organized and existing under the laws of the United Kingdom
24
("Venator plc"); and, Occidental Petroleum Corporation, a Delaware Corporation ("OXY"); and,
25
Ineos Group Limited, a private limited company organized under the laws of the United
26
Kingdom ("Ineos Group Limited"); and, Ineos Pigments USA Inc., a Delaware Corporation

27 ("Ineos Pigments USA Inc"); and, Ineos Enterprises US Holdco LLC; a limited liability

28                               3

company organized in Delaware ("Ineos Enterprises, LLC"); and, Kinder Morgan, Inc., a Delaware Corporation ("KM"); Charles O. Holliday, Jr., an individual person and resident of Washington, DC ("Mr. Holliday"); and, Kenneth Reed Mayo an individual person and resident of Virginia ("RM"); and, Reed Mayo Law Firm, P.C., a Virginia professional corporation ("RMLF"); and, Hunton & Williams, a Virginia company ("H&W"); and, Hunton & Williams LLP, a limited liability partnership ("Hunton"); and, Hunton Andrews Kurth LLP, a Limited Liability Partnership ("HAK"); and, National Industrialization Company, a limited company organized, existing, and doing business under, and by virtue of, the laws of the Kingdom of Saudi Arabia ("TASNEE"); and, J-M Manufacturing Company, Inc., a Delaware Corporation ("J-M"); and, JM Eagle, a Delaware Corporation ("JM"); and, Sam Alexander, an individual person and resident of Mississippi ("Sam Alexander"); and, Frederick L. Pirkle, and individual person and resident of Florida ("Mr. Pirkle"); and, Bank of America Corporation, a Delaware Corporation ("BOA"); and, Iluka Resources (TN) LLC, a Tennessee Limited Liability Company ("TN"); and,

DOES 1-25, inclusive,

Defendants.

_____/

Verified complaint for relief under Cal. Civil code Sec. 1692 based on rescission of ten mining leases for failure of consideration based on breach of fiduciary duties; fraud (Cal. Civil Code Sec. 1572); and, Conspiracy (CACI No. 3600); and tolled by Ongoing Conspiracy (CACI No. 3601), and the other tolling arguments made herein including, but not limited to, duress, undue influence, active concealment, etc.; and, CACI No. 1901 fraud by concealment which also tolls any statute of limitations.

Plaintiffs Laurence J. Graham (also known as Laurence John Graham), Betty Patrick Graham (also known as Betty P. Graham), Laurence J. Graham as Agent for Betty P. Graham (also known as: attorney-in-fact for Betty P. Graham), and Laurence J. Graham as attorney-in-fact for Betty P. Graham ("Plaintiffs") are informed and believe and on that basis allege as follows:

4

1. Iluka, AKA Iluka Resources, Inc. ("Iluka") is already in receipt of a copy of Betty P. Graham's durable power of attorney titled: FLORIDA GENERAL DURABLE POWER OF ATTORNEY dated 7/18/2014 which was executed in Massachusetts; I, Laurence J. Graham, am Betty P. Graham's Agent (also known as her attorney-in-fact); I, Laurence J. Graham, have the powers to bring, prosecute, and settle all claims held by Betty P. Graham.  Betty P. Graham may be referred to as ("Betty") herein. Laurence J. Graham may be referred to as ("Laurence") herein. The 9/29/03 Settlement Agreement attached hereto as ("EXHIBIT A") is also written authorization for Laurence to act on Betty's behalf which he does in this amended complaint. Furthermore, Laurence and Betty agree and declare that the venue for all interpleaders and declaratory relief involving the 9/29/03 Settlement Agreement, Betty's 10/23/2000 deed of gift, and the 97 Deed is Washington County Oregon.

<u>GENERAL ALLEGATIONS</u>

2. Whenever reference is made in this VERIFIED COMPLAINT FOR RELIEF BASED ON RESCISSION OF CONTRACTS AND DEMAND FOR JURY TRIAL to any act of any corporate or other business defendant, such allegation shall mean that said defendant and its officers, directors, agents, employees, representatives, or aider or abettor did or authorized such acts while engaged in the management, operation, direction, or control of the affairs of such defendant and while acting within the scope and course of their duties.

3. Whenever reference is made in this VERIFIED COMPLAINT FOR RELIEF BASED ON RESCISSION OF CONTRACTS AND DEMAND FOR JURY TRIAL to concealing the quantity of sales of any product or concealing the volume of sales of any product, the term "quantity" is interchangeable with the term "volume" and both refer to the amount of sales by weight.

4. Joint and several liability certainly applies to the economic damages and plaintiffs argue that it also applies to punitive damages sought under Cal. Civil Code Section 1692 due to the evil and malicious conspiratorial conduct of the defendants.

5

NATURE OF ACTION AND BACKGROUND

5. Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and
Ann P. Everett were conveyed title, in equal shares, to tangible real property minerals
of every kind and character within and underlying ten parcels of land which total
more than 1,150 acres by a certain Deed of Gift dated the 19th Day of May 1997
which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155
Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page
204, (hereinafter "the 97 Deed") attached as ("EXHIBIT B")  which, by its written
language, is said to be drafted by one attorney who, although we did not know it at
the time, had a history of performing work for RGC (USA) Minerals Inc., AKA RGC
(USA) Minerals, Inc. (hereinafter, "RGC"); but, we did know that he was working on
the 97 Deed with RGC and that the McGuire Woods law firm was involved.

6. In addition to the conveyance of title to the physical, tangible, real property minerals
located within and underlying ten parcels of land together with the surface rights of
ingress and egress, and possession at all times for the purpose of mining, drilling and
operating for said minerals and the maintenance of facilities and means necessary or
convenient for producing, treating and transporting such minerals, the 97 Deed also
transferred all of Betty's parents' royalties due under ten certain October 13, 1989
Deeds of Mining Lease to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except
for the next two annual advance royalty payments; said ten certain October 13, 1989
Deeds of Mining Lease were signed by Betty's father George L. Parson, Jr. and
Betty's mother Mary E. Parson and RGC and are intertwined; therefore, they are one
contract and are also known as the 1,169.86 acre lease by Betty, her parents, and
RGC since the recording of the 97 Deed, memorandums of said leases being of record
in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's
Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases")
attached as ("EXHIBIT C"). The 97 Deed severed the 1,169.86 acre lease from the
1,196.61 acre lease that Betty's parents and RGC entered into. At the time Betty's
parents executed the 97 Deed, they owned all right, title and interest in and to the

6

minerals within and underlying the ten parcels of land listed in the 97 Deed although said minerals were subject to the Leases.

7.  Prior to executing the 97 Deed, Betty's parents severed the minerals within and underlying the ten parcels of land listed in the 97 Deed from the land by 1994 severance deeds, most of which are attached in ("EXHIBIT L"); the 1994 severance deeds which severed the physical, tangible, real property minerals within and underlying the ten parcels of land listed in the 97 Deed from the land together with the inherent surface rights of priority use over the land from which said minerals were severed and conveyed said land without any of the physical, tangible, real property minerals within and underlying the ten parcels of land listed in the 97 Deed which Betty's parents retained by virtue of the 94 severance deeds together with the surface rights of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals.

8.  E.I. Du Pont De Nemours and Company ("DuPont") drilled into the minerals within and underlying the ten parcels of land listed in the 97 Deed and tested the quality of said minerals and made representations about the tonnage of minerals contained within and underlying the ten parcels of land listed in the 97 to Betty's father which he relied upon while signing the Leases that RGC prepared. DuPont and RGC were separate companies; therefore, they were not affiliates.

9.  Accordingly, Betty P. Graham, Julia P. Boyd, and Ann P. Everett were each conveyed title to a separate one-third share of the physical tangible real property minerals located within and underlying the ten parcels of land listed in the 97 Deed together with the surface rights of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; and, each of them also received one-third of the royalties due under the Leases by the 97 Deed except for the next two annual advance royalty payments,

7

1    and each of them also received one-third of the Parsons lessor rights, also known as

2    lessor standing, by the 97 Deed.

3                    Action for relief under Cal. Civil Code Sec. 1692

4    10. This is an action for relief, by jury trial, based on the rescission of the portion of the

5        Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97

6        Deed and later recovered, as saleable minerals, from the ore that was extracted from

7        the ten parcels of land listed in the 97 Deed based on Iluka's breaches of fiduciary

8        duties one of which is the failure of consideration for said saleable minerals another is

9        the failure to deliver reporting about the minerals that were extracted from the ten

10       parcels of land listed in the 97 Deed and the saleable minerals recovered from the ore

11       that was extracted from the ten parcels of land listed in the 97 Deed. Iluka AUS with

12       its subsidiary Iluka did the extracting of the minerals and the other Defendants aided

13       and abetted Iluka's breaches of fiduciary duties by providing encouragement and

14       substantial assistance to Iluka while knowing that it would not deliver fair and

15       equitable consideration to us for the one-third share of the minerals conveyed to Betty

16       by the 97 Deed and later recovered, as saleable minerals, from the ore that was

17       extracted from the ten parcels of land listed in the 97 Deed. The California Superior

18       Court has general jurisdiction for an action for relief under Cal. Civil Code. Sec. 1692

19       based on recession of contracts. Cal. Civil Code Sec. 1646 provides, *"A contract is to*

20       *be interpreted according to the law and usage of the place where it is to be*

21       *performed; or, if it does not indicate a place of performance, according to the law*

22       *and usage of the place where it is made."* We noticed 481 N Santa Cruz Ave #178

23       Los Gatos, CA 95030 as the place of performance pursuant to section 33 of the

24       Leases which provides for notices.

25                             Offer to Restore Iluka

26    Plaintiffs have already offered to restore Iluka 28.2 million dollars and contend that

27    they have rescinded the Leases based on Iluka's breaches of fiduciary duties, one of

28    which is the failure of consideration, for the one-third share of the minerals conveyed

to Betty by the 97 Deed that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

11. The Leases provide that the Lessor shall name the place of performance and California law governs torts when the place of performance is California per Cal. Civil Code Section 1646.

12. Plaintiffs named California as the place of performance per the attached letters "EXHIBIT D"

13. With California being the place of performance, Cal. Civil Code Sec. 1692 governs relief for rescission.

14. Cal. Civil Code Sec. 1692 controls rescission of the Leases based on torts when the place of performance is California.

15. The failure of consideration happened in California by Iluka's 2/12/2023 letter mailed to Los Gatos, see "EXHIBIT E" at page 1.

16. Arbitration is an unavailable forum for the relief sought because, among other reasons, the American Arbitration Association rules in place at the time the Leases were entered in 1989 did not allow the arbitrator to award punitive damages and legal fees and punitive damages are available for the relief sought under Cal. Civil Code Sec. 1692. Legal fees are also available under Cal. Civil Code Sed. 1692 which is another reason that arbitration is an unavailable forum.

17. None of the defendants were parties to the Leases in 1989; therefore, none of the defendants have a right to compel arbitration nor seek the protections of it.

18. Betty executed a 2000 Deed of Gift in Florida that assigned 60% of her royalties to Laurence. Betty's 2000 Deed of Gift also assigned lessor standing in the Leases to Laurence.

19. As agreed in the 9/29/03 Settlement Agreement, Laurence controls the one-third share of the real property mineral estate conveyed to Betty by the 97 Deed together with the

surface rights of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals located within and underlying the ten parcels of land listed in the 97 Deed and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; and Laurence also controls the royalties and lessor rights assigned to Betty by the 97 Deed.

20. Laurence had the lessor standing to rescind the portion of the Leases pertaining to the entire one-third share of the minerals conveyed to Betty by the 97 Deed and, to the extent that said portion of Leases has not been rescinded, Laurence still has said lessor standing to effect rescission.

21. Betty retained the one-third share of the tangible real property minerals conveyed to her by the 97 Deed.

22. Betty is the owner of the one-third share of the tangible real property minerals conveyed to her by the 97 Deed.

23. Although Betty acts with all the standing that she has to rescind the Leases as owner of the one-third share of the minerals conveyed to her by the 97 Deed, Iluka, Iluka Aus, and DuPont controlled Betty's 2000 deed with undue influence and duress and they will buy off anyone that they can to obstruct to our recovery; therefore, in the alternative, Betty here again offers to restore Iluka and rescinds the Leases, as lessor, in this action for relief to recover the value of the one-third share of the saleable minerals extracted from the ten parcels of land listed in the 97 Deed and punitive damages for having rescinded the Leases. The defendants have waived all defenses to any pleading standard that Cal. Civil Code Sec. 1692 and related codes generalize and tolled any statute of limitations; in support of all such arguments and in addition to all of the tolling arguments made in this complaint based on undue influence, duress, active concealment, etc., plaintiffs point to the defendants' foreshadowing of Betty's death in the San Francisco litigation with a sham affidavits alleging that she is already deceased while the defendants that have been following and harassing her

with private investigators knew she was not deceased. Betty showed up in the San Francisco Superior Court and signed a notarized affidavit in Berkeley to disprove the sham affidavits; and, all the defendants that were in the case at the time of the hearing in the San Francisco Superior Court including Iluka, Timet, etc. knew that she was alive and not "long dead" as they alleged and we allege that all the defendants were aware that Betty was alive when the defendants' sham affidavits were filed although some of the associates working under the partners of the law firms representing the defendants may not have known. In disgust, we point out that the law firms involved are having associates sign the fraudulent pleadings that they represent to the associates as accurate which is sad. They are hiding behind the associates which is shameful and does not divest the partners of liability. And, that sham pleading for discovery with sham affidavits in the San Francisco litigation was part of a calculated plan by the defendants to foreshadow Betty's death in an attempt to diminish the effect of Betty's death if it occurs during litigation while they were committing fraud upon the Court to cause us harm and delay.

24. In 2006 there were Palm Beach County, FL guardianship and incapacity cases, Case Nos. 502006GA000650XXXXSB & 502006MH002068XXXXSB, which were effectively ended by orders from the DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA FORTH DISCRICT, see https://4dca.flcourts.gov/content/download/164619/opinion/Opinion_07-996.pdf which we request that the Court take judicial notice of which is also attached as ("EXHIBIT G")], with which the Court determined that the appointment of Betty's other son Luke P. Graham as temporary guardian was invalid and that no authority to act for Betty was given to any person nor entity by the orders of the Palm Beach County Florida Court and the Court determined that the trial court did not find any valid reason to revoke Betty's advance care directives by which Betty gave Laurence broad and sweeping powers to make health care and financial decisions for Betty which determination is also binding in California courts and prevails over any case law precedent in California that forbids an attorney-in-fact also known as "Agent" from representing a person in a California court with an advance care directive if that

11

person cannot represent themselves without regard to any conflict of laws. As provided by said order, Florida law dictates that representing an infirm person with the powers granted by that person's advance care directive is a less restrictive alternative to guardianship and we argue that the California courts must respect Betty's right to have Laurence represent her in court as her Agent and attorney-in-fact because Betty's advance care directives, by which Laurence has the powers to represent her interests in Court, are a less restrictive alternative to guardianship and that such powers are valid in this Court. Also, the Court did determine that Betty is the owner of the minerals located below the ten parcels of land listed in the 97 Deed and the inherent right to rents therefrom. Furthermore, the defendants alleged in the San Francisco litigation that Betty has been intellectually incapacitated since 2006.

25. Iluka Resources Inc. claims to be successor to RGC (USA) Minerals Inc. by merger as evidenced in the 6/12/2023 Notice of Termination of Mining Leases sent to Los Gatos, CA, see attached "EXHIBIT F" at page 1, which is fraud directed at us in California that purposefully availed Iluka Resources Inc. and Iluka Resources Limited, and HAK, and RM, and RMLF and the other defendants, that aided and abetted Iluka, of the jurisdiction of the California Superior Court because RGC (USA) Minerals Inc. filed an annual report in Florida in 2012, see "EXHIBIT H", after Iluka Resources Limited defined the process by which it changed the name of its subsidiaries when it changed the name of RGC (USA) Mineral Sands Inc. to Iluka Resources Inc., see EXHIBIT H, at pages 1-4; therefore, Iluka Resources Limited became successor to RGC (USA) Minerals Inc. by merger and Iluka's claim that it became successor by said merger, can't be true which is all further evidence that neither Iluka Resources Limited nor Iluka Resources Inc. nor the other defendants has clean hands, that neither entity is a signatory to the Leases, that neither entity entered the Leases in 1989, that neither entity has the right to compel arbitration, that both entities engaged in undue influence, and that any statute of limitations is tolled by this conduct; however, Iluka Resources Inc. claims to be successor to RGC (USA) Minerals Inc. and we served it a copy of the complaint thereby rescinding the Leases. Furthermore, the 06/12/2023 Notice of Termination of Mining Lease is a fraud

because CHRISTOPHER LANCE EVERETT AND LEE RANDOLPH EVERETT do not have any interest in the minerals that were below Sussex County Virginia Tax Map Parcels 101-A-17 and 101-A-17A nor any of the other nine parcels of land listed in the 97 Deed and it does not identify any lessor for the one-third portion of the lessor rights also known as lessor standing assigned to Betty. It is evidence of undue influence.

26. Plaintiffs rescinded the Leases by previously serving a copy of a verified complaint for relief under Cal Civil Code Sec. 1692 to Iluka.

## VENUE IS PROPER IN CALIFORNIA

27. Venue is proper in California because defendant Iluka breached a fiduciary duty to deliver fair and equitable consideration for the one-third share of the saleable minerals recovered form the ore that was extracted from the ten parcels of land listed in the 97 Deed in California thereby subjecting Iluka to California jurisdiction and venue for relief based on rescission of the Leases and because each of the other defendants intended to assist Iluka in its breach of fiduciary duty to deliver fair and equitable consideration to us for said one-third share of the saleable minerals wherever and whenever it occurred and it occurred in California; therefore, each of the defendants intended to harm us in California and purposefully availed itself of the jurisdiction of the California Superior Court which has general jurisdiction for the relief sought. Furthermore each of the defendants acted with actual knowledge of the plan to cause a failure of consideration to us for said one-third share of the saleable minerals and intended to cause a failure of consideration to us for said one-third share of the saleable minerals and provided substantial encouragement and assistance with some of such conduct occurring in California. When the defendants aided and abetted Iluka's breach of fiduciary duty to deliver fair and equitable consideration to us for the one-third share of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, the defendants purposefully availed themselves of the jurisdiction of the state court wherever that failure of consideration occurred and it occurred in California; and, leading up to said

13

failure of consideration, each of the defendants committed intentional acts to aid and abet said failure of consideration that were expressly aimed at California and caused us harm and contributed to the brunt of the harm which was the failure of consideration for said one-third share of the saleable minerals in California. Each of the Defendants, except for BH, Kinder Morgan, Inc. ("KM") and Hunton Andrews Kruth LLP ("HAK"), RM, RMLF, BOA, and Corteva, Inc. separately shipped products to and sold products in Los Angeles County California and elsewhere in California containing saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed. Iluka sold some of the saleable minerals in Los Angeles and elsewhere in California which is purposeful availment and conduct intended to harm us in California. The other defendants except for BH, KM, HAK, RM, RMLF, BOA, and Corteva, Inc. each separately sold products in California that included, but are not limited to, titanium dioxide pigment and things that were made with titanium dioxide pigment such as paint, PVC pipe, plastics, etc. and each such defendant underreported the sales of those products to assist Iluka in its breaches of fiduciary duties to us which is also conduct directed to harm us in California and which caused substantial harm to us. We allege that both DuPont and Chemours operated large distributorships in Alameda County California for products containing the saleable minerals and that, after Chemours was spun off from DuPont, Chemours started using third party distributorships to conceal such conduct in an effort to reduce contacts within California but has purposefully availed itself of jurisdiction in California as have all of the defendants with their conduct directed at us. The defendants that did not ship products to and sell products in California that contained said saleable minerals were aware of that conduct and the underreported production price-fixing scheme and participated in the scheme in various ways, some of which conduct occurred in California and some of which conduct was directed at us in California. The defendants that are not in contractual privity with us also intended to aid and abet Iluka's failure of consideration to us in California which is purposeful availment, and all the defendants benefited financially from participation in the underreported production price-fixing scheme and caused us substantial harm.

14

"The elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of that breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third party's breach; and (4) defendant's conduct was a substantial factor in causing harm to plaintiff. (Judicial Council of Cal., Civ. Jury Instns. (CACI) (2014) No. 3610 . . .)." (Nasrawi v. Buck Consultants LLC (2014) 231 Cal.App.4th 328, 343 [179 Cal.Rptr.3d 813].) A defendant who acts with actual knowledge of the intentional wrong to be committed and provides substantial assistance to the primary wrongdoer is not an accidental participant in the enterprise." (Upasani v. State Farm General Ins. Co. (2014) 227 Cal.App.4th 509, 519 [173 Cal.Rptr.3d 784], original italics, internal citations omitted.) Huntsman Corporation mixed coatings in Los Angeles County with titanium dioxide pigment that it knew was produced with the saleable minerals. Titanium Metals Corporation ("Timet") used the saleable minerals at its plant in Vallejo, CA at least through calendar year 2020 and although it claims to have ceased production at that plant discovery is warranted. Furthermore, it is highly probable that there are witnesses living in California that were employed by some of the defendants including, but not limited to, private investigators and former employees of E.I. du Pont de Nemours & Company's Antioch, CA titanium dioxide pigment plant and Timet's Vallejo, CA plant and current employees of Huntsman Advanced Materials in Los Angeles County California. Furthermore venue is proper in California because in-state defendant J-M is a citizen of California with its principal place of business in Los Angeles and HAK has partners in San Francisco and Los Angeles. Furthermore, the preceding entities Dupont, Dow Chemical, Corteva have employed private investigators to monitor and harass us in California with Iluka and Iluka AUS and the succeeding entities continue to conspired in the same conduct with Iluka and Iluka AUS which is purposeful availment of jurisdiction in California and conduct directed at us in California to harm us which has and continues to be a source of harm to us. Jurisdiction exists over each of the defendants because they each engaged in the underreported production price-fixing scheme alleged in the paragraphs below that

15

resulted in Iluka's failure to deliver fair and equitable consideration to us for the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed in California. Venue in Los Angeles County, CA is also proper because the market for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed was suppressed within Los Angeles, CA and San Francisco, CA. Each of the defendants participated in the underreported production price-fixing scheme alleged in the paragraphs below and each defendant's conduct was a substantial factor in causing Iluka's failure to deliver fair and equitable consideration to us in California for the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.  For all these reasons, the Defendants purposefully availed themselves of California jurisdiction and venue and are subject to California law for the relief that we seek based on rescission of the Leases pertaining to at least a share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and a jury trial for a bare money judgement and the punitive damages and the California Superior Court at the Oakland courthouse has general jurisdiction for the relief sought when the place of performance is California per Cal. Civil Code Sections 1646 and 1692.  Furthermore, plaintiffs are residents of Alameda County California.

28. I, Laurence John Graham, allege that I spoke with the head geologist employed by Iluka who explained that there were 30 to 35 million tons of heavy minerals left to be mined in the Old Hickory Heavy Mineral Reserve and that 80% to 85% of those tons would be recovered as saleable minerals and confirmed that 24 million tons of saleable minerals would be sold and I questioned Iluka's officer about Iluka's geologist's representations and Iluka's officer denied them and he also represented Iluka to notify me that the owners of minerals and royalties were not allowed to know such information at that time and not allowed to know it until the end of Iluka's undertaking of extracting and receiving payment for the minerals conveyed to Betty

16

P. Graham, Julia P. Boyd, and Ann P. Everett by the 97 Deed and not allowed to know it before Iluka determined who was to receive all of Betty P. Graham's royalty payments; Iluka's officer explained to me that the minerals conveyed to Betty P. Graham, Julia P. Boyd, and Ann P. Everett by the 97 Deed would be mined from the ten parcels with simultaneous mining and that the minerals from those parcels would be comingled.

29. We allege that by letters served and sent to Iluka by certified mail in December of 2022 and in 2023 we demanded that Iluka disclose to us how many tons of each kind of mineral that it had extracted from the acres of land described in the 97 Deed and the location of each of those tons; and, those letters include, but are not limited to the ("EXHIBIT D").

30. We allege that by demanding that Iluka disclose to us how many tons of each kind of mineral that it has extracted from the acres of land described in the 97 Deed and the location of each of those tons that we thereby demanded that Iluka disclose to us how many tons of each kind of mineral that it has extracted from the ten parcels of land listed in the 97 Deed and the location of each of those tons.

31. We allege that by demanding that Iluka disclose to us how many tons of each kind of mineral that it has extracted from the acres of land described in the 97 Deed and the location of each of those tons and the per ton fair market value of each kind of mineral that was extracted from the acres of land described in the 97 Deed that we thereby demanded that Iluka disclose to us how many tons of each type of mineral that it has extracted from the ten parcels of land listed in the 97 Deed and the location of each of those tons and the per ton fair market value of each type of mineral that was extracted from the ten parcels of land listed in the 97 Deed.

32. In response to our demands for Iluka to disclose to us how many tons of each kind of mineral it has extracted from the acres of land described in the 97 Deed, the location of each of those tons, and the per ton fair market value of each kind of mineral extracted from the acres of land described in the 97 Deed, Iluka concealed all the

17

information that we demanded it disclose to us but delivered its royalty statement into California.

33. RGC wrote the royalty rate into the Leases at 8% and there were also land lease payments to be disbursed that RGC wrote into the Leases.

34. With Iluka concealing the number of tons of each kind of mineral that was extracted from the acres of land described in the 97 Deed, the location of each of those tons, and the per ton fair market value of each kind of mineral extracted from the acres of land described in the 97 Deed and the with the failure of consideration by Iluka with the representation of slightly over 2.5 million dollars of royalties delivered by Iluka into California, Laurence John Graham calculated that ore containing a sum total of 28.125 million short tons (2000 pounds per ton) of zircon mineral tons and titanium mineral tons was extracted from the ten parcels of land listed in the 97 Deed and that a sum total of 22.5 million saleable short tons of minerals were recovered from that ore including, and limited to, tons of saleable zircon and titanium minerals and he calculated the value of those 22.5 million short tons of saleable minerals at $67,275,000,000.00 (67.275 billion dollars).

35. We allege that Iluka's 02/12/2023 letter to Los Gatos, California, see "EXHIBIT E" at page 1, represented the royalties as over 2.5 million rather than the exact amount of royalties in an effort to obstruct rescission of the Leases and that such conduct tolled any statute of limitations that may apply to rescission although we allege that no statute of limitations applies to rescission because of Iluka's undue influence and ongoing tortious and duress causing treatment of us.

36. Iluka also concealed the dollar amount disbursed for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed in an effort to obstruct rescission of the Leases which also tolls any statute of limitations.

37. With Iluka concealing information to obstruct rescission of the Leases, Laurence John Graham calculated that the sum total amount in dollars disbursed to Betty's parents,

their three daughters, and their grandchildren for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed is less than 28.2 million dollars and now clarifies that less than 27 million dollars of royalties were disbursed for the minerals conveyed by the 97 deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that less than 1.2 million dollars of land lease payments were disbursed which adds up to less than 28.2 million dollars that has been disbursed; accordingly, less than 27 million dollars of consideration was disbursed for the 22.5 million short tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

38. Laurence John Graham also calculated that the value of a one-third share of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed is $22,425,000,000.00 (22.425 billion dollars).

39. Plaintiffs further allege that the number of allegations in this complaint exceeds the number of paragraphs in this complaint and that each of the allegations stands individually as legal basis for rescission of the Leases under California law.

40. We allege that within close proximity to but prior to October 13, 1989, DuPont drilled into the subsurface minerals located below the ten parcels of land listed in the 97 Deed and tested the quality of the minerals therefrom and knowingly made fraudulent and misleading representations to Betty's father regarding the number of tons of minerals located below the surface of the ten parcels of land listed in the 97 Deed.

41. We allege that DuPont directed Mr. Pirkle to make fraudulent and misleading representations about the quality and quantity of heavy minerals located below the ten parcels of land listed in the 97 Deed to Betty's parents.

42. In 2002 Laurence first spoke with Mr. Pirkle who was DuPont's head geologist for heavy minerals exploration in Virginia in 1989 and drilled down into the ten parcels of land listed in the 97 Deed with a team of several geologists for months in 1989 that

did minerology testing on the drill samples and other samples gathered by excavation although in 2002 he first told Laurence that DuPont drilled 300-500 drill holes in 1989, he then changed and said that the drilled fewer holes. Also when Laurence asked him if DuPont did any minerology work he first answered stating, "I don't think that we did any minerology work" but then conceded with, "we would have had to have done some minerology work". Because Mr. Pirkle was so nice and personable, Laurence thought that he was in a state of mental decline and could not rely on him. Betty's parents informed Laurence that DuPont's geologists spent several months on the ten parcels of land listed in the 97 Deed and that Frederick L. Prikle made representations to them about the quality and tons of heavy minerals located below the ten parcels of land listed in the 97 Deed which they relied upon when entering the Leases because DuPont's geologists had spent so much time on the ten parcels of land listed in the 97 Deed making reserve calculations. Also, because Frederick L. Pirkle was employed by DuPont, the succeeding entities of Dupont, Dow Chemical, Corteva, Inc., and Chemours have the liability for his conduct. Laurence first spoke with Frederick

43. We allege that DuPont had a long history of mining the heavy minerals in the US that it used in its titanium dioxide pigment production and was was wary of entering into leases to mine the ten parcels of land listed in the 97 Deed because of the size and high heavy mineral percentage of the reserves below them and concluded that concealing the fraud would require a mining company with operations in other countries to conceal the production by claiming that the production came from other mining operations in other countries and encouraged RGC to enter the leases to facilitate the underreported production price-fixing scheme that DuPont designed.

44. We further allege that DuPont was prosecuted by the Federal Trade Commission ("FTC") in 1979 for monopolistic conduct in the titanium dioxide pigment production industry.

45. We allege that E.I. Du Pont De Nemours and Company merged with The Dow Chemical Company ("Dow") to form DowDuPont.

20

46. We allege that Corteva, Inc. ("Corteva, Inc.") was formed by a spinoff from DowDuPont and is a Delaware corporation with its principal place of business in Indiana.

47. We allege that The Chemours Company is a Delaware Corporation with its principal place of business in Delaware.

48. We allege that Iluka Resources Inc. is a Delaware Corporation with its principal place of business in Virginia.

49. We allege that Dow Inc. ("Dow Chemical") was formed by a spinoff from DowDuPont and is a Delaware Corporation with its principal place of business in Michigan.

50. We allege that DowDuPont changed its name to DuPont de Nemours, Inc. "Dupont" after the Dow Chemical spinoff and that Dupont is a Delaware Corporation with its principal place of business in Delaware.

51. We allege that Occidental Petroleum Corporation "OXY" is a Delaware corporation with its principal place of business in Texas.

52. We allege that Huntsman Corporation is a Delaware corporation with its principal place of business in Texas.

53. We allege that J-M Manufacturing Company, Inc. "J-M" is a Delaware corporation with its principal place of business in Los Angeles, California.

54. We allege Kerr-McGee Corporation ("Kerr-McGee") spun off its titanium dioxide manufacturing business into Tronox, plc and then sold its remaining business to Anadarko Petroleum Corporation with the assumption of liabilities related to its business and we allege that Anadarko Petroleum Corporation was acquired by Occidental Petroleum Corporation ("OXY") with the assumption of liabilities related to its business.

55. We allege that the National Industrialization Company ("TANSEE") is a citizen of Saudi Arabia with its principal place of business in Saudi Arabia and that it obtained Millennium Inorganic Chemicals, Inc. and Millennium Chemicals, Inc. (collectively "Millennium") with the assumption of liabilities related to its business.

56. We allege that Tronox Holdings, plc maintains its executive offices located at 263 Tresser Blvd, #1100, Stamford, Connecticut. We allege that its principal place of business is in Stamford Connecticut by virtue of the "nerve center" test, see Hertz Corp. v. Friend, 559 U.S. 77 (2010). We allege that Tronox Holdings, plc is also known at Tronox Limited and Tronox plc and that it owns and controls multiple entities, one of which is Tronox, LLC and that they are all collectively and hereinafter referred to as ("Tronox"). The original entity of Tronox was formed by spinoff from Kerr-McGee Corporation and remained a closely related entity to Kerr-McGee Corporation after its spinoff. We allege that Tronox is at home in California based on the allegations made throughout this complaint. Furthermore, it is at home because it also sells other products in California, see EXHIBIT I at pages 16-19.

57. We allege that Tronox Limited maintains its executive offices located at 263 Tresser Blvd, #1100, Stamford, Connecticut. We allege that its principal place of business is in Stamford Connecticut by virtue of the "nerve center" test, see Hertz Corp. v. Friend, 559 U.S. 77 (2010); and, by information provided in a settlement agreement found at: https://www.ftc.gov/system/files/documents/cases/171_0085_tronox_cristal_do.pdf., which it agreed to.

58. We allege that Tronox and TANSEE are closely related entities by the Tronox-Tansee Settlement Agreement and that TANSEE owns more than 10% of Tronox and exerts significant control over Tronox and is a member of Tronox and that service of TASEE can be made c/o Tronox.

59. We allege that Sam Alexander was employed by DuPont for many years as an engineer involved with the processing of heavy minerals at DuPont's titanium dioxide

1    pigment plants and was hired by Kerr-McGee to do the same job at its titanium

2    dioxide pigment plants. Because Sam Alexander was employed by Kerr-MgGee and

3    Kerr-McGee was obtained by Oxy with the assumption of liabilities related to its

4    business, Oxy, TANSEE, Tronox and other defendants have liability for his conduct.

5    60. We allege that Ineos Group Limited acquired the Ashtabula, OH titanium dioxide

6    pigment plants, (with its subsidiaries, one of which is INEOS Joliet US Holdco, LLC

7    and a research facility in Glenn Burnie, MD by a settlement agreement found at:

8    https://www.ftc.gov/system/files/documents/cases/171_0085_tronox_cristal_do.pdf

9    ("Tronox-Tansee ") and the FTC entered an order found at:

10    https://www.ftc.gov/system/files/documents/cases/d09377_tronox_decision_and_orde

11    r.pdf and we request that the Court take judicial notice of the settlement agreement,

12    order, and the docket. INEOS Joliet US Holdco, LLC changed its name to INEOS

13    Enterprises US Holdco LLC, which comprised of The National Titanium Dioxide

14    Company's Cristal USA, Inc. plants in Ashtabula, Ohio and its administrative

15    research center in Glen Burnie, Maryland. Ineos Group Limited is a private limited

16    company organized under the laws of the United Kingdom with its principal place of

17    business in the UK. Following the acquisition, Ineos Enterprises changed the name

18    of Cristal USA Inc. to Ineos Pigments USA, Inc. INEOS Enterprises US Holdco

19    LLC, and Ineos Group Limited are collectively referred to as ("Ineos"). We allege

20    that both Tronox and Ineos were aware of TANSEE's participation in the

21    underreported production price-fixing scheme prior said settlement agreement and

22    provided substantial assistance to TANSEE to conceal it while carrying out the terms

23    of said settlement agreement which is ongoing. We further allege that Ineos has been

24    aware of the minerals located below the ten parcels of land listed in the 97 Deed

25    before it acquired Cristal USA, Inc. and that Sam Alexander was also employed by

26    Cristal USA, Inc. and that Ineos was also aware of the minerals located below the ten

27    parcels of land listed in the 97 Deed from Cristal USA, Inc.'s employees that became

28    Ineos employees.

23

61. We allege that Iluka Resources Limited ("Iluka AUS") is an Australian public company and has is principal place of business in Australia and that it is the owner of Iluka, and conducts business in Los Angeles County California and is at home in California, see attached bills of lading ("Exhibit I") at pages 1-15. We also allege that Iluka AUS owns Iluka Resources (TN) LLC ("TN") which is a business authorized to conduct business in California which is another reason that it is at home in California. We allege that service of process can be effected upon Iluka and Iluka AUS c/o TN by serving TN's registered agent in Los Angeles. We further allege that neither RGC (USA) Minerals Inc. nor Iluka Resources Limited nor Iluka notified Betty of the 1998 merger that formed Iluka Resources, Inc. and have been concealing the particulars of that merger and the sequence of successor to obstruct rescission which tolls any statute of limitations; however, Iluka claims to be successor.

62. We allege that Precision Castparts Corp. is an Oregon corporation with its principal place of business in Oregon and the owner of Titanium Metals Corporation, a Delaware Corporation which maintains its principal place of business in Oregon by virtue of the "nerve center" test, see Hertz Corp. v. Friend, 559 U.S. 77 (2010).

63. We allege that Berkshire Hathaway Inc. ("BH") is a Delaware Corporation with its principal place of business in Omaha Nebraska. We allege that BH acquired Precision Castparts Corp. with the assumption of liabilities related to its business; therefore, BH owns Precision Castparts Corp. and Titanium Metals Corporation and owns all of the liability to us that they have and are insolvent for. Although we have great respect and admiration for the charitable contributions that the chairman of its board of directors has made to various charitable causes, they have a large amount of liability to us and we expect that they will embrace our PFAS settlement fund because it will be a charitable gift by us to compensate cancer victims who are in need and deserve justice; and, BH will pay whatever portion of the 125 billion dollars plus jury award that it has to pay to us although we would rather settle with BH and have it become an advocate for the PFAS settlement fund while we render Dupont, Dow Chemical, Corteva, Inc., Chemours, and certain of the other defendants insolvent for the liability

24

that they have to us.  Because BH owns Precision Castparts Corp. and Titanium Metals Corporation, which have purposefully availed themselves of the jurisdiction of the California Superior Court, BH has also availed itself of said jurisdiction. Furthermore, BH is also at home in California because it owns numerous businesses in California and has numerous employees in California in addition to the employees of Precision Castparts Corp. and Titanium Metals Corporation located in California who are witnesses.

64. We allege that Bank of America Corporation ("BOA") is a Delaware Corporation with its principal place of business in Charlotte North Carolina and that it has been named as a defendant for purposes of discovery and because of Mr. Holliday's actions as director and chairman of BOA's board of directors "BOA-Chairman" including, but not limited to, his causing the transfer of Betty's IRA account to New Jersey without her consent in an attempt to create contacts for jurisdictional arguments for transfer of prospective actions to recover damages for rescission based on a failure of consideration for the minerals extracted from the ten parcels of land listed in the 97 Deed.  Regardless of whether any of the defendants use those fraudulently created contacts in any motion to transfer or attempt to use the contacts as basis for dispositive motions or arguments, any motion for transfer to another forum by the defendants is basis for liability against BOA because BOA is conspiring to aid and abet motions for transfer to influence litigation and obstruct this action for relief under Cal. Civil Code Sec. 1692.  Furthermore, BOA continues to conspire with the other defendants in an attempt to fraudulently create jurisdictional contacts to be used as bases for arguments for transfer of venue and BOA has thereby purposefully availed itself of the jurisdiction of this Court because such conduct is directed at us in California.  Furthermore, BOA is at home in California with offices and bank branches in Alameda County and elsewhere in California.

65. We allege that the ten October 13, 1989 Deeds of Mining Lease identified hereinabove, involving the ten parcels of land listed in the 97 Deed, are intertwined; therefore, they are one contract.

25

66. We allege that the ten October 13, 1989 Deeds of Mining Lease identified hereinabove are intertwined; therefore, they are one contract and we allege that performance is not divisible.

67. We allege that the ten October 13, 1989 Deeds of Mining Lease identified hereinabove are intertwined; therefore, they are one contract and we allege that the royalty payments are not divisible.

68. We allege that we demanded that Iluka disclose to us how many tons of each kind of mineral that it has extracted from the ten parcels of land listed in the 97 Deed, the location of each of those tons, and the per ton fair market value of each kind of mineral that it has extracted from the ten parcels of land listed in the 97 Deed and that Iluka is concealing all of this information from us.

69. We allege that Reed Mayo, Esq., as attorney for Iluka, sent several letters containing Iluka's representation of royalties due under the Leases into California, see attached (2/12/2023, 4/12/2023, and 4/26/2023 letters ("Exhibit E")), which notified of slightly over 2.5 million dollars of royalties thereby subjecting Iluka to California law for rescission of the Leases. We further allege that he was employed by Hunton & Williams and Hunton & Williams LLP as an associate and later became owner of The Reed Mayo Law Firm and that his benefit in terms of fees from Iluka was a small compared to the companies that received the saleable minerals and the titanium dioxide pigment and KM the other co-conspirators captured most of the ill-gotten gains. DuPont knew about the 02-26 contested deed litigation in Sussex County Virginia and that it was part of the furtherance of a scheme as did Kerr-McGee. H&W, Hunton, HAK, and RMLF made some legal fees but they are small in comparison to the ill-gotten gains obtained by the defendants that received the saleable minerals or titanium dioxide pigment made with the saleable minerals or made money storing the minerals and products containing them as KM did.

70. We allege that the slightly over 2.5 million dollars of royalties reported by Iluka into California was a final royalty calculation.

26

71. We allege that Iluka was the extractor of the ore from the ten parcels of land listed in the 97 Deed from which the sum total of 22.5 million saleable short tons of zircon and titanium minerals were recovered.

72. We allege that less than 27 million dollars of royalties was disbursed for the 22.5 million short tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed which is severely insufficient consideration and therefore is a failure of consideration to us by Iluka.

73. We allege that the land lease payments were consideration for the right to have priority use over the surface of the land in preparation for extracting minerals and priority use while extracting minerals; therefore, payment of land lease payments was not consideration for the saleable minerals recovered from the ore that was extracted from the ten parcels of land 97 Deed; however, we had included the land lease payments with 27 million dollars of royalties into our offers to restore Iluka with 28.2 million dollars because Iluka's failure of consideration for the minerals conveyed by the 97 Deed and later recovered as 22.5 million short tons of saleable minerals from the ten parcels of land listed in the 97 Deed is so severe, that 28.2 million dollars is not fair and equitable consideration for said saleable minerals either; therefore, returning money to Iluka is not applicable. Iluka is also concealing the amount of royalties disbursed for the saleable minerals recovered from the ore extracted from ten parcels of land listed in the 97 Deed to obstruct rescission which tolls any statute of limitations for the relief sought under Cal. Civil Code Sec. 1692 and bars any defenses to the relief sought under Cal. Civil Code Sec. 1692 and we allege that a jury must determine any such defenses.

74. We allege that we relied on the production information that Iluka reported to the Virginia Department of Mines Minerals and Energy ("DMME").

75. We allege that Iluka breached a fiduciary duty by not delivering fair and equitable consideration to us for a share of 22.5 million short tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97

27

Deed. *The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. (Knox v. Dean (2012) 205 Cal.App.4th 417, 432–433 [140 Cal.Rptr.3d 569].) No fraudulent intent is required. (See Civ. Code, § 1573 (defining "constructive fraud").) ("""Whether a fiduciary duty exists is generally a question of law. "[E]xamples of relationships that impose a fiduciary obligation to act on behalf of and for the benefit of another are 'a joint venture, a partnership, or an agency.' But, '[t]hose categories are merely illustrative of fiduciary relationships in which fiduciary duties are imposed by law.' " (Cleveland, supra, 209 Cal.App.4th at p. 1339, internal citation omitted.) Whether the defendant breached that duty towards the plaintiff is a question of fact." (Marzec v. Cal. Public Employees' Retirement System (2015) 236 Cal.App.4th 889, 915 [187Cal.Rptr.3d 452], internal citation omitted.)""").* Under California state law, because of the complexity of the transaction, the Leases necessarily imply a fiduciary duty. RGC was expert in the mineral sands mining business and the unsophisticated party, Betty's Parents, were not expert in the mineral sands mining business and had no way to discover the fraud. The maintaining and operation of a stock account by RGC as provided by the Leases also necessarily implies a fiduciary duty. We further allege that this breach of a fiduciary duty is basis for rescission of the Leases and the relief that we seek under Cal Civil Code Section 1692.

76. We allege that Iluka claims that the Leases have not been rescinded and continues to actively conceal the failure of consideration for the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that it has been concealing said failure of consideration from us in California which is fraud by concealment, CACI No. 1901, which tolls any statute of limitations and is basis for rescinding the Leases and recovery of the 22.3968 billion dollar value of the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deeds and punitive damages.

28

77. We also allege that DuPont, Dow, Chemours, Dupont, and Dow Chemical aided and abetted Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed by knowingly receiving tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka was underreporting the number of tons of saleable minerals recovered from the ten parcels of land listed in the 97 Deed and the entire Old Hickory Heavy Mineral Reserve to the DMME, while knowing that this underreported production price-fixing scheme designed by DuPont would cause Iluka to not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and by giving encouragement and substantial assistance to Iluka in its breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and we allege that financial gain motivated DuPont, Dow, Chemours, Dupont, and Dow Chemical to aid and abet Iluka in its breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that each entity benefited financially from aiding and abetting Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that each entitie's contribution caused us substantial harm. The substantial assistance that DuPont provided Iluka includes, but is not limited to, DuPont knowingly receiving many more tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed than the number of tons of saleable minerals that Iluka reported producing from the entire Old Hickory Heavy Mineral Reserve to the DMME and concealing the receipt of these tons from the DMME and its other US regulators including, but not limited to the Environmental Protection Agency ("EPA"), as part of the underreported production price-fixing scheme after DuPont encouraged and designed said underreported

29

1    production price-fixing scheme to obtain saleable minerals recovered from the ore

2    that was extracted from the ten parcels of land listed in the 97 Deed by false

3    pretenses, as the architect of it, and DuPont converted said tons of saleable minerals

4    recovered from the ore that was extracted from the ten parcels of land listed in the 97

5    Deed into titanium dioxide pigment some of which DuPont sold as titanium dioxide

6    pigment and some of which DuPont sold in products containing titanium dioxide

7    pigment while DuPont underreported the production of titanium dioxide pigment to

8    its regulators including, but not limited to, the EPA and we allege that this

9    underreported production of titanium dioxide pigment was part of the underreported

10   production price-fixing scheme for saleable minerals recovered from the ten parcels

11   of land listed in the 97 Deed and also thwarted competition and that both financial

12   gain and the exclusion and elimination of competition motivated DuPont's conduct.

13   We allege that DuPont did a spinoff of its titanium dioxide pigment manufacturing

14   business into Chemours in an effort to conceal this conduct and after said spinoff

15   continued to receive large quantities of titanium dioxide pigment and titanium dioxide

16   pigment containing products from Chemours while encouraging Chemours to

17   underreport production of titanium dioxide pigment to its regulators including, but not

18   limited to, the EPA to conceal Iluka's failure of consideration to us for the saleable

19   minerals while knowing that said titanium dioxide pigment and titanium dioxide

20   pigment containing products were made with saleable minerals recovered from the

21   ore that was extracted from the ten parcels of land listed in the 97 Deed while

22   knowing that Iluka was underreporting the tons of saleable minerals recovered from

23   the ore that was extracted from the ten parcels of land listed in the 97 Deed and the

24   entire Old Hickory Heavy Mineral Reserve to the DMME as part of the underreported

25   production price-fixing scheme that it designed and while knowing that Iluka would

26   not deliver fair and equitable consideration to us for the tons of saleable minerals

27   recovered from the ore that was extracted from the ten parcels of land listed in the 97

28   Deed. We allege that Chemours knew about the massive reserves listed below the ten

     parcels of land listed in the 97 Deed because it was a formed by a spinoff of DuPont's

     titanium dioxide pigment manufacturing business and that officers and other

                                        30

1    employees from DuPont became Chemours officers and employees and knew that the

2    spinoff was done to conceal the underreported production price-fixing scheme for the

3    saleable minerals recovered from the ore that was extracted from the ten parcels of

4    land listed in the 97 Deed. We further allege that DuPont disguised and concealed

5    payment to Chemours for said titanium dioxide pigment to aid and abet Iluka's failure

6    of consideration to us for the salable minerals used to make it; and, we allege that

7    Dow was the largest purchaser of titanium dioxide pigment from DuPont and

8    Chemours and knew that DuPont and Chemours were underreporting production of

9    titanium dioxide pigment to the EPA and other regulators that regulated their

10   titanium dioxide pigment plants and receiving the tons of saleable minerals to make

11   said titanium dioxide pigment from the Old Hickory Heavy Mineral Reserve and that

12   Iluka was underreporting the production of saleable minerals from the Old Hickory

13   Heavy Mineral Reserve to the DMME and that Iluka would breach its fiduciary duty

14   to pay fair and equitable consideration for said saleable minerals; and, we allege that

15   Dow provided substantial assistance to Iluka by receiving millions of tons of titanium

16   dioxide pigment and products containing titanium dioxide pigment from DuPont and

17   Chemours that they did not report producing while concealing receipt of those tons

18   and the tons of products it sold containing said tons of titanium dioxide pigment from

19   its regulators including but not limited to the IRS to aid and abet Iluka's failure of

20   consideration to us for said saleable minerals and benefit financially and that it did

21   benefit financially and that its conduct caused us substantial harm. By knowingly

22   concealing the number of tons of said titanium dioxide pigment and products

23   containing titanium dioxide pigment that it received from DuPont and Chemours,

24   Dow knowingly participated in the concealment of the number of tons of saleable

25   minerals recovered from the ore that was extracted from the ten parcels of land listed

26   in the 97 Deed and Dow engaged in accounting practices to disguise and conceal

27   payment to DuPont and Chemours for titanium dioxide pigment and titanium dioxide

28   pigment containing products in the furtherance of this underreported production

     price-fixing scheme, and we allege that Dow benefited financially by receiving said

     tons of titanium dioxide pigment and titanium dioxide pigment containing products at

     31

extremely low prices and later merged with DuPont thereby forming DowDuPont to conceal the underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and we allege that DowDuPont aided and abetted Iluka in its breach of a fiduciary duty to deliver fair and equitable consideration to us for the 22.5 million short tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed by conduct that includes, but is not limited to, providing substantial assistance to Chemours by receiving more tons of titanium dioxide pigment and products containing titanium dioxide pigment from Chemours than Chemours was reporting that it produced to its regulators including, but not limited to, the EPA while receiving said tons of titanium dioxide pigment from Chemours at below market prices while knowing that Chemours was making those tons of titanium dioxide pigment with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, while knowing that Iluka was underreporting the number of tons of saleable minerals that it was recovering from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the entire Old Hickory Heavy Mineral Reserve to the DMME while knowing that this conduct was part of a price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, and while knowing that Iluka would not deliver fair and equitable consideration to us for the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, and we allege that the payment from DuPont and Chemours to Iluka for the tons of said saleable minerals that they received was a small percentage of the fair market value of said tons of saleable minerals and that they obtained them by false pretenses and that it was their intention to cause loss and damage to us by said underreported production price-fixing scheme and that they knowingly and maliciously caused us loss and harm and we allege that the succeeding entities of Dupont, Dow Chemical, and Corteva, Inc. each have liability to us for it.

32

78. We also allege that the officers in the seed and crop protection businesses within
DuPont and Dow were aware of the underreported production price-fixing scheme
alleged herein and participated in it and that revenues from the titanium dioxide
pigment manufacturing business, PVC plastics business, and other products that used
large amounts of titanium dioxide pigment were being disguised and concealed
within the seed and crop protection business segments and other business segments
within DuPont and Dow and that the development and growth of the seed and crop
protection businesses was funded with ill-gotten profits from the underreported
production price-fixing scheme and DowDuPont did a spinoff of the seed and crop
protection businesses into Corteva, Inc. to conceal this conduct. We further allege
that Corteva, Inc.'s officers are aware of the accounting fraud of ill-gotten profits
concealed within the prior seed and crop protection businesses of DuPont, Dow, and
DowDuPont to assist Iluka's failure of consideration to us for the saleable minerals
and that after the spinoff Corteva, Inc. has engaged in fraudulent transactions to
conceal the fraudulent accounting, ill-gotten revenue and equity preserved within it to
provide substantial assistance to Iluka to conceal its breach of a fiduciary duty to
deliver fair and equitable consideration to us for the saleable minerals and continues
to reinvest the fraudulently obtained profits concealed within it from the
underreported production price-fixing scheme for saleable minerals recovered from
the ore that was extracted from the ten parcels of land listed in the 97 Deed. We
further allege that DuPont's operational consulting and training businesses were part
of the ongoing underreported production price-fixing scheme and that DuPont
encouraged large titanium dioxide pigment purchasers to participate in fraudulent
transactions for these operational consulting and training services and that DuPont
delivered significant quantities of titanium dioxide pigment and products containing
titanium dioxide pigment to these large customers and received consideration for it
booked as the sale of operational consulting and training services. The customers that
engaged in these accounting practices, or knew about them, knew that DuPont was
underreporting the production of titanium dioxide pigment. We·also allege that, in
addition to the outright sale of titanium dioxide pigment produced with saleable

minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, many of the products sold by DuPont, Chemours, and Dow contained large amounts of titanium dioxide pigment including, but not limited to, paint and coatings and that the titanium dioxide pigment in these products was produced with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed. DuPont sold several products that were essentially batches containing large weight-percentages of titanium dioxide pigment that customers needing titanium dioxide pigment could have mixed internally in their manufacturing processes and such products were utilized by DuPont to disguise the sale of titanium dioxide pigment produced with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

79. We also allege that the conduct complained of in this complaint is also common law conversion however, we only choose the bases for rescission and remedies available for a jury trial about the proportional liability of each defendant for the 22.425 billion dollar value of the one-third share of the saleable miners recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the punitive damages due from each defendant under California law which include a jury trial for a bare money judgement for the value of the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the punitive damages in this action for relief under Cal. Civil Code Sec. 1692 based on rescission as determined by a jury and each of the Defendants has liability to us in the jury trial for rescission due to their participation in the underreported production price-fixing scheme which caused Iluka's failure of consideration to us for the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

80. We allege that Kerr-McGee Corporation knowingly received tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed

in the 97 Deed while engaging in price-fixing with Iluka to obtain said saleable minerals at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the entire Old Hickory Heavy Mineral Reserve to the DMME while knowing that Iluka would not deliver fair and equitable consideration to us for the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while it underreported production of titanium dioxide pigment to the DMME.

81. We allege that Dupont and its officers, and directors are actively participating in an ongoing fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

82. We allege that Dow Chemical and is actively participating in an ongoing fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

83. We allege that Chemours is actively participating in a fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

84. We allege that Corveta, Inc. is actively participating in a fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

85. We allege that Iluka is actively participating in a fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

86. We allege that Dupont, Dow Chemical, Corteva, Inc., and Chemours are collectively the largest financial beneficiary of Iluka's failure of consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and continue to actively conceal the underreported production price-fixing scheme that deprived Betty P. Graham and her family of fair and equitable consideration for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

87. We allege that Tronox knowingly engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed to the DMME, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while it underreported production of titanium dioxide pigment produced with said saleable minerals at its Savanna, GA and Hamilton, MS titanium dioxide plants to its regulators including, but not limited to, the EPA as it used said saleable minerals to produce titanium dioxide pigment at its Hamilton, MS and Savanna GA titanium dioxide plants; and, we allege that Tronox sold some of said titanium dioxide pigment in Los Angeles County California, Los Angeles County California, and elsewhere in California while concealing the volume of these sales.  We allege that the tons of the saleable minerals obtained by Tronox that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed were obtained by false pretenses. We allege that Tronox provided substantial encouragement to Iluka to

breach its fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals and that it provided substantial assistance to Iluka by underreporting its production of titanium dioxide pigment to said regulators and that it benefited financially by obtaining said tons of saleable minerals at below fair and equitable prices. We allege that the tons of the saleable minerals obtained by Tronox that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed were obtained by false pretenses.

88.

89. We allege that Millennium Inorganic Chemicals, Inc., and Millennium Chemicals, Inc. collectively ("Millennium") knowingly engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from said parcels to the DMME as part of the underreported production price-fixing scheme while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while it underreported its Baltimore Maryland and Ashtabula Ohio titanium dioxide plants' production to its regulators including, but not limited to the states of Maryland, Ohio, and the EPA to aid and abet Iluka's failure of consideration to us for said saleable minerals and that this conduct caused us substantial harm; and, we allege that Millennium sold some of said titanium dioxide pigment in California while concealing the quantity of these sales to aid and abet Iluka's failure of consideration to us for said saleable minerals. We allege that Millennium provided substantial encouragement to Iluka to breach its fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals and that it provided substantial assistance to Iluka by underreporting its production of titanium dioxide pigment to said regulators and that it benefited financially by obtaining said tons of saleable minerals at below fair and equitable prices. We allege that the tons of the saleable minerals obtained by Millennium that

were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed were obtained by false pretenses.

90. We allege that the National Industrialization Company ("TANSEE") provided substantial encouragement to Iluka to breach its fiduciary duty to deliver fair and equitable encouragement to us for the one-third share of the saleable minerals recovered from the ten parcels of land listed in the 97 Deed and engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from said parcels to the DMME as part of the underreported production price-fixing scheme while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore extracted from the ten parcels of land listed in the 97 Deed and provided substantial support to Iluka by underreporting its production of titanium dioxide pigment to its regulators including but not limited to the EPA to aid and abet Iluka in its failure of consideration to us for said saleable minerals and that TANSEE profited from this conduct that caused us substantial harm; and, we allege that TANSEE sold some of said titanium dioxide pigment in California while concealing the quantity of these sales. We further allege that TANSEE knew about us and the minerals located below the ten parcels of land listed in the 97 Deed because Sam Alexander was employed by TANSEE. We further allege that TANSEE obtained said saleable minerals by false pretenses.

91. We allege that the National Titanium Dioxide Company Ltd. provided substantial encouragement to Iluka to breach its fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals extracted from the ore that was recovered from the ten parcels of land listed in 97 Deed and engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from

38

the ore that was extracted from said parcels to the DMME as part of the underreported production price-fixing scheme while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while it underreported its production of titanium dioxide pigment to its regulators including, but not limited to the EPA to aid and abet Iluka's failure of consideration to us for said saleable minerals and that it did all of these bad acts for profit and profited substantially from engaging in this conduct that was directed at us wherever and whenever the failure of consideration occurred and it occurred in California and this conduct caused us substantial harm; and, we allege the National Titanium Dioxide Company Ltd sold titanium dioxide pigment containing some of said titanium dioxide pigment California while concealing the quantity of those sales to aid and abet Iluka's failure of consideration to us for said one-third share of the saleable minerals. We allege that National Titanium Dioxide Company Ltd. knew about us and the minerals located below the ten parcels of land listed in the 97 Deed because Sam Alexander was employed by TANSEE, National Titanium Dioxide Company, Ltd., and the North American business of the National Titanium Dioxide Company Ltd. ("Cristal"). We further allege that Cristal obtained said saleable minerals by false pretenses.

92. We allege that Cristal was acquired by Ineos and that Tronox was involved in facilitating the transaction while both Ineos and Tronox knew that TANSEE, National Titanium Dioxide Company, Ltd., and Cristal provided substantial encouragement to Iluka to breach its fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals and provided substantial assistance to Iluka by underreporting its production of titanium dioxide pigment at its Ashtabula, OH titanium dioxide pigment plants knowingly received tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka was underreporting production to the DMME, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from

39

the ore that was extracted from the ten parcels of land listed in the 97 Deed while it underreported production of titanium dioxide pigment to its regulators including, but not limited to, the EPA; and, we allege that Cristal sold some of said titanium dioxide pigment in Los Angeles California while concealing the quantity of these sales to aid and abet Iluka's breach of fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals and benefited financially from such conduct that caused us substantial harm.

93. We allege that Ineos engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from said parcels to the DMME, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while Ineos provided substantial encouragement to Iluka to breach its fiduciary duty to us and provided substantial assistance to Iluka in its failure of consideration to us by underreporting production of titanium dioxide pigment at its Ashtabula, OH titanium dioxide plant to its regulators including, but not limited to the state of Ohio and the EPA; and, that it sold some of said titanium dioxide pigment in California while concealing the quantity of these sales to aid and abet Iluka's breach of fiduciary duty to us and benefited financially by doing so, purposefully availed itself of California jurisdiction by doing so and caused us substantial harm by doing so. We allege that the Ineos obtained said tons of saleable minerals by false pretenses and that Ineos was aware of us and the minerals located below the ten parcels of land listed in the 97 Deed because the employees of Cristal were informed by Sam Alexander.

94. We allege Kronos Worldwide, Inc. ("Kronos Worldwide") is a Delaware corporation with its principal place of business in Texas and that it drilled into the subsurface minerals located below the ten parcels of land listed in the 97 Deed and tested the

40

quality of the minerals therefrom because Betty's parents told us so and because a geologist that drilled and tested said parcels in 1989 told Laurence did not directly talk to any geologists that were employed by Kronos to confirm so. We further allege that Kronos Worldwide had the expertise to build the Lake Charles Louisiana titanium dioxide pigment plant and built it with the intention of acquiring saleable minerals recovered from the ten parcels of land listed in the 97 Deed by false pretenses. We allege that Huntsman Corporation ("Huntsman") and Kronos Worldwide owned the Lake Charles Louisiana titanium dioxide pigment plant and partnered in a joint venture named Louisiana Pigment Company, L.P. ("LPC") to operate the Lake Charles Louisiana titanium dioxide pigment plant. We allege that Kronos World Wide and Huntsman provided substantial encouragement to Iluka by encouraging it to underreport the production of saleable minerals extracted from the ten parcels of land listed in the 97 Deed and breach its fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals and informed Iluka that it would help conceal said underreported production by, among other things, underreporting titanium dioxide pigment production of the LPC titanium dioxide pigment plant to the EPA and state regulators. We allege that Kronos and Huntsman knowingly engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from said parcels to the DMME, as part of the underreported production price-fixing scheme and they benefited financially by doing so and caused us harm by doing so because they knew that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore extracted from the ten parcels of land listed in the 97 Deed and we allege that they purposefully availed themselves of California jurisdiction by aiding and abetting the failure of consideration wherever and whenever it occurred and it occurred in California. We further allege that Kronos and Huntsman sold some of said titanium dioxide pigment in California, while concealing the volume of said sales to aid and abet Iluka's failure of consideration to us. We

41

further allege that Huntsman knowingly used some of said titanium dioxide pigment in Los Angeles California to make other products that contained some of said titanium dioxide pigment and sold products in Los Angeles California that contained some of said titanium dioxide pigment, while concealing the volume of said sales to help conceal Iluka's failure of consideration to us; and, we allege that Huntsman spun off its titanium dioxide manufacturing business and its share of Louisiana Pigment into Venator Materials plc which owns and controls several entities and subsidiaries including Venator Materials LLC. Venator Materials plc and Venator Materials LLC are collectively ("Venator") and that after said spinoff Huntsman knowingly purchased and used titanium dioxide pigment from produced from saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed to make other products in California while knowing that LPC and Venator Materials plc, and Kronos Worldwide were underreporting their Lake Charles Louisiana titanium dioxide pigment plant's production to their regulators including, but not limited to, the state of Louisiana and the EPA, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore extracted from the ten parcels of land listed in the 97 Deed to aid and abet Iluka's failure of consideration to us wherever and whenever it occurred and it occurred in California; therefore, they purposefully availed themselves of California jurisdiction; and, we allege that Venator sold some of said titanium dioxide pigment in California while concealing the volume of these sales to aid and abet Iluka's failure of consideration to us. We allege that Venator and Kronos obtained said saleable minerals by false pretenses.

95. We allege that Venator Materials plc is an entity organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom.

96. Venator Materials, LLC is a limited liability company organized in Delaware and a citizen of Delaware.

97. We allege that OXY is a large producer of PVC plastics and participated in the underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed; and, we allege that OXY sold products containing some of said saleable minerals in California and concealed the quantity of such sales to aid and abet Iluka's failure of consideration to us for said third-share of the saleable minerals wherever and whenever it occurred which is purposeful availment of jurisdiction in California because the failure of consideration occurred in California. We further allege that Oxy was aware of the minerals located below the ten parcels of land listed in the 97 Deed, the conveyance of the one-third share of said minerals by the 97 Deed and that Iluka was involved in the 02-26 contested deed litigation prior to the settling of such litigation because Laurence talked with Sam Alexander several times in 2002 and that Sam Alexander and another person that were formerly employed by DuPont where hired by Kerr-McGee to help Kerr-McGee obtain the salable minerals extracted from the ten parcels of land listed in the 97 Deed by false pretenses and that Sam Alexander was in close contact with DuPont during such time in 2002 about the minerals located below the ten parcels of land listed in the 97 Deed and the 02-26 contested deed litigation and that Kerr-McGee suddenly changed from a firm that was interested in entering leases to mine the minerals located below the ten parcels of land listed in the 97 Deed to an entity that was not interested and informed Laurence thereof by Sam Alexander informing Laurence that he was concerned about, getting his "head blown off by one of these big Australian mining companies." We further allege that Sam Alexander was encouraged by DuPont and Iluka to make that veiled threat to Laurence and that it is evidence of providing substantial assistance to Iluka and the other conspirators participating in the underreported production price-fixing scheme to cause undue influence, duress, and aid and abet the failure of consideration to us for the one-third share of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed

43

1    in the 97 Deed to obtain said saleable minerals by false pretenses. We further allege

2    that Kerr-McGee provided substantial assistance to Iluka to breach its fiduciary duty

3    to deliver fair and equitable consideration to us for said one-third share of the saleable

4    minerals by underreporting the production of titanium dioxide pigment at its

5    Hamilton Mississippi titanium dioxide plant and Savanna Georgia titanium dioxide

6    plant to its regulators including, but not limited to, the EPA and obtained said tons of

7    saleable minerals by false pretenses. We further allege that OXY concealed the

8    volume of sales of PVC and other products containing titanium dioxide pigment made

9    with our saleable minerals to aid and abet Iluka's breach of fiduciary duties to deliver

10    fair and equitable consideration to us for said saleable minerals and that some of such

11    conduct occurred in California which is purposeful availment of California

     jurisdiction and caused us substantial harm.

12    98. We allege that Precision Castparts Corp. is a Delaware corporation with its principal

13    place of business in Oregon and that it acquired Titanium Metals Corporation with

14    the assumption of liabilities related to its business.  Precision Castparts Corp. and

15    Titanium Metals Corporation are collectively referred to as ("TIMET-PCP"). TIMET-

16    PCP provided substantial encouragement and assistance to Iluka by knowingly

17    engaging in price-fixing to obtain tons of saleable minerals that were recovered from

18    the ore that was extracted from the ten parcels of land listed in the 97 Deed at below

19    fair and equitable prices while knowing that Iluka was underreporting the tons of

20    saleable minerals recovered from the ore that was extracted from said parcels and the

21    entire Old Hickory Heavy Mineral Reserve to the DMME, as part of the

22    underreported production price-fixing scheme that it knew DuPont designed and that

23    it knew the titanium dioxide pigment producers where engaging in while knowing

24    that Iluka would not deliver fair and equitable consideration to us for the saleable

25    minerals recovered from the ore that was extracted from the ten parcels of land listed

26    in the 97 Deed and we allege that TIMET-PCP provided substantial encouragement to

27    Iluka to engage in the underreported production price fixing scheme and provides

28    substantial support to Iluka by concealing the fact that it was engaging in price-fixing

     and by concealing its use of saleable minerals in California that were recovered from

44

the ore that was extracted from the ten parcels of land listed in the 97 Deed and we allege that TIMET-PCP caused us substantial harm by participating in the underreported production price-fixing scheme and sold products containing some of said saleable minerals in California.  We allege that TIMET-PCP produced titanium sponge in Vallejo California with the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed continuously from the commencement of mining continuously through 2020 and likely produced some during the period of 2021-224 that it is concealing to obstruct evidence that further supports the jurisdictional bases for venue in the California Superior Court in an attempt to aid and abet Iluka's breach of fiduciary duties to us. We allege that TIMET-PCP obtained tons of saleable minerals recovered from the ten parcels of land listed in the 97 Deed in California and elsewhere from Iluka by false pretenses.

99. We allege that Kinder Morgan, Inc. ("KM") is a Delaware Corporation with its principal place of business in Houston Texas has been the operator of warehouses and property used to store the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and provided substantial encouragement and assistance to Iluka while knowingly participating in the underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed; and that KM stored some of said saleable minerals and products containing some of said saleable minerals in Los Angeles California and that KM may still have some of the saleable minerals stored in Los Angeles California and elsewhere in California. We allege that before any minerals were ever extracted from the ten parcels of land listed in the 97 Deed, KM was involved in the advance planning of the underreported production price-fixing scheme by acquiring warehouses and property to store said saleable minerals and provided substantial encouragement and assistance to Iluka to proceed with the underreported production price-fixing scheme. KM profited substantially from the underreported production

45

price-fixing scheme and because the amount of production was not reported, KM did not pay taxes on the profits that it made and concealed this information from regulators to further aid and abet Iluka and the other defendants that had minerals shipped to their plants and KM knew that its profits and the profits of the other defendants were ill-gotten and that Iluka would not deliver fair and equitable consideration to us for said minerals. KM provided substantial assistance to conceal the stockpiling of minerals that Iluka could not do in Virginia for fear of exposing underreported production price-fixing scheme. We allege that KM aided and abetted the defendants that received said saleable minerals by false pretenses and Iluka's failure of consideration to us and benefited financially for said conduct which caused us harm. Furthermore, some of said conduct occurred in California; therefore, KM purposefully availed itself of the jurisdiction of the California Superior Courts.

100.    We allege that DuPont was the architect of the underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and knowingly engaged in price-fixing to obtain tons of said saleable minerals at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from said parcels to the DMME, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while DuPont underreported its De Lisle Mississippi, Edge More Delaware, New Johnsonville Tennessee, and Altamira Mexico plants' production of titanium dioxide pigment to its regulators including, but not limited to, their state regulators and the EPA as it used said saleable minerals to produce titanium dioxide pigment at its at its De Lisle Mississippi, Edge More Delaware, Altamira Mexico, and New Johnsonville Tennessee plants; but, the EPA does not have oversight of the Altmaira Mexico plant and we do not allege that it reported anything to the EPA about the Altmaira Mexico plant **although it it's production of titanium dioxide pigment was continuously supplied with our saleable minerals**; and, we allege that DuPont sold some of said

46

titanium dioxide pigment and other products containing some of said titanium dioxide pigment in California while concealing the volume of and revenue from those sales to aid and abet Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals whenever and wherever it occurred and it occurred in California and we allege that DuPont obtained said saleable minerals by false pretenses.

101.    We allege that Chemours knowingly engaged in price-fixing to obtain tons of said saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore extracted from said parcels to the DMME, as part of the underreported production price-fixing scheme while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while Chemours underreported its De Lisle Mississippi, Edge More Delaware, Altamira Mexico, and New Johnsonville Tennessee plants' production of titanium dioxide pigment to its regulators including, but not limited to, its state regulators and the EPA, but the EPA does not have oversight of the Altmaira Mexico plant and we do not allege that it reported anything to the EPA about the Altmaira Mexico pant **although it's production of titanium dioxide pigment was continuously supplied with our saleable minerals**; and, we allege that its underreported production to regulators was done to aid and abet Iluka's failure of consideration to us wherever and whenever it occurred and it occurred in California while it used said saleable minerals to produce titanium dioxide pigment at its at its De Lisle Mississippi, Edge More Delaware, Altamira Mexico, and New Johnsonville Tennessee plants; and, we allege that Chemours sold some of said titanium dioxide pigment and other products containing some of said titanium dioxide pigment in Los California while concealing the volume of and revenue from these sales to aid and abet Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals all of which conduct caused us substantial harm. We allege that Chemours obtained said saleable minerals by false

47

pretenses. We allege that Dupont, Dow Chemical, Chemours, Corveta, Inc., OXY, Huntsman, KM, Kronos Worldwide, Venator, HAK, TIMET-PCP, Ineos, JM, TANSEE, RM and RMLF and other unnamed companies and individuals referred to herein as DOES are actively participating in a fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that each of these entities has liability to us for their evil and malicious participation in the underreported production price-fixing scheme alleged above that caused loss and harm to us and the liability is equal to one-third of the present fair market value of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed plus punitive damages. The secret meetings started in 1989 on the ten parcels of land listed in the 97 Deed and continued at annual titanium dioxide industry conferences dating back into the early 1990s and more recently the TiO2 Summit conferences that date back to the early 2000s in various iterations in which these defendants met annually in locations in the US and around the world to conspire about obtaining our saleable minerals by false pretenses and they also did so substantially with continuous communications to and meetings at Kinder Morgan storage facilities and terminals in California, Pennsylvania, and the other Kinder Morgan terminals and storage facilities near the other titanium dioxide plants, and ports beginning in the early 2000s before 2002 and it is ongoing. The Pennsylvania Terminal was a location for continuous meetings and communications between Iluka and DuPont and Kinder Morgan officers before the beginning of mining in fiscal year 2002-2003 as defined by the Leases until the end and afterwards with the concealment and harboring of the minerals obtained by false pretenses for dissipation to plants in the region and up to Ohio as well as the export of tons of zircon and titanium minerals. We are going to discover off-shore entities that they created and used to conceal their obtaining the minerals by false pretenses and we'll track down the dissipation of the ill-gotten gains to corrupt officers and agents that preserve them.

48

102.    We allege that J-M has used thousands of tons of titanium dioxide pigment per year containing saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed to manufacture PVC pipe and obtained said titanium dioxide pigment from some of the titanium dioxide pigment producers that have been named as defendants in this action while knowing that they were engaged in the underreported production of titanium dioxide pigment while J-M provided substantial assistance to said titanium dioxide pigment producers and Iluka as it aided and abetted the underreported production of titanium dioxide pigment and the underreported production of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka was underreporting the production of saleable minerals recovered from the Old Hickory Heavy Mineral Reserve to the DMME and would not deliver fair and equitable consideration for said saleable minerals.  J-M is engaged in secret meetings and communications to aid and abet and the underreported production price-fixing scheme alleged herein from which J-M financially benefited by obtaining thousands of tons of titanium dioxide pigment per year made with the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below market prices while knowing that the underreported production of titanium dioxide pigment by the titanium dioxide pigment producing defendants was part of the underreported production price-fixing scheme to aid and abet Iluka's failure of consideration for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed; and, we allege that J-M sold products containing some of said saleable minerals in California while concealing the volume of said sales to aid and abet Iluka's failure of consideration for the saleble minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

103.    We allege that Dupont, Dow Chemical, Chemours, Corveta, Inc., OXY, Huntsman, KM, Kronos Worldwide, Venator, HAK, TIMET-PCP, Ineos, JM, TANSEE, RM and other unnamed companies and individuals referred to herein as DOES continue to actively participate in a fraudulent scheme to conceal the failure of consideration by Iluka to us for the minerals conveyed by the 97 Deed and later

recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed to aid and abet Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals.

104.    We request that the Court take judicial notice of https://www.lawyerdb.org/lawyer/kenneth-reed-mayo/ and all other directories of lawyer credentials regarding Kenneth Reed Mayo's prior employment as proof that he was an associate in Hunton & Williams and Hunton & Williams LLP, collectively herein this complaint as ("HW"). The firms of Hunton & Williams LLP and Andrews Kurth Kenyon LLP merged to form Hunton Andrews Kurth LLP ("HAK") and HAK provided substantial assistance to Iluka by advising Iluka to aid and abet Iluka in its breach of its fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed and on how to breach its fiduciary duty to disclose how many tons of each kind of mineral that it has extracted from the acres of land described in the 97 Deed and the location of each of those tons to us in California which was done with malice and evil intent towards each of us, see attached letter from Iluka to Los Gatos, CA dated 6/12/2023 which included the MEMORANDUM OF TERMINATION OF MINING LEASE prepared by HAK ("EXHIBIT F") as evidence of HAK's evil and malicious conduct of aiding and abetting Iluka to deprive us of fair and equitable consideration for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed in California and evidence of HAK's liability for its evil and malicious conduct of aiding and abetting Iluka's breach of its fiduciary duties to deliver reporting to us about the saleable minerals to us in California and aiding and abetting breach of fiduciary duties to disclose information about the saleable minerals to us in California, concealment, and aiding and abetting Iluka's failure to deliver fair and equitable consideration to us for the saleable minerals in California.

105.    We also allege an ongoing conspiracy to commit and conceal fraud by Dupont, Dow Chemical, Chemours, Iluka, and each of the other named defendants and other unnamed companies referred to herein as DOES with secret meetings and

communications between these defendants to conceal the failure of consideration for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that such conduct amounts to an enterprise engaged to commit fraud.

106.    We allege that the defendants in the California Superior Court County of San Francisco case, that we both filed on 01/30/2024 having San Francisco Case #: CGC-24-611963 "San Francisco litigation", conspired to commit fraud in that litigation to cause us expense and delay and that such conduct also tolled any statute of limitations. We allege that said defendants' reference to saleable minerals as ore in the San Francisco litigation is evidence of fraud, active concealment, and ongoing conspiracy to conceal the failure of consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed because ore is the sediment that minerals exist within when in the ground and the failure of consideration that formed the basis for rescission occurred in California and is for saleable minerals that were recovered from ore not ore.

107.    We allege that we filed another case in the Los Angeles Superior Court 24STCV25090 that was fraudulently removed to the US District Court for the Central District of California, Western Division and the Court dismissed the case without prejudice as duplicative to the case filed in the San Francisco Superior Court although it recognized that it was an action for relief under Cal. Civil Code Sec. 1692 to recover the value of personal property and punitive damages for having rescinded the ten mining leases thereby recognized that San Francisco Superior Court Case CGC-24-611963 was also an action for relief under Cal. Civil Code Sec. 1692 to recover the value of personal property and punitive damages.

108.    We allege that the defendants that obtained the tons of titanium minerals obtained them by false pretenses by participating in the underreported production price-fixing scheme also have liability to us for the failure of consideration to us for the tons of zircon minerals because the failure of consideration to us for the zircon minerals was part of the furtherance of said scheme that they aided and abetted and financially

51

benefited from and they were all aware of it as they aided and abetted Iluka's failure of consideration to us for all the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

109.    We also allege that Iluka, Iluka AUS, DuPont, Chemours, Kerr-McGee Corporation, Millennium, Huntsman, Kronos Worldwide, Venator, TANSEE, Tronox, Ineos, and TIMET-PCP, were engaged in ongoing price-fixing for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, with DuPont being succeeded by Chemours, Millennium being succeeded by  and that the succeeding entities are now engaged in ongoing price-fixing to suppress the market prices of minerals similar to the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed to conceal the prior price-fixing of said saleable minerals, the failure of consideration to us for said saleable minerals, and reduce the value received by us for the rescission of the Leases pertaining to the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and this this conduct suppressed the prices of said saleable minerals and similar saleable minerals in California and continues to do so.

110.    We also allege that DuPont, Chemours, Kerr-McGee Corporation, Millennium, Huntsman, Kronos Worldwide, Venator, TANSEE, Tronox, Ineos, and TIMET-PCP, were engaged in price-fixing for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that the succeeding entities were also engaged in said price fixing and that the succeeding entities are now engaged in ongoing price-fixing to suppress the market prices of minerals similar to the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed to conceal the prior price-fixing of said saleable minerals, the failure of consideration to us for said saleable minerals, and reduce the value received by us for the rescission of the Leases pertaining to the one-third share of the minerals conveyed by the 97 Deed and later recovered, as

52

saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and this this conduct suppressed the prices of said saleable minerals and similar saleable minerals in California.

111.    We also allege that the above alleged underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed is tortious interference with the Leases and that Dupont, Dow Chemical, Chemours, Corveta, Inc., OXY, Huntsman, KM, Kronos Worldwide, Venator, Iluka, HAK, TIMET-PCP, and Ineos and other unnamed companies referred to herein as DOES caused us harm by their evil and malicious act of engaging in said tortious conduct and each of these Defendants and other unnamed companies referred to herein as DOES has liability to us for the loss and damage caused to us by said conduct.

112.    We also allege that the underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed is tortious interference with contract expectations as the fair and equitable consideration that we expected under the Leases was not delivered to us by Iluka and each of Defendants and the other unnamed companies referred to herein as DOES caused us harm by their evil and malicious act of engaging in said tortious conduct and each of the Defendants and other unnamed companies referred to herein as DOES has liability to us for the loss and damage caused to us by said conduct.

113.    We allege that none of the Defendants were a party to the Leases when signed; therefore, none of the defendants have a right to compel arbitration and the unavailability of punitive damages and legal fees is a surprise.

114.    We allege that Iluka did not exist in 1989.

115.    We allege that the leases were fraudulently induced in 1989 but neither Betty nor Laurence nor Betty's other son Luke P. Graham ("Luke") was in Virginia in 1989.

116.    We allege that by concealing the number of tons of each kind of mineral extracted from the acres of land described in the 97 Deed that Iluka concealed the number of

53

tons of each kind of saleable mineral recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

117.   We also allege that Iluka breached a fiduciary duty by its concealment of the number of tons of each kind of mineral that was extracted from the acres of land described in the 97 Deed that included the ten parcels of land listed in the 97 Deed. We further allege that this breach of a fiduciary duty is basis for rescission of the Leases and the relief we seek under Cal Civil Code Section 1692.

118.   We also allege that Iluka breached a fiduciary by its concealment of the number of tons of each type of mineral that were extracted from the acres of land described in the 97 Deed that included the ten parcels of land listed in the 97 Deed and the fair market value of each of those tons. We further allege that this breach of a fiduciary duty is basis for rescission of the Leases and the relief that we seek under Cal Civil Code Section 1692.

119.   We also allege that Iluka breached a fiduciary by its concealment of the number of tons of each kind of mineral that it has extracted from the acres of land described in the 97 Deed that included the ten parcels of land listed in the 97 Deed and the fair market value of each of those tons. We further allege that breach of a fiduciary duty is basis for rescission of the Leases and the relief that we seek under Cal Civil Code Section 1692.  We further allege that this breach of a fiduciary duty is basis for rescission of the Leases and the relief that we seek under Cal Civil Code Section 1692.

120.   We also allege further malicious and evil conduct which includes, but is not limited to, the manipulative and tortious use of undue influence by Iluka's officers, HW, RM, HW, and other rogue attorneys to induce Betty and Luke into a 2002 Sussex County Virginia court case that contained 02-26 in the case number; and, your manipulation of Betty's parents is also appalling. Bringing you to justice with guilty pleas from your officers, RM and other attorneys that aided and abetted you is an important part of this. You know that the Sussex County, VA 02-26 contested deed

54

litigation ("02-26 lawsuit") was life threateningly stressful and harmful to Betty and tremendously stressful and harmful to Laurence and that it was motivated by the furtherance of a fraudulent scheme. HW provided substantial assistance to Iluka in planning and implementing the tortious inducement of Betty and Luke into the 02-26 lawsuit. The severe undue influence that put Betty and Luke under duress included, but is not limited to, Iluka's threatening not to mine over Laurence's inquiries about the minerals that elicited the instruction not to mine from Betty and quickly turned into threats to sue Betty and destroy her financial security from Iluka and its agents all while Iluka and its agents sought to deprive Betty of her rights. In 2001 or 2002 HW was brought in to help Iluka gain access to the minerals conveyed by the 97 Deed and advised Iluka to continue with threats to sue Betty that Iluka had been making since early in 2001 and also provided substantial assistance to Iluka by drafting the complaint for the 02-26 lawsuit that was designed to gain access to the minerals conveyed by the 97 Deed, which Laurence and Betty had denied by telling Iluka not to mine; and, HW advised Iluka in the recruitment of Harry Benjamin Vincent, Esq. ("Mr. Vincent") (now deceased) and helped Iluka gain his loyalty to help Iluka file and prosecute the 02-26 lawsuit. I, Laurence J. Graham, spoke with Iluka's officer by telephone in 2002 and he threatened to sue me to set aside Betty's 10/23/200 Deed of Gift explaining that HW had drafted a complaint to set aside Betty's Deed of Gift to me and my brother Luke based on undue influence and that Iluka's attorney Mr. Vincent would file it if I kept requesting information about the minerals. I, Laurence J. Graham, spoke with Iluka's officer multiple times and he was commonly evasive and aggressive and I fear for my safety after enduring the duress leading up to, during, and since the 02-26 lawsuit. Iluka and its agents had destroyed Betty's free will before the filing of the 02-26 lawsuit with evil and malicious intent to do so and HW was aware of it and participated in it with evil and malicious intent. The evil and malicious treatment of Betty by Iluka and its agents caused Betty to be admitted into a mental health hospital and stay for several days and she was later admitted into an assisted living facility. Iluka, HW, and Mr. Vincent proceeded to effect the filing of the 02-26 lawsuit with Iluka as a defendant, then HW advised Iluka

to delay the resolution of the 02-26 lawsuit and directed the litigation with Iluka by instructing Mr. Vincent to take actions to prolong the 02-26 lawsuit and thwart settlement. HW knew before it joined in the design and implementation of the 02-26 lawsuit, that after gaining access to the minerals conveyed by the 97 Deed was achieved, depriving us of fair and equitable consideration for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed would be the objective and that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed although it knew that Iluka had a fiduciary duty to do so which is aiding and abetting the breach of a fiduciary duty and HW did it for financial gain.

121.    We also allege that, in the operation of their fraudulent scheme, the defendants have committed numerous, tortious and criminal acts in attempt to deprive Betty of her rights which is an ongoing source of harm to Betty and Laurence.

122.    We allege that each of the Defendants participated in the underreported production price-fixing scheme and helped to conceal the underreported volume of products sold in California that contained the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed which is aiding and abetting Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us for the one-third share of said saleable minerals and that this conduct by each of the defendants is purposeful availment of jurisdiction in California and that it was directed at us wherever and whenever the failure of consideration occurred and it occurred in California.

123.    We also allege that Iluka has been concealing the amount of consideration that it disbursed for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed in attempt to thwart and obstruct the rescission of the Leases but, with Iluka's final representation of royalties due for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, Laurence calculated that the total amount disbursed for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the

56

ore that was extracted from the ten parcels of land listed in the 97 Deed at less than 27 million dollars and there were land lease payments disbursed that Laurence calculated to be less than 1.2 million dollars.

124.    Virginia is not a convenient venue for either of us and we have never appeared in court there and Betty fears that the defendants will falsely imprison her in Virginia and we hereby notify you that we object to any legal proceedings in Virginia.  I, Betty Patrick Graham, hereby notify you that I fear that Iluka seeks to weaponize Virginia courts to harm by the use of unethical and unlawful tactics intended to delay and deprive and that it is a threat to me to ever have to appear in any legal proceeding in Virginia, therefore I object to it. We object to any legal proceedings in Virginia because, among other reasons, it is an inconvenient venue; and, we reserve the right to assert other bases to determine Virginia courts inappropriate for any litigation involving us which may include, but is not limited to, you perpetrating frauds in and upon Virginia courts.  Furthermore, it is important to note that the delay tactics used by Iluka are enormously harmful and have taken so much of our lives and its efforts to delay and try to avoid wire fraud charges and likely prosecution for other criminal charges is also part of the furtherance of a fraudulent scheme.

125.    We allege that Charles O. Holliday, Jr. ("Mr. Holliday") was employed by DuPont in its titanium dioxide division and became president of that division prior to becoming chief executive officer of DuPont and that Dupont, Dow Chemical, Corteva, Inc., Chemours and the other co-conspirator defendants have liability for his conduct.

126.    I, Laurence John Graham, believe that you have spent millions trying to deprive Betty P. Graham of her rights. It may be discovered that the amount of questionable payments made to rogue lawyers and others acting unlawfully to influence the outcome of litigation involving us is many times more than the 6.445 million dollar payment that DuPont made to the law firm of Friedman, Rodriguez, Ferraro, and St. Louis that was alleged to have influenced a Miami, FL Benlate case. Betty and I empathize with the Benlate victims who valiantly sought justice against DuPont. The

reported sum total that DuPont paid out for judgments and settlements in Benlate litigation seems unconscionably low as are the PFAS settlements and we intend to set forth a plan for all the cancer victims and their survivors. Abuse and alleged corruption of the justice system by DuPont de Nemours, Inc., ("Dupont"), Corteva, Inc., Dow Inc. The Dow Chemical Company, and The Chemours Company is also a public interest concern as the 6.445 million dollar payment that DuPont made to the law firm of Friedman, Rodriguez, Ferraro, and St. Louis was alleged to have influenced a Miami, FL Benlate case and now their PFAS settlements are unconscionably low. Plaintiffs don't believe that most PFAS cancer victims and their survivors have a fair chance in court against these defendants and our experience reinforces that belief, see, https://www.ewg.org/news-insights/news/why-are-dupont-and-chemours-still-discharging-most-notorious-forever-chemical which we request that the Court take judicial notice of.  Considering the 22.425 billion dollar value of a one-third share of the saleable minerals recovered from ore that was extracted from the ten parcels of land listed in the 97 Deed and the punitive damages due to us in this action for relief under Cal. Civil Code Sec. 1692 for rescinding the Leases, we believe that we will recover over 125 billion dollars and will only consider offers for settlement that exceed 125 billion dollars with 120 billion of it going into a PFAS settlement fund for the PFAS cancer victims and their survivors. As we have learned more about these chemicals called "forever chemicals" that stay in the soil and groundwater and accumulate in people and cause cancer, we determined that it is more equitable to contribute a large portion of the proceeds from the liquidation of the insolvent defendants and a large portion of the proceeds from any judgement solvent defendants to PFAS victims. PAFS chemicals may stay in the environment for thousands of years so 120 billion is not going to pay for injury to all of the victims, some of which haven't even been born yet.  Increasing awareness of the PFAS crisis is important to stopping production of these chemicals and finding solutions. Certain of these defendants are known for changing the name of PFAS chemicals and altering them slightly to avoid regulation. Rendering these defendants insolvent due to the liability that they have to us and our donation to a PFAS

58

settlement fund will be meaningful not only because those who have been harmed will be compensated but because it will stop certain of these defendants from continuing to produce PFAS chemicals. The PFAS settlement fund needs to have the money to pay victims and then pay it out because the justice system is not working for the victims. Many of the victims are sick and grieving and have adversely impacted income, depleted savings and other challenges that render them unable to endure the bad faith frauds upon courts that these defendants commit. We also want to consider the pension obligations of the insolvent defendants and have requested auditable accounting of such obligations from some of the insolvent defendants but the pensions of senior executives such as Charles O. Holliday, Jr. ("Mr. Holliday"), who was president of the titanium dioxide division of DuPont and became chief executive officer "CEO" of DuPont will not be honored because he participated in the design of the underreported production price-fixing scheme and became CEO of DuPont to implement the company-wide accounting fraud. However, there are many thousands of pensioners other than the board members, senior managers, and senior plant engineers who knew about the underreported production at those plants and the resulting environmental damage and reduced tax revenue, see https://iehn.org/resources/resolution/dupont-costs-of-pfoa-related-pollution-remediation-from-facilities which we request that the Court take judicial notice of. We are taking this case to a jury and Mr. Holliday can have his time before the jury which should result in a perp walk and a conviction. He was a scienter of the underreported production price-fixing scheme and we expect that his attorneys will argue that he does not have to go to jail because he exited DuPont. He did exit DuPont and we believe that he did so to avoid a several decades-long prison sentence which could have exceeded his life. He then applied his law firm connections and scorched earth litigation prowess to help Bank of America Corporation "BOA" avoid financial crisis liability and while employed by BOA he caused the transfer of Betty's IRA to New Jersey without her consent which was an attempt to create contacts for the defendants to argue for venue transfer whenever the failure of consideration was to occur to further aid and abet Iluka's failure of consideration to us for the saleable

59

minerals extracted from the ten parcels of land listed in the 97 Deed and by doing so purposefully availed himself of the jurisdiction of the state court whenever and wherever the failure of consideration occurred and it occurred in California. Mr. Holliday was CEO of DuPont when DuPont made the 6.445 million dollar payment to the law firm of Friedman, Rodriguez, Ferraro, and St. Louis that was widely criticized as a payoff to influence litigation, see

*firmhttps://archive.blogs.harvard.edu/ethicalesq/2003/09/10/ethics-charges-come-late-in-miami-benlate-case/* which we request that the Court take judicial notice of; see also, *https://www.panna.org/archive/panna-dupont-convicted-racketeering-benlate-case/* which we request that the Court take judicial notice of. We allege that Mr. Holliday's fraudulent and illegal conduct is litigation was learned and honed at DuPont and that reports in the media inform that he spent a lot of time influencing litigation and corrupting the justice system. We also request that the Court take judicial notice of: *https://www.corpwatch.org/article/us-files-show-governor-intervened-court* which also sheds light on how DuPont and Mr. Holliday litigated and sought to manipulate trial and appellate courts as it was revealed that DuPont's lawyer and vice president were preparing briefs for a friend-of-the-court brief for a neutral party to sign and did not notify the court in that case which is relevant in this case because, DuPont and its succeeding entities have a long history of manipulating the justice system and the fraud in the San Francisco litigation is evidence that the succeeding entities of DuPont and the other defendants are desperate to conceal their aiding and abetting of Iluka's failure of consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed. They don't have any valid defense. Again, the succeeding entities of DuPont were formed to conceal DuPont's and Dow's aiding and abetting of Iluka's failure of consideration for the saleable minerals extracted from the ten parcels of land listed in the 97 Deed whenever and wherever it occurred and it occurred in California and they all continue to actively conceal it and will not stop with their fraud and concealment until we render them insolvent. We incorporate the Bank of America Corporation Corporate Governance Guidelines in place at the time of Mr. Holliday's employment

as BOA-Chairman herein by reference. Per said guidelines, Mr. Holliday was in charge of BOA's hiring of senior executives and accountable for their conduct; therefore, he was in charge of BOA's CEO and he was hired to deal with the financial crisis litigation. At the time of Mr. Holliday's hiring by BOA, Laurence watched a NBC financial news host report during a NBC television broadcast that Mr. Holliday's hiring as chairman of BOA's board of directors would help BOA with litigation because of his contacts with lawyers and we allege that he was hired because of those contacts and his scorched earth litigation prowess and that he oversaw BOA's financial crisis litigation during his employment by BOA. As chairman of DuPont's board of directors and as CEO of DuPont he employed an large number of of law firms that was unprecedented in the number of firms involved to represent a single company and he did so to both conceal DuPont's liability to us for the saleable minerals and to achieve DuPont's objectives to avoid its liability for PFAS and other toxic tort liability. He wanted to create conflicts of interests with lawyers so that they could not be adverse to him and he used it as a risk management tool. It is important to note that Mr. Holliday was trained as an engineer but was a master of manipulation and was able to overwhelm politicians and intuitions. When interviewed, he picks his words like a lawyer and picked the entry point into law firms that he conflicted so that they could never represent a toxic tort victim afterwards. He would direct "the right person" talk to the person that he was seeking to control. Mr. Holliday publically acknowledged that, as BOA-Chair, he talked with the general counsel and oversaw risk management. We allege that Mr. Holliday directed DuPont's titanium dioxide pigment clients to have their lawyers talk to DuPont's lawyers about the fraudulent risk management services that they were selling to those clients to conceal the fact that payment for titanium dioxide pigment made with our saleable minerals was being made to DuPont as payment for risk management services to conceal the underreported production price-fixing scheme, it being understood that some of DuPont's sale of titanium dioxide pigment made with our minerals was booked as actual titanium dioxide pigment sales but lots of it wasn't and Dow was selling lots of the pigment that DuPont made with our saleable minerals

61

in pre mixed PVC resin much of . Again Dow was the Furthermore, we request that the Court take judicial notice of the article found at: https://themeaningofwater.com/2024/03/10/duponts-decades-long-legacy-of-crime-1990s/ which we incorporate herein by reference in support. The author, Nina Munteanu, commented about the chief executive officers of DuPont and Dupont including Charles O. Holliday, Jr., Edward D. Breen, and others by writing, *"These are the faces of the DuPont men and women who sanctioned–encouraged–the willful harm of other life to make a profit. Despite knowing the danger posed by exposure to PFOAs of people, these DuPont CEOs chose to: 1) continue to poison the environment and people, 2) cover up their actions from authorities, and 3) fight the courts and regulators from doing the right thing when they were caught. No one went to jail. No one was fired. They just paid $$$ and shamefully kept going. This is NOT good business. This is NOT being a good person. This is gross disrespect for all life and ultimately heinous criminal behaviour deserving more meaningful prosecution than a simple fine.";* see also, *https://organicconsumers.org/devil-we-know-how-dupont-poisoned-world-teflon/* which we request that the Court take judicial notice of. Nina Munteanu is a hero who is helping people and the environment by increasing awareness of the PFAS crisis. Her articles are helping to reduce the incidence of cancer and save many lives by increasing awareness of the PFAS crisis which informs people of the danger and effects change. DuPont had a long history of manipulating the justice system and the defendants in the San Francisco litigation have been brazen in their fraud upon the Court as Iluka's map of customers, EXHIBIT K, exposes the fraudulent declaration of Joseph Mullins and the conspiracy that these defendants conceal. The employees and pensioners of these defendants have an opportunity to do the right thing and turn over evidence against these defendants and we believe that there are more pensioners that know and feel what it means to be a citizen of this country than the defendants can stifle. The pensioners who worked in titanium dioxide pigment plants and PVC plants can come clean and will deserve respect for doing so. Those who are willing to turn over evidence against these defendants will be given consideration to keep their pensions vested.

1    Unfortunately, the underreported production of titanium dioxide pigment is also a
2    large environmental crime. Titanium dioxide pigment plants are known to be the
3    largest emitters of dioxins into the atmosphere of all US industrial plants and the
4    executives of the titanium pigment producing defendants knew it in 1989 which has
5    been a motivating factor for underreported production at these plants and continues to
6    be a motivating factor for concealing the underreported production given the storms
7    and wildfires that the emissions of the titanium dioxide pigment plants are a
8    measurable contributor to. Now we are left to deal with winding down and
9    liquidating the insolvent defendants and we will do a better job of it than the
10    management that is participating in concealing the underreported production price-
11    fixing scheme and we are going to do it with compassion for the pensioners. Initially
12    our plan was to donate part of the proceeds of the jury award to charities that have a
13    record of successful contribution but knowing about DuPont's conduct in the Benlate
14    litigation and seeing the bad faith conduct by the defendants in the San Francisco
15    litigation has opened our eyes to the PFAS litigation and the PFAS crisis. See,
16    https://chemsec.org/reports/the-top-12-pfas-producers-in-the-world-and-the-
17    staggering-societal-costs-of-pfas-pollution/ which we request that the Court take
18    judicial notice of. As anyone can see by the conduct of the defendants in the San
19    Francisco litigation, that their officers and directors are only increasing their liability.
20    The defendants don't have any valid defense for their liability to us and the
21    defendants in the San Francisco litigation committed fraud in court as is evidenced by
22    the declaration of Joseph Mullins ("EXHIBIT J")[1] which they all adopted in support.
23    Said declaration is fraudulent for many reasons, one of which is found in EXHIBIT J
24    at page 2, at lines 7-9 which is paragraph 5 by which Iluka and the other defendants
25    claimed that, *"...Iluka supplied minerals within a geographic market that almost
26    exclusively included consumers of mineral sands products primarily in Ohio,
27    Delaware, South Carolina, Alabama, Tennessee, New York, and New Hampshire."*,

[1] EXHIBIT J includes pages 1-5 of the declaration of Joseph Mullins, exhibits are excluded.

which is a fraudulent statement, part of a fraudulent declaration, perjury, and clearly
intended to conceal the fact that the titanium dioxide pigment plants in Mississippi,
Louisiana, Delaware, Maryland, and Altamira Mexico were continuously supplied
with saleable minerals that were recovered from the ore that was extracted from the
ten parcels of land listed in the 97 Deed, see the attached map showing the location of
many of the plants that were supplied with saleable minerals recovered from the ore
that was extracted from the ten parcels of land listed in the 97 Deed. Furthermore, the
claim that New Hampshire is a significant state in which minerals are distributed is
not plausible because there aren't any plants in New Hampshire. In light of the map
that Iluka produced, EXHIBIT K, in which Iluka delineated the location of its
customers, the Court must conclude that the defendants have committed fraud and
perjury in the San Francisco litigation with the Joseph Mullins declaration, EXHIBIT
J. The reason that the defendants have committed fraud and perjury in court with the
Joseph Mullins declaration, EXHIBIT J, is because they have a large amount of
liability to us without any valid defense. Most of the defendants are insolvent for their
liability to us.

127.    As was required by California law, prior to rescinding the Leases, I, Laurence
John Graham, first offered to restore Iluka. Although I allege that the portion of the
Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97
Deed and later recovered, as saleable minerals, from the ore that was extracted from
the ten parcels of land listed in the 97 Deed Leases has been rescinded and that I have
previously offered to restore Iluka prior to rescinding said portion of the Leases, I will
here again offer to restore Iluka although this offer does not and cannot disturb the
prior rescission of said portion of the Leases. Now, by the powers that I have, to
bring, prosecute, and settle all claims involving the one-third share of the minerals
conveyed to Betty by the 97 Deed, which include, but are not limited to, the powers
and authority to represent Betty's interests and Luke's interests which were awarded
to me in the settlement of the 02-26 lawsuit by the 9/29/03 settlement agreement, I
hereby offer to return 9 million dollars of royalties to Iluka which is more than the
maximum amount that was disbursed for the one-third share of the minerals conveyed

to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return $400,000.00 dollars of the land lease payments; and, by such powers, I hereby also offer to return 9 million dollars of royalties to Iluka which is more than the maximum amount that was disbursed for the one-third share of the minerals conveyed to Julia P. Boyd, (also known as Julia H. Parson) by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return another $400,000.00 dollars of the land lease payments; and, by such powers, I hereby to also offer to return 9 million dollars of royalties to Iluka which is more than the maximum amount that was disbursed for the one-third share of the minerals conveyed to Ann P. Everett by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return another $400,000.00 of the land lease payments.

128.    Although, in the paragraph above, I again offered to restore Iluka more than the total amount in dollars that was disbursed to Betty's parents, their three daughters, and their grandchildren for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed which I, Laurence John Graham, calculated to be less than 27 million dollars of royalties that were disbursed as consideration for said saleable minerals. I also calculated that less than $1,200,000.00 of land lease payments were disbursed although they aren't consideration for the saleable minerals and I offered to restore Iluka those land lease payments in addition to 27 million dollars of royalties but the $22,425,000,000.00 (22.425 billion dollars) value of a one-third share of the minerals recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive damages which will probably increase the recovery to over 125 billion dollars which is an additional reason that returning money to Iluka is not applicable.

65

129.    I, Laurence J. Graham, have the powers to bring, prosecute, and settle all claims involving the minerals conveyed to Betty by the 97 Deed, which include, but are not limited to, the powers and authority to represent Betty's interests and Luke's interests which were awarded to me in the settlement of the 02-26 lawsuit by the 9/29/03 settlement agreement, and based upon a failure of consideration for the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and each separate allegation made hereinabove, I have already rescinded the portion of the Leases pertaining to 60% of the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other 40% of the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and, to the extent that it is determined that I did not rescind said portions of the Leases, I hereby separately rescind them based upon a failure of consideration; and, by such powers, and based upon a failure of consideration for the one-third share of the minerals conveyed to Julia P. Boyd (also known as Julia H, Parson) by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other separate allegations made herein above, I separately rescinded the portion of the Leases pertaining to the one-third share of the minerals conveyed to Julia P. Boyd (also known as Julia H. Parson) by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and, to the extent that it is determined that I did not rescind said portion of the Leases, I hereby separately rescind it based upon a failure of consideration; and, by such powers, and based upon a failure of consideration for the one-third share of the minerals conveyed to Ann P. Everett by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other separate allegations made herein above, I separately rescinded the portion of the Leases pertaining to the one-third share of the minerals conveyed to

Ann P. Everett by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and, to the extent that it is determined that I did not rescind said portion of the Leases, I hereby rescind it based upon a failure of consideration. Now, I demand that you immediately pay $22,396,800,000.00 (

130.    22.3968 billion dollars) for the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed by sending a check c/o Laurence J. Graham to 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027.

131.    Immediate proof that you have the money to pay $125,000,000,000.00 is demanded from you and I reserve the right to demand proof of additional liquid funds; recovering these funds is the avenue that I choose as having a bankruptcy court dissolve your companies is not the relief sought; however, I reserve all rights to recover the money judgement that is sought herein together with punitive damages.

132.    I, Betty Patrick Graham, believe that the sum total of royalties disbursed for the one-third share of the minerals that were conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed is severely insufficient and therefore a failure of consideration for the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed; therefore, I, Betty Patrick Graham offered to return 9 million dollars of royalties to Iluka which is more than the maximum sum total amount that was disbursed for the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offered to return $400,000.00 of land lease payments. Although I allege that the portion of the Leases pertaining to the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed Leases has been rescinded and that I have

previously offered to restore Iluka prior to rescinding said portion of the Leases, I will
here again offer to restore Iluka although this offer does not and cannot disturb the
rescission of said portion of the Leases. Now, I here again offer to return 9 million
dollars of royalties to Iluka which is more than the maximum amount that was
disbursed for the one-third share of the minerals conveyed to me by the 97 Deed and
later recovered, as saleable minerals, from the ore that was extracted from the ten
parcels of land listed in the 97 Deed and I also offer to return $400,000.00 dollars of
the land lease payments but the $22,425,000,000.00 (22.425 billion dollars) value of a
one-third share of the saleable minerals recovered from the ore that was extracted
from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars;
therefore, returning money to Iluka is not applicable; and, a jury must determine the
value of the punitive damages which will probably increase the recovery to over 125
billion dollars which is an additional reason that returning money to Iluka is not
applicable; and, I offered to return another 18 million dollars of royalties to Iluka
which amounts to a total of 27 million dollars of royalties that I offered to return to
Iluka which is much more than they disbursed to my parents, their three daughters
(one of which is me Betty), and their grandchildren for the minerals conveyed by the
97 Deed and later recovered, as saleable minerals, from the ore that was extracted
from the ten parcels of land listed in the 97 Deed and I also offered to return an
additional $800,000.00 of land lease payments to Iluka which amounts to a total of
$1,2000.000.00 of land lease payments that I also offered to restore Iluka in addition
to 27 million dollars of royalties but the $67,275,000,000.00 (67.275 billion dollars)
value of all the minerals conveyed by the 97 Deed and later recovered, as saleable
minerals, from the ore that was extracted from the ten parcels of land listed in the 97
Deed exceeds 28.2 million dollars; therefore, returning money to Iluka was not
applicable and, if it is determined that I, my son Laurence, or Laurence and I did not
rescind such portion of the Leases, I have already offered to restore Iluka.  Now, I
here again offer to return said sums of money but the $22,425,000,000.00 (22.425
billion dollars) value of only a one-third share of the saleable minerals recovered
from the ore that was extracted from the ten parcels of land listed in the 97 Deed

68

exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive damages which may increase the recovery to a multiple of 125 billion dollars which is an additional reason that returning money to Iluka is not applicable. Based upon a failure of consideration and each separate allegation made hereinabove and the other separate allegations made herein above, I already have rescinded the portion of the Leases pertaining to 60% of the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other 40% of the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels land listed in the 97 Deed; however, if it is determined that said portions of the Leases have not been rescinded, I hereby separately rescind each of them; and, if rescinding a portion of the Leases was not possible, I rescinded the Leases pertaining to all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed based upon Iluka's failure of consideration for all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels land listed in the 97 Deed and based on each separate allegation made hereinabove; and, if it is determined that the portion of the Leases pertaining to the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed has not been rescinded, I hereby rescind it; and, to the extent that it is determined that rescinding said portions of the Leases is not possible, I hereby rescind the Leases pertaining to all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed based upon Iluka's failure of consideration for all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels land listed in the 97 Deed and each separate allegation made hereinabove; now, I again demand that you immediately pay

69

$22,396,800,000.00 (22.3968 billion dollars) for the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore extracted from the ten parcels of land listed in the 97 Deed by sending a check c/o Laurence to 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 as this is my address for receipt of the rescission money.

133.    I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham) believe that the royalties disbursed for the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed is severely insufficient and therefore a failure of consideration for the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed; and, as Agent for Betty P. Graham (also known as attorney in-in-fact for Betty P. Graham) and as attorney-in-fact for Betty P. Graham, I offered to return 9 million dollars of royalties to Iluka which is more than the maximum amount that was disbursed for the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offered to return $400,000.00 dollars of the land lease payments and I here again offer to return said sums of money but the $22,425,000,000.00 (22.425 billion dollars) value of a one-third share of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive damages which will probably increase the recovery to over 125 billion dollars; and, by such powers, I offered to return 9 million dollars of royalties to Iluka which is more than the maximum amount that was disbursed for the one-third share of the minerals conveyed to Julia P. Boyd, (also known as Julia H. Parson) by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offered to return another $400,000.00 dollars of the land lease payments and here again offer to return said

70

sums of money but the $22,425,000,000.00 (22.425 billion dollars) value of a one-third share of the minerals recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive damages which will probably increase the recovery to a multiple of 125 billion dollars; and, by such powers, I offered to return 9 million dollars of royalties to Iluka which is more than the maximum amount that was disbursed for the one-third share of the minerals conveyed to Ann P. Everett by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offered to return another $400,000.00 of the land lease payments and I here again offer to return all such money but the $22,425,000,000.00 (22.425 billion dollars) value of a one-third share of the minerals recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive damages which will probably increase the recovery to a multiple of 125 billion dollars.

134.    Although we offered to restore Iluka the total amount in dollars that was disbursed to Betty P. Graham parents, their three daughters (one of which is Betty), and their grandchildren for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed which I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham), calculated to be less than the 27 million dollars of royalties disbursed as consideration for said minerals and I calculated that less than $1,200,000.00 of land lease payments were also disbursed which I also offered to restore Iluka but the $22,425,000,000.00 (22.425 billion dollars) value of a one-third share of the minerals recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive damages which will probably

increase the recovery to over 125 billion dollars; therefore, returning money to Iluka is not applicable.

135.    Based upon a failure of consideration and each separate allegation made hereinabove, I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney in-in-fact for Betty P. Graham) and attorney-in-fact for Betty P. Graham rescinded the portion of the Leases pertaining to 60% of the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other 40% of the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and, if it is determined that I and/or Betty did not rescind said portions of the Leases I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham) and as attorney-in-fact for Betty P. Graham hereby rescind said portions of the Leases. I have rescinded the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and, if it is determined that I and/or Betty have not, I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham) and as attorney-in-fact for Betty P. Graham hereby rescind it. However, if it is determined that rescinding a portion of the Leases is not possible, I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham) and as attorney-in-fact for Betty P. Graham rescinded the Leases pertaining to all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and, if it is determined that I and/or Betty did not effectuate such rescission, I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham) and as attorney-in-fact for Betty P. Graham hereby rescind the Leases pertaining to the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97

72

Deed; and, I demand that you immediately pay $22,396,800,000.00 (22.3968 billion dollars) to 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 c/o Laurence J. Graham for the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the parcels of land listed in the 97 Deed.

136.    I, Betty Patrick Graham, emphasize that my son Laurence J. Graham is my Agent (also known as my attorney-in-fact) and that he is the only person authorized to bring, prosecute, and settle claims for me; accordingly, my son, Laurence J. Graham has the authority to do all things necessary to prosecute this rescission and recover the value of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed plus the punitive damages determined by a jury. My son Laurence J. Graham also has the authority to donate the majority of the 22.3968 billion dollars plus the punitive damages to charity.

4647 Kingswell Ave Ste 105 Los Angeles CA, 90027 c/o Laurence J. Graham shall be our royalty payment address for any portion of the Leases pertaining to the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed for which a recovery for rescinding said portion of the Leases cannot be made after this litigation and all appeals therefrom are final and after the prior San Francisco litigation and all appeals therefrom are final and after all additional actions involving rescission and all appeals therefrom are final.

WHEREFORE, Plaintiffs pray for an order confirming that the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed has been rescinded based on a failure of consideration; and,

For a jury trial to determine how many of the 22.5 million short tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed that each defendant received and must pay the proportional percentage of the 22.3968 billion dollar value of said one-third share saleable minerals and the punitive damages; and,

For punitive damages due in our action for relief under Cal Civil Code Sec 1692; and,

For a jury to determine any affirmative defenses raised by any of the Defendants; and,

For the costs incurred herein; and,

For post judgement interest; and,

For attorneys' fees incurred herein; and,

For plaintiffs' time spent litigating as self-represented plaintiffs; and,

For interest on the 22.3968 billion dollars due to plaintiffs for delays by the Defendants; and,

For the Court to order that Iluka pay the slightly over 2.5 million dollars of royalties represented in its 2/12/2023 letter to Laurence so that plaintiffs will have resources to maintain this action for relief under Cal. Civil Code Sec. 1692; accordingly, we request for the Court to order Iluka to pay $2,500,000.01 to Laurence within 5 business days because he deducted it from the money demanded and that the acceptance of said money by Laurence shall be done with the reservation of all rights and claims and that plaintiffs shall maintain their action for relief under Cal. Civil Code Sec. 1692 after Laurence receives said funds free and clear in his personal bank account; and,

For the return of any minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed that the Court determines are not subject to the Leases in front of the Marin County Superior Court at 3501 Civic Center Drive San Rafael, CA 94903 or, if said minerals are not available, payment of the present fair market value thereof by mailing a check for payment of it c/o Laurence J. Graham to Laurence J. Graham at 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 by USPS Certified Mail; and,

For punitive damages in addition to the return of any minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed that the Court determines are not subject to the Leases; and,

For punitive damages in addition to payment of the present fair market value of any minerals that the Court determines are not subject to the Leases and not available to be returned; and,

For such other and further relief that the Court deems proper.

74

1  We now sign this VERIFIED COMPLAINT FOR RELIEF BASED ON RESCISSION OF
2  CONTRACTS AND DEMAND FOR JURY TRIAL in Oakland California.
3  Dated: June, 26 2025
4  Respectfully Submitted,

5  Betty Patrick Graham for Betty Patrick Graham: *Betty Patrick Graham*

6
7  Betty P. Graham for Betty P. Graham: *Betty P. Graham*

8
9  Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Larry Graham*

10  Laurence J. Graham as Agent for Betty P. Graham: *Larry Graham*

11
12  Laurence J. Graham for Laurence J. Graham: *Larry Graham*

13
14  Laurence John Graham for Laurence John Graham: *Larry Graham*

15
16
17
18
19
20
21
22
23
24
25
26
27
28                                          75

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE (the "Settlement Agreement") is made this _29_ day of September, 2003, by and among Betty P. Graham ("Betty"), Luke P. Graham ("Luke") and Laurence J. Graham ("Laurence").

Recitals

A.    WHEREAS, Betty is the mother of Luke and Laurence;

B.    WHEREAS, G. L. and Mary Elizabeth Parson (the "Parsons") are the parents of Betty and the grandparents of Luke and Laurence;

C.    WHEREAS, the Parsons were the owners of certain real estate interests in the Counties of Sussex and Dinwiddie, Virginia, including valuable minerals (including titanium) in, on and under the surface of the real property identified on Exhibit "A" attached hereto (hereinafter the "Real Property");

D.    WHEREAS, the Parsons entered into with RGC (USA) Minerals, Inc. ("RGC") certain Deeds of Mining Lease dated October 13, 1989, (the "Leases"), wherein the Parsons granted to RGC the right to explore for, mine and remove the minerals on and below the Real Property;

E.    WHEREAS, Iluka Resources, Inc. now claims to be the successor in interest to RGC (USA) Minerals, Inc.;

F.    WHEREAS, the Parsons executed a Deed of Gift dated May 19, 1997, and which is recorded in the Office of the Circuit Court of Dinwiddie County, Virginia at Deed Book 410, Page 204 and in the Office of the Clerk of the Circuit Court of Sussex County, Virginia at Deed Book 155, Page 626 (the "Parsons' Deed of Gift"), a copy of which is attached hereto as Exhibit "B";

G.    WHEREAS, the Parsons' Deed of Gift conveyed all right, title and interest in and to the minerals of every kind and character, in, on and under the Real Property and their Lessor management power and rights and all other title interest in the Leases to the Parsons' three (3) daughters, including Betty, as tenants in common, in equal one-third (1/3) parts, reserving only to themselves the next two "advance royalty payments" that remained due and payable under the Leases at that time and the annual "Rental Payments" under the Leases;

H.    WHEREAS, Betty executed a Deed of Gift dated October 23, 2000, and which is recorded in the Office of the Clerk of the Circuit Court of Dinwiddie County, Virginia in Deed Book 493 at Page 152 and in the Office of the Clerk of the Circuit Court for Sussex County, Virginia in Deed Book 175 at Page 181 (the "Graham Deed of Gift"), a copy of which is attached as Exhibit "C";

I.    WHEREAS, the Graham Deed of Gift conveyed all of the interests conveyed to Betty by the Parsons' Deed of Gift, including but not limited to the interests in the mineral rights in, on and under the surface of the Real Property and her Lessor management power and rights, and all other title interest in the Leases (all of such interests are hereinafter referred to as the "Property"), to Luke and Laurence with Luke receiving forty percent (40%) of Betty's interests and Laurence receiving sixty percent (60%) of Betty's interests;

J.    WHEREAS, it was the intent of Betty that Laurence was to have control over the Property conveyed to Luke and Laurence;

K.    WHEREAS, a dispute has arisen regarding the validity of the Graham Deed of Gift;

L.    WHEREAS, Betty and Luke filed a Bill of Complaint in the

Page 1

Circuit Court of the County of Sussex (the "Circuit Court"), styled Betty P.
Graham and Luke P. Graham v. Laurence J. Graham and Iluka Resources, Inc.,
Chancery No. 02-26 as well as a Bill of Complaint in the action styled Betty
P. Graham and Luke P. Graham v. Laurence J. Graham in the Circuit Court for
the County of Sussex, Virginia, Chancery No. 02-1033 (collectively, the
"Actions");

M.   WHEREAS, pursuant to the Decree entered by the Circuit Court
on April 16, 2002, the Clerk of the Circuit Court is holding as of September
29, 2003, $ 513,358.63 made up of funds paid to the Clerk by Iluka and
interest (the "Court Held Funds");

N.   WHEREAS, in lieu of further litigation, Betty, Luke and Laurence
each desire to compromise, resolve and settle all claims, causes, disputes
or other issues among them arising out of or relating to the Actions, the
Leases, the Parson's Deed of Gift, the Graham Deed of Gift and any other
issues among them relating thereto.

NOW, THEREFORE, for and in consideration for the mutual covenants
and agreements set forth herein and other good and valuable consideration,
the mutual receipt and legal sufficiency of which are hereby acknowledged,
the Parties expressly agree as follows:

1.   All of the foregoing "WHEREAS" clauses are hereby incorporated by
reference as if fully set forth herein.

2.   Except for the rights and obligations set forth in this Settlement Agreement and in
consideration of the terms and conditions of this Settlement Agreement, Betty, Luke and
Laurence, each on their behalf and on behalf of their respective heirs, executors, estate
administrators, successors, and assigns does hereby and unconditionally forever waive,
release, remise, discharge and covenant not to sue each other, from and against any and all
liabilities, claims, lawsuits, causes of action, demands, actions, appeals, costs, expenses, interest
on money, and attorney's fees which they now have or may hereinafter have against each
other, whether known or unknown, arising out of, possibly arising out of or relating in any way to
the Actions, the Leases, the Parson's Deed of Gift, the Graham Deed of Gift, any allegation
raised in the Actions or which could have been raised in the Actions by any party to this
Settlement Agreement, or any other issues among them relating thereto with respect to any of the
foregoing, arising or accruing prior to the date hereof.

3.   Betty and Luke hereby acknowledge and confirm the validity of the Graham Deed of Gift as
of the date of its execution of October 23, 2000, and forever waive, release and relinquish any
claim of duress, undue influence, mental illness or incompetence as a defense to the Graham
Deed of Gift or as a basis for setting aside, challenging or avoiding the Graham Deed of Gift.
All parties represent, acknowledge and agree that by virtue of the Parson's Deed of Gift and the
Graham Deed of Gift, Laurence and Luke are the owners, as tenants in common, of the Property
conveyed to Betty, with Luke owning 40% of the interests in the Property and Laurence owning
60% of the interests in the Property conveyed to Betty.  Laurence and Luke have the
sole right to receive all royalty payments and all income due on account of the Property including,
but not limited to revenues derived from the sale of the Property and royalty payments under the
Leases (including any amendment, renewal, extension or renegotiation payments they are
entitled to receive as Lessors) with Luke receiving 40% of any such payments and Laurence
receiving 60% of any such funds; however Laurence shall allow the Court Held Funds to be
disbursed 50% to him and 50% to Luke with Luke reimbursing Laurence for taxes on the Larry to
Luke portion of such disbursement being approximately $50,000.00.

4.   The parties agree that this Settlement Agreement does not constitute an assignment of any
of Laurence's rights under the Graham Deed of Gift to Betty and/or Luke and shall not be
construed as such. Similarly this Settlement Agreement does not constitute an assignment of any
of Luke rights under the Graham Deed of Gift to Betty.  This Settlement Agreement shall not be
construed as a ratification of any Lease or conduct by Iluka or a waiver of any claims and rights
against Iluka.

5.   The parties agree that should any third party contest or challenge that Laurence and Luke

are the owners, as tenants in common or otherwise, of the Property including the Leases, or assert, allege, seek declaratory relief, claim, question or testify that Betty by the Parsons' Deed of Gift or that Laurence and Luke by the Graham Deed of Gift received only an assignment of the royalties to be paid under the Leases or less than lessor and title interest in the Leases (hereinafter collectively referred to as a "Tenancy in Common Challenge"), that they will each contest any such Tenancy in Common Challenge and not take any position contrary to paragraphs 3, 4 and 5 of this Settlement Agreement.  For the purpose of fulfilling the obligations contained in this paragraph 5, Betty hereby grants a power of attorney to Laurence and appoint Laurence as her true and lawful attorney-in-fact, with full authority to act on their behalf with respect to a Tenancy in Common Challenge, including, but not limited to, the right to commence, prosecute, discontinue, defend and settle any or all actions or other legal proceedings related thereto.  The power of attorney contained in this paragraph 5 is a durable power of attorney coupled with an interest and is irrevocable.

6. Betty hereby assigns, transfers and conveys to Laurence any and all claims she may have, known or unknown, against Iluka and/or RGC relating to the Leases, including, but not limited to, all fraud claims or breach of contract claims, if any.  To the extent any of such claims are personal and not assignable, Betty hereby grants a power of attorney to Laurence and appoints Laurence as her true and lawful attorney-in-fact, with full authority to act on her behalf with respect to any such claim, including, but not limited to, the right to commence, prosecute, discontinue, defend and settle legal actions or other legal proceedings, and further assigns, transfers and conveys to Laurence any settlement or recovery from such claims.  The power of attorney contained in this paragraph 6 is a durable power of attorney coupled with an interest and is irrevocable.

7.  Betty shall, within 60 days of the full execution of this Settlement Agreement, transfer her assets, real and personal (excluding her personal residence in Naples, Florida, personal affects and household goods) to the Trustee of The Graham Family Trust Agreement, dated *September 29*, 2003, a copy of which is attached hereto as Exhibit "D" (hereinafter the "Graham Trust"), to be held and administered pursuant to the terms of the Graham Trust.

8.    Within 60 days of receiving and at his discretion choosing to accept any money, royalty or other payment from or relating to the Real Property, the mineral rights below the surface of the Real Property and the Leases (including as the Lease may be modified, amended, changed or extended) (hereinafter "Laurence's Mineral Proceeds"), Laurence shall pay to Luke, by certified or bank check, a sum of money equal to one-sixth or 16.67% of Laurence's Mineral Proceeds after deducting estimated taxes which may be owed or due on account thereof as determined by a certified public accountant (the "Larry-to-Luke Payment"). With respect to disbursement of the Court Held Funds, Laurence hereby authorizes the direct payment to Luke of the gross Larry to Luke payment, and Luke shall, at his expense, retain a CPA to determine the applicable gift and income taxes due by Laurence for the 16.67% Larry to Luke payment ( approximately $50,000.00) given by Laurence, and refund said amount for taxes within 60 Days. Thereafter, within 60 days of receiving and at his discretion choosing to accept Laurence's Mineral Proceeds, Laurence shall pay of sum of money equal to 33.33% of Laurence's remaining Mineral Proceeds to the Trustee of the Graham Trust, to be held and administered pursuant to the terms of the Graham Trust.  Laurence shall make such payment to the Trustee of the Graham Trust until such time as Laurence has paid an aggregate total of $350,000.

9.    Within 60 days of receiving and at his discretion choosing to accept any money, royalty or other payment from or relating to the Property, the mineral rights below the surface of the Property and the Leases (including as the Lease may be modified, amended, changed or extended) (hereinafter "Luke's Mineral Proceeds") and receipt of the Larry-to-Luke Payment, Luke shall pay a sum of money equal to 33.33% of Luke's Mineral Proceeds after deducting any estimated taxes which may be owed or due on account thereof as determined by a certified public accountant to the Trustee of the Graham Trust, to be held and administered pursuant to the terms of the Graham Trust. Luke shall make such payment to the Trustee of the Graham Trust until such time as Luke has paid an aggregate total of $350,000.

10.    The discretion referenced in 8 and 9 above is only applicable in the event that a lessee including, but not limited to Iluka makes a payment accompanied by the assertion or requirement that Laurence and/or Luke ratify the Leases or waive any claims or rights against the lessee. In the event that such payment is tendered by a Lessee and Larry or Luke refuse to accept then

Page 3

Luke or Laurence shall have 180 days to resolve the dispute out or court or initiate litigation over the same. Neither Laurence or Luke can interfere with the others ability to exercise discretion.

11.  Notwithstanding anything contained herein, the parties agree that Laurence has the right, at his own cost and expense, to commence, prosecute, discontinue, defend and settle legal actions, claims and other legal proceedings against any lessee, including, but not limited to, Iluka and/or RGC, relating to the Property or the Leases including, but not limited to, breach of contract claims and the right to have the Leases set aside or rendered invalid; and Luke and Betty agree that they will not intentionally interfere with or take positions contrary to such claims. Commensurate with this right, Laurence shall have the right to negotiate the resolution of those claims and/or a sale or transfer of all or a portion of this interests and Luke's interests in the Property or Leases to a third party, including, but not limited to Iluka. Luke shall be bound by such resolution and/or contract to sell or transfer and shall transfer his interests in the Property or Leases to such third party provided: (1) Laurence also transfers or sells the same share of his interests in the Property or Leases to such third party as Luke transfers or sells (2) Laurence and Luke receive the same amount of money from the transfer or sale of their interests in the Property; and (3) Luke receives for his interests a cashiers check, bank check or immediate entitlement to escrowed funds in an amount equal to the greater of : (a) an amount equal to the present value of Luke's share of the estimated royalty payments to be paid under the Leases (as estimated by Iluka and shown on Exhibit "E" attached hereto), after deductions for all advance royalty payments and royalty payments paid through such time, and (b) the net proceeds paid for Luke's interest, after deducting 50% of reasonable compensation earned by attorneys and costs and expenses incurred by Laurence in pursuing and resolving claims relating to the Property and Leases. Upon satisfaction of the conditions set forth in this paragraph, Luke agrees to simultaneously execute the appropriate documentation to transfer or sell his interests in the Property to a third party within fourteen (14) calendar days of receipt of written demand (the "Written Demand") by Laurence or such third party. The parties agree that a copy of the Written Demand shall be sent at the same time counsel for Luke. Should and only upon satisfaction of the conditions set forth in this paragraph and Luke's failure to executed the appropriate documentation to transfer or sell his interests in the Property within fourteen (14) calendar days of receipt of the Written Demand, Luke hereby grants a power of attorney to Laurence and appoints Laurence as his true and lawful attorney-in-fact, with full authority to act on his behalf for the limited purpose of transferring or selling Luke's interests in the Property.

12.  Without ratifying the Leases, reserving all rights, without prejudice to any rights and without waiving or altering the rights granted to Laurence in paragraph 11 above, and reserving all such rights, the parties agree that in accordance with the Graham Deed of Gift, Laurence is entitled to receive 60% of the Court Held funds and Luke is entitled to receive 40% of the Court Held funds.

13.  Luke and Laurence represent and warrant to each other that they have not assigned nor are there any liens against or affecting any of their rights relating to the Property, including the mineral rights below the surface of the Real Property and the Leases. Betty represents and warrants that she transferred all of her interests in the Property and Leases by the Graham Deed of Gift free and clear of any liens against or affecting any of the rights relating to the Property and the Leases, and other than the Graham Deed of Gift, she did not make, and has not made, any other assignment or transfer of such interests.

14.  It is the intent of the parties to this Settlement Agreement that this agreement and the actions to be taken hereunder, are not intended to and shall not ratify the Leases, is entered into with full reservation of all rights and claims under the Leases and without prejudice to those rights. Subject to the rights and obligations set forth in this Settlement Agreement, Laurence and Luke further recognize and agree that they hold the Property as tenants in common with neither party having control over the Property nor control over nor ability to act on behalf of the other's interest in the Property. The parties further agree that any transfer, exchange or payment of rights, interests or amount of money under this Settlement Agreement has been made for the sole purpose of settling the Actions and resolving all disputes between the parties.

15.  The parties agree to the entry by the Circuit Court of the order in the form attached as Exhibit "G" (1) directing the Clerk of the Circuit Court of Sussex County to disburse the Court Held Funds; and (2) dismissing with prejudice the Actions and all claims related thereto. The

Page 4

parties shall cooperate and take all necessary and appropriate action to accomplish the same without delay. In the event the Circuit Court will not enter the order as presented, the settlement of the Actions and this Settlement Agreement will stand as binding upon the parties, and the parties agree to endorse a new order that encompasses the covenants and agreements within this Settlement Agreement.

16.    The parties shall bear their own costs and legal fees in connection with the Actions.

17.    The parties agree that the execution of this Settlement Agreement and the release of any claims hereunder shall not constitute nor be deemed an admission of liability or wrongdoing by any party.

18.    This Settlement Agreement and the respective covenants, provisions, terms, conditions and agreements contained herein shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, executors, estate administrators, successors and assigns. Notwithstanding the foregoing, Iluka, RGC and their successors cannot be beneficiaries, third-party or otherwise, of any of the releases contained in this Settlement Agreement.

19.    The parties agree and affirm that they have each sought the advice of legal counsel with respect to the Settlement Agreement and by signing each party certifies that he or she has reviewed the terms of the Settlement Agreement with counsel of his or her choice, has had all questions and concerns regarding the Settlement Agreement answered or resolved to his or her complete satisfaction and fully understands and agrees to such terms.

20.    In entering into this Settlement Agreement, each party represents that he or she has relied exclusively on his or her own judgment, investigation and analysis of the facts, and has not relied on any representations or conditions not included in this Settlement Agreement.

21.    In the event legal action is commenced to enforce or interpret this Agreement or for declaratory relief with respect thereto, the prevailing party or parties in such action shall be entitled to recover from the  non-prevailing party or parties the reasonable attorneys fees and costs incurred by the prevailing party in such action, in such amount as determined by the Court.

22.    The parties agree to act in good faith to carry out the terms and intent of this Agreement. The parties shall also, at all times in the future, upon the reasonable request of the other or others, execute and delivery to the others, or to cause the execution and delivery of, all additional documents which may be reasonably necessary to fully consummate and carry out the terms and intent of this Settlement Agreement.  However, nothing contained in this section shall require any party or other entity to assume any liability, expense, obligation or duty not expressly required by the terms of this Settlement Agreement.

23.    The parties agree that this Settlement Agreement and the Graham Trust shall constitute the entire agreement among the parties relating to the subject matter hereof and the obligations set forth hereunder may not be altered, amended, or modified in any respect except by and in writing, duly executed by all parties.  This Settlement Agreement supercedes any and all prior oral or written understandings, agreements, guarantees, contracts and arrangements between the parties, with the exception of the Graham Deed of Gift.

24.    The parties agree that no presumption of construction exists against either party based upon the drafting of the Settlement Agreement.

25.    Each provision of this Settlement Agreement is a separate and independent clause.  If any provision of this Settlement Agreement is held invalid, such invalidity shall not invalidate the entire agreement, and the remainder of the Settlement Agreement will not be affected.

26.    The terms and conditions of this Settlement Agreement are confidential, and the parties agree that they will not disclose to or discuss with others the nature, terms and amount of the settlement which has been reached among the parties, except as may be necessary for the compliance with the terms and conditions contained herein, as may be required by law or with the prior written approval of the party not seeking to disclose such information.

27.    The execution of this Settlement Agreement shall include four (4) duplicate original copies, including exhibits, each initialed on each page by each of the parties and signed by each of the parties and notarized.

28.    The Settlement Agreement shall be governed and construed in accordance with the laws of

Page 5

the Commonwealth of Virginia.

29.  The parties agree that any litigation arising out of a dispute over the Settlement Agreement shall occur in Collier County Circuit Court in the State of Florida, without regard to the conflict of laws.  The parties agree that they will mediate any such dispute arising out of this Settlement Agreement prior to initiating litigation.


BETTY P. GRAHAM;{SEAL} _Betty P Graham_


COMMONWEALTH OF FL

CITY/COUNTY OF Naples, FL, to wit:

The foregoing was acknowledged before me this 29 day of ~~August~~ Sept, 2003, by Betty P. Graham.

_Nancy D Long_
Notary Public

My commission expires:

NANCY D. LONG
Notary Public, State of Florida
My comm. expires Mar. 9, 2007
No. DD 178836


LUKE GRAHAM:{SEAL} _____

COMMONWEALTH OF FL

CITY/COUNTY OF Naples, FL, to wit:

The foregoing was acknowledged before me this 29 day of ~~August~~ Sept, 2003, by Luke Graham.

_Nancy D Long_
Notary Public

My commission expires:

NANCY D. LONG
Notary Public, State of Florida
My comm. expires Mar. 9, 2007
No. DD 178836


LAURENCE GRAHAM: {SEAL} _____

COMMONWEALTH OF FL

CITY/COUNTY OF Naples, FL , to wit:

The foregoing was acknowledged before me this 29 day of ~~August~~ Sept, 2003, by Laurence Graham.

_Nancy D Long_
Notary Public

NANCY D. LONG
Notary Public, State of Florida
My comm. expires Mar. 9, 2007
No. DD 178836

My commission expires: March 9, 2007

Page 6

# EXHIBIT B

Dinwiddie : 410/204

Deed #97-1974

This Document Prepared By:          Grantees' Address:
Thomas H. Rose, Jr.                Betty P. Graham
Attorney at Law                    6157 Westwood Terrace
P. O. Drawer B                     Norfolk, Virginia 23508
Stony Creek, Virginia 23882-0075
(804-246-4941)                     Ann P. Everett

                                   Julia P. Boyd

THIS DEED IS EXEMPT FROM RECORDATION TAXES PURSUANT TO
SECTION 58.1-811D OF THE CODE OF VIRGINIA, 1950, AS AMENDED.

     THIS DEED OF GIFT, made this 19th day of May, 1997, by
and between George Lee PARSON, Jr. and Mary Elizabeth
PARSON, his wife, Parties of the First Part and hereinafter
styled "Grantors", and Betty P. GRAHAM, Ann P. EVERETT, and
Julia P. BOYD, Parties of the Second Part and hereinafter
styled "Grantees".

                 W I T N E S S E T H

     That for and in consideration of the sum of Ten Dollars
($10.00) cash in hand paid by the Grantees to the Grantors,
the receipt of which is hereby acknowledged, the Grantors do
hereby give, grant and convey unto Betty P. Graham, Ann P.
Everett and Julia P. Boyd, in equal shares, all of their
right, title and interest in and to the minerals of every
kind and character in, on and under those certain tracts of
parcels of land situate in Stony Creek Magisterial District,
Sussex County, Virginia, and Sapony District, Dinwiddie
County, Virginia, containing a total of 1169.86 acres, more
or less, being shown and described on Exhibits A thru J
attached to this Deed of Gift, together with the right of
ingress and egress, and possession at all times for the
purpose of mining, drilling and operating for said minerals
and the maintenance of facilities and means necessary or
convenient for producing, treating and transporting such
minerals.

     This conveyance is made subject to certain Deeds of
Mining Lease dated October 13, 1989, between the Grantors
and RGC (USA) Minerals, Inc., a Delaware Corporation, the
First Amendments to Deeds of Mining Lease dated June 30,
1994, and the Second Amendments to Deeds of Mining Lease
dated February 23, 1996, but, for the same consideration
hereinabove mentioned, the respective Grantees, their heirs,
successors or assigns, all of the royalties accruing or to
accrue under said leases for the above described land except
as hereinafter reserved.

     The Grantors reserve and except from the conveyance the
advance royalty payments from RGC (USA) Minerals, Inc. as
set forth in the First Amendments to Deeds of Mining Lease
dated June 30, 1994, it being understood that two (2) annual
advance payments remain due and payable under each lease.

                         1

The Grantors further reserve and except the annual rental payments from RGC (USA) Minerals, Inc., as set forth in the Deeds of Mining Lease dated October 13, 1989.

WITNESS the following signatures and seals:

_George Lee Parson, Jr._ (SEAL)
George Lee Parson, Jr.

_Mary Elizabeth Parson_ (SEAL)
Mary Elizabeth Parson

STATE OF VIRGINIA
CITY/COUNTY OF ___Smyth___, to-wit:

The foregoing instrument was acknowledged before me this 30th day of June, 1997, by George Lee Parson, Jr. and Mary Elizabeth Parson.

My term expires: __August 31  1997__

_Margaret W Boor_ (SEAL)
Notary Public

2

DOOK 1 O O ... U .. O .

*George Lee Parson, Jr.* and Mary Elizabeth Parson

Exhibit A

That same tract or parcel of land conveyed to G. L. Parson, Jr. by Warranty Deed, dated December 18, 1972, and recorded in Deed Book 160 at page 61, in Clerk's Office of Circuit Court of Dinwiddie County, Virginia. To Wit: All of that certain tract, piece or parcel of land lying and being situate in Sapony District, Dinwiddie County, Virginia, South of what is called Dover Spring Branch, containing one hundred and forty (140) acres, more or less, and bounded on the North by the said Dover Spring Branch, on the East by the land of Charlie Pride and the land of Lee Parson, on the South by the land of S. T. Rideout and on the West by the land of Mrs. C.C. Rideout; and being the same land described in and conveyed by deed dated July 20, 1896, from Thomas J. Crowder and wife to Mary H. Carraway, duly recorded in the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, in Deed Book 20, No. 1 at page 317; and being in all respects the same real estate conveyed to G. Lee Parson from W. Potter Sterne, Special Commissioner, by deed dated the 13th day of May, 1938, and recorded in the aforesaid Clerk's Office in Deed Book 62, at page 24.

LESS and EXCEPT: That same tract or parcel of land conveyed to Lance V. Everett and Ann P. Everett; Husband and wife, by Warranty Deed, dated December 18, 1976, and recorded in Deed Book 182 at page 259, in the Clerk's Office of Circuit Court of Dinwiddie County, Virginia. To Wit: All that certain lot, piece or parcel of land lying and being situate in Sapony District, Dinwiddie County, Virginia, containing 2.68 acres, more or less, as shown on a plat of survey made by W. G. Chappell, C.L.S., dated December 10, 1976, which plat is attached hereto and made a part hereof, and on which plat said lot is described as follows, to-wit: Beginning at a spike in the center of State Highway Route No. 619, thence N 86° 00' E 638.80 feet to an iron (set); thence S 4° 00' E 189.00 feet to an iron (set); thence S 86° 00' W 638.80 feet to a spike in the center of said Route No. 619; thence N 4° 00' W 189.00 feet along the center of said Route No. 619 to a spike, the point of beginning.

Being in all respects a part or portion of the same real estate conveyed to G. L. Parson, Jr. from G. Lee Parson, also known as G. L. Parson, Sr. and Virgie F. Parson, his wife, by deed dated the 18th day of December, 1972, and recorded in the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, in Deed Book 160, at page 61.

AND ALSO LESS and EXCEPT 14.63 acres, as described in unrecorded survey, by Kenneth O. Peterson, L.S. 1553 dated 9-19-1989, standing in the name of G.L. Parsons.

Subject property is referred to in the Dinwiddie County tax records as Tax Parcel Number 101-4.

BOOK 155 PAGE 629

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit B

That same tract or parcel of land bequeathed to G. L. Parson, Jr. by Last Will and Testament of G. Lee Parson, Sr. (also known as G. L. Parson and also known as G. L. Parson, Sr.), dated May 3, 1966, recorded March 8, 1973, in Volume 23, page 430 through 436 of the Clerk's Office of Sussex Circuit Court, Sussex County, Virginia. To Wit:  The farm that I own, situate near Concord Church in Sussex County, Virginia, and known as "The Walter Harrison Farm", across State Road No. 619, from Berry Ridout Farm, the side where the home part is situated and containing approximately 125 acres.

ALSO, being that same tract or parcel of land conveyed to G. L. Parson, by Warranty Deed, dated February 8, 1924, and recorded in Deed Book 28 at page 519, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit:  ...... all that certain tract or parcel of land situated in the Stony Creek Magisterial District, County of Sussex, State of Virginia; containing one hundred and twenty five acres, more or less and bounded as follows:  on the North and West by the Walker's Mill Road, on the East by the lands of C. W. Parsons and Willis Roberson, (Willis Robinson) and on the South by the land of B. Wesley Barns and the public road leading to Stony Creek, Virginia.

EXEMPTING from this tract of land all mining operations for a cemetery, situated upon 0.50 acres, more or less and six (6) bulk barns, situated upon 2.00 acres more or less.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-7.

BOOK 1550 PAGE 630

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit C

That same tract or parcel of land conveyed to G. L. Parson (also known as G. Lee Parson, Sr.), from M. L. Finney, as grantor, by Trustees Deed dated January 25, 1941 and recorded in Book 38 at page 100 in the Clerk's Office of Sussex Circuit Court.

The property is a small part of "The Wesley Barnes Farm", between the parsonage and the two branches down beside the public road and around the grave-yard to the road and back to the branch again, in fee-simple, as found in Deed Book 11, page 464, Deed Book 5, page 613, Deed Book 11, page 196 and Deed Book 22 page 409.

The above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson, G. Lee Parson, Jr. and G. L. Parson, Jr.) from the Will of G. Lee Parson, Sr. deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

EXEMPTING from all mining operations a one acre parcel of land lying in the southerly part of this tract. This parcel of land is presently unsurveyed and is used as a cemetery.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-6.

BOOK 135 PAGE 611

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit D

That same tract or parcel of land conveyed to G. L. Parson, Jr. by Warranty Deed, dated April 15, 1960, and recorded in Deed Book 59 at page 579, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All "that certain tract or parcel of land lying and being situate in the County of Sussex and State of Virginia containing sixteen and five tenths acres (16.5) more or less and herein after described as follows: Beginning at an iron stob on the Cabin Point Road, running thence along the said Road South 79° 15' East 983 feet, thence North 32° 00' East 343 feet along the said Road, thence North 7° 00' West 1013 feet to a pine tree, thence South 41° 45' West 1537 feet to the point of beginning.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-13.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit E

That same tract or parcel of land conveyed to G.L. Parson, Jr. by Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59 at page 559, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: ...... all that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing, by estimation, two hundred (200) acres, and bounded as follows: On the North by G. Lee Parson; on the East by W. S. Barnes; on the South by the public road leading from Stewart's to Concord Church; on the West by R. C. Chappell and said public road leading from Stewart's to Concord Church and Wesley Barnes, reserving a certain road or passage-way which leads from the house now owned by W. S. Barnes through said tract of land to the public road at the forks of the road, on of which leads to Purdy, as and for an outlet of the occupants of the said house now occupied by W. S. Barnes, with the right or privilege of the purchaser of straightening said road, if he shall so desire."; and being in all respects the identical real estate that was conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, by deed from John H. Cole, Special Commissioner, dated June 1, 1927, and duly recorded in the Clerk's Office of the aforesaid county in Deed Book 31 at page 244.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-31.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit F

That same tract or parcel of land conveyed to G. Lee Parson, Jr. by Warranty Deed, dated February 16, 1970, and recorded in Deed Book 73 at page 600, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All that certain tract, piece or parcel of land, lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing one hundred and eighty-seven (187) acres, more or less, adjoining the lands of Markham B. Chappell; Old Eppes Tract; Green Church Road; and Wyatt Mill Road, being in all respects the same land which was devised unto Nannie B. Chappell by John E. Stewart, as will be seen by reference to the first clause of his last will and testament, of record in the clerk's Office of the Circuit Court of Sussex County, Virginia, except a portion thereof, containing about twenty-five (25) acres, which was conveyed to Nannie B. Chappell to Markham B. Chappell by deed recorded in the aforesaid Clerk's Office in Deed Book 27, at page 323; and being in all respects the same real estate conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, from John H. Cole, Special Commissioner, by deed dated the 29th day of December, 1934, and recorded in the aforesaid Clerk's Office in Deed Book 34, at page 283.

EXEMPTING from this tract of land three (3) bulk barns, situated upon two (2) acres, more or less.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-38.

BOOK 1

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit G

That same tract or parcel of land conveyed to G.L. Parson (also known as G. Lee Parson, Sr.) by Warranty Deed, dated November 14, 1959, and recorded in Deed Book 59 at page 279, in Clerk's Office of Circuit Court of Sussex County, Virginia. To wit: All of that certain track, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing four and seventeen hundredths (4.17) acres by actual survey, and being shown and designated on a certain plat of survey, dated March 1, 1952, made by B.C. Frye, C.E., which said plat of survey is recorded in the aforesaid Clerk's Office in Plat Book 7, at page 26, and reference thereto is hereby invited for a more perfect description of the real estate herein conveyed; and being more particularly described on said plat as follows: Commencing on the West side of State Highway Route No. 619 at the Southeastern corner of a certain lot of land owned by B.J. Rideout, Jr.; thence S. 79° 30′ W. 443 ft. to a point; thence South 24° 46′ E. 494 ft. to a point; thence N. 62° 30′ E. 465 ft. to a point; thence along Route 619 N. 30° 00′ W. 370 ft. to the point of beginning; and being in all respects the same real estate that was conveyed to the parties of the first part, as husband and wife, by the entireties, with the right of survivorship as at common law, by deed from B.J. Rideout, Sr. and wife, and dated March 17, 1952, and recorded in the aforesaid Clerk's Office in Deed Book 48 at page 477.

The above stated land bequeathed and devised to Virgie Fraher Parson (also known as Virgie F. Parson) from the Will of G. Lee Parson, Sr., deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

AND ALSO the above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson, G. Lee Parson, Jr. and G. L. Parson, Jr.) from the Will of Virgie F. Parson (also known as Virgie Fraher Parson), deceased, in Will Book 31 at page 314 dated September 25, 1973, recorded October 15, 1982 in the Clerk's Office of Sussex Circuit Court.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-3.

BOOK 155 PAGE 635

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit H

That same tract or parcel of land conveyed to G. Lee Parson (also known as G. Lee Parson, Sr.), by Warranty Deed, dated December 24, 1947, and recorded in Deed Book 44 at page 126, in Clerk's Office of Circuit Court of Sussex County, Virginia.  To wit:  All of that certain track or parcel of land, with the appurtenances thereto belonging, containing Three and one-half (3 1/2) acres, more or less, lying, being and situate on both sides of the Milwaukee Road Little Mill Magisterial District, Sussex County, Va., and bounded as follows:  On the North, East and West by lands of Lee Parson and on the South by the land of Willis Robinson, the said tract of land hereby conveyed being situate about 300 yards West of the present residence of said G. Lee Parson.

The above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson and G. L. Parson, Jr.) from the Will of G. Lee Parson, Sr., deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-14.

09/30/2024

BOOK 159 PAGE 560
George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit I

That same tract or parcel of land conveyed to G.L. Parson Jr., by Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59 at page 559, in Clerk's Office of Circuit Court of Sussex County, Virginia.  To Wit:  ......all of that certain tract or parcel of land sold in bulk and not by acres, said to contain fifty (50) acres, be it the same more or less, and being in Stony Creek Magisterial District Sussex County, Virginia, with general warranty.  Bounded and described as follows, on the North by Public Road leading from Concord Church to Stony Creek, On the East by the 'Old Man-love Tract' formerly owned by Camp Manufacturing Company, on the South by a branch and on the West by said public road leading from Concord Church to Stony Creek, Va."; and being in all respects the identical real estate that was conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, by deed from J. Walter Harrison and wife, dated April 16, 1915 and duly recorded in the Clerk's Office of the aforesaid county in Deed Book 24 at page 303.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-17.

BOOK 155 PAGE 637

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit J

That same tract or parcel of land conveyed to G. Lee Parson, Jr., by Warranty Deed, dated March 22, 1960, and recorded in Deed Book 59 at page 524, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All that certain tract of land, with all the improvements thereon and the appurtenances thereto belonging, lying, being and situate on the East side of the Nottoway River in Stony Creek Magisterial District, Sussex County, Virginia, containing eight hundred (800) acres, more or less, and bounded as follows: On the north by the lands now or formerly belonging to Slate, C.R. Chappell, Robinson and Camp Manufacturing Company; on the east by the lands now or formerly belonging to Otho Chappell, Henry Poole, G. Lee Parson, Sr. and the Wyatt Mill Road; on the South by the lands now or formerly belonging to J. H. Poole and the Nottoway River; and on the West by said Nottoway River and the land now or formerly belonging to the Camp Manufacturing Company; the land hereby conveyed is the same that was conveyed to G. Lee Parson, Sr. from J. Thompson Wyatt, Special Commissioner, by deed dated June 11th, 1946 recorded in the Circuit Court Clerk's Office of said County in Deed Book 42, at page 180; by deed from Francis E. Wyatt, and others, dated May 3, 1945, and recorded in said Clerk's Office in Deed Book 41 at page 137; by deed from William E. Anderson, unmarried, dated November 7th, 1945, and recorded in said Clerk's Office, in Deed Book 41, at page 365, and by deed from Benjamin G. Anderson, unmarried, dated May 10th, 1945, and recorded in said Clerk's Office, in Deed Book 41, at page 136.

The above described property was resurveyed by J. C. Shearin, dated March 20, 1972, recorded May 30, 1989 in Plat Book 18 at Page 6 in the Sussex County, Virginia records. The above stated deed recites 800.0 acres which is now corrected to recite 933.30 acres which is an increase of 133.30 acres, stated as follows: Tract No. 1 contains 50.0 acres, Tract No. 2 contains 343.0 acres, Tract No. 3 contains 379.0 acres and an open tract of land not presently surveyed containing approximately 161.30 acres, more or less.

LESS and EXCEPT from this tract of land the westerly portion thereof, containing 487.30 acres.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-36.

INSTRUMENT #9781572
RECORDED IN THE CLERK'S OFFICE OF
DINWIDDIE ON
JULY 2, 1997 AT 09:47AM
ANNIE L. WILLIAMS, CLERK
BY: _____ DEPUTY CLERK

VIRGINIA: In the Clerk's Office of the Circuit Court of Sussex County. The foregoing instrument was this day presented in the office aforesaid and is, together with the certificate of acknowledgment annexed, admitted to record this ......7th..... day of ........July.......... 19 97 ....at..... 9:19.... A. M.

TESTE: ..........................................Clerk

159

961-1031


COPY

STD Lease
VA 8/89

## DEED OF MINING LEASE

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on _____October 13,_____ 1989 _____ by and between _G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife Route 1, Box 60, Stony Creek, Virginia  23882_

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1.  Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

**2.  Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

**3.  Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

**4.  Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:
(a)  To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");
(b)  To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");
(c)  To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;
(d)  To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;
(e)  To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;
(f)  To use all easements, means of access, and rights-of-way from and to the Property; and
(g)  To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

**5.  Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6.  Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of payment:

GLP Jr
GLP, JR.
DPW

| Payment Date | Payment Type | Payment | |
|---|---|---|---|
| Lease Date | Initial Payment | $250 per acre | |
| Lease Date | Advance Royalty $1,221.88 | $730 per acre | MEP<br>MEP |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre | |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $110,370.00<br>lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) | |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $110,370.00<br>lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) | |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $110,370.00<br>lump sum, subject to 70% Limitation | |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) | |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7.  Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8.  Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

**9.  Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.   Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.   RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damage in question.

**12.   RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.   Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.   Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims asserted in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, drying and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.   Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.   Taxes.** Taxes will be apportioned and paid as follows:

(a)   RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)   Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)   Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will (i) pay any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)   RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under the Lease.

**17.   Warranty of Title.** Lessor warrants as follows:

(a)   Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b)   The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

(c)   Lessor has full power and authority to execute this Lease;

(d)   RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e)   There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f)   This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.   Lessor Interest.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.   Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.   Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.   Compensation for Buildings.**

(a)   **Principal Residence.** If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence prior to its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

418TEMP2

(b) **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will terminate in all respects.

22. **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23. **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24. **Entireties.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25. **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26. **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a) The party making such an assignment must give the other party prior written notice thereof;

(b) The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c) Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d) Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e) No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27. **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornado, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28. **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29. **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30. **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31. **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32. **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33. **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34. **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35. **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36. **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37. **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38. **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

418TEMP2

39.  **_Memorandum._**  At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40.  **_Mortgagee Consent._**  Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither effect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41.  **_Headings._**  The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42.  **_Obligations That Survive This Lease._**  In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43.  **_Good Faith._**  During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

_G. L. Parson, Jr._ [SEAL]

G. L. Parson, Jr.
(Print Name)
  AKA George Lee Parson, Jr.
  AKA G. L. Parson
  AKA G. Lee Parson, Jr.


_Mary Elizabeth Parson_ [SEAL]

Mary Elizabeth Parson
(Print Name)
  AKA Mary Butterworth Parson
  AKA Mary B. Parson
  AKA Mary E. Parson
  AKA Mrs. G. L. Parson, Jr.


STATE OF VIRGINIA

~~CITY/~~COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 1989, by  _G. L. Parson, Jr., and Mary_
_Elizabeth Parson, husband and_
_wife_
_____
_____

My Commission Expires:

_October 28, 1991_

_Thomas H. Persey_
Notary Public

[NOTARIAL SEAL]


RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_

Its:  Vice  President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary


STATE OF  FLORIDA
COUNTY OF  CLAY

The foregoing instrument was acknowledged before me this _13_ day of _February_, ~~1989,~~ 1990, by  Daniel P. Wolcott
as  Vice  President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Robins_
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993

[NOTARIAL SEAL]


418TEMP2

- 4 -

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
**AKA MRS. G. L. PARSON, JR., husband and wife**
**(LESSOR)**


**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Sapony___ Magisterial District, __Dinwiddie_____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to _122.69_ acres, and which is described as follows:

That same tract or parcel of land conveyed to G. L. Parson, Jr. by Warranty Deed, dated December 18, 1972, and recorded in Deed Book 160 at page 61, in Clerk's Office of Circuit Court of Dinwiddie County, Virginia.  To Wit:  All of that certain tract, piece or parcel of land lying and being situate in Sapony District, Dinwiddie County, Virginia, South of what is called Dover Spring Branch, containing one hundred and forty (140) acres, more or less, and bounded on the North by the said Dover Spring Branch, on the East by the land of Charlie Pride and the land of Lee Parson, on the South by the land of S. T. Rideout and on the West by the land of Mrs. C.C. Rideout; and being the same land described in and conveyed by deed dated July 20, 1896, from Thomas J. Crowder and wife to Mary H. Carraway, duly recorded in the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, in Deed Book 20, No. 1 at page 317; and being in all respects the same real estate conveyed to G. Lee Parson from W. Potter Sterne, Special Commissioner, by deed dated the 13th day of May, 1938, and recorded in the aforesaid Clerk's Office in Deed Book 62, at page 24.

LESS and EXCEPT:  That same tract or parcel of land conveyed to Lance V. Everett and Ann P. Everett; Husband and wife, by Warranty Deed, dated December 18, 1976, and recorded in Deed Book 182 at page 259, in the Clerk's Office of Circuit Court of Dinwiddie County, Virginia.  To Wit:  All that certain lot, piece or parcel of land lying and being situate in Sapony District, Dinwiddie County, Virginia, containing 2.68 acres, more or less, as shown on a plat of survey made by W. G. Chappell, C.L.S., dated December 10, 1976, which plat is attached hereto and made a part hereof, and on which plat said lot is described as follows, to-wit:  Beginning at a spike in the center of State Highway Route No. 619, thence N 86° 00' E 638.80 feet to an iron (set); thence S 4° 00' E 189.00 feet to an iron (set); thence S 86° 00' W 638.80 feet to a spike in the center of said Route No. 619; thence N 4° 00' W 189.00 feet along the center of said Route No. 619 to a spike, the point of beginning.

Being in all respects a part or portion of the same real estate conveyed to G. L. Parson, Jr. from G. Lee Parson, also known as G. L. Parson, Sr. and Virgie F. Parson, his wife, by deed dated the 18th day of December, 1972, and recorded in the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, in Deed Book 160, at page 61.

AND ALSO LESS and EXCEPT 14.63 acres, as described in unrecorded survey, by Kenneth O. Peterson, L.S. 1553 dated 9-19-1989, standing in the name of G.L. Parsons.

EXEMPTING from all mining operations a parcel of land used for a cemetery.

Subject property is referred to in the Dinwiddie County tax records as Tax Parcel Number 101-4.

EXHIBIT B
TO
MINING LEASE
BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

AND

RGC (USA) MINERALS INC.
(RGC)

RGC's Royalty Policy for Virginia Operations

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

   (a)    "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b)    "Minor Minerals" means Minerals other than Principal Minerals.

   (c)    "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

   (d)    "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

   (e)    "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f)    "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

   (g)    "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a)    The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

   (b)    Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

   (c)    Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

   (d)    Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

   (e)    A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5. **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6. **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a)    RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b)    Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

      (i)      "Mining" - extracting and delivery of mineral sand ore to the concentrator;

      (ii)     "Concentrating" - removal of non-commercial material;

      (iii)    "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.



(c)    The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)    Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

7.    *Royalty Payment Calculations.*

   (a)    Principal Minerals Sold

      (i)    Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

      (ii)   The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

      (iii)  The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

      (iv)   RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

      (v)    The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

   (b)    Minor Minerals Sold

      Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

   (c)    Adjustments

      At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

8.    **Commingling and Stockpiling.** RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

9.    **Sales to Affiliates.** RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the Indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

10.    **Most Favored Lessor.** If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 herein), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

11.    **Completion of Mining.**

   (a)    RGC will send Lessor written notice when it has completed Mining on the Property.

   (b)    The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 6 (Minimum Royalty) of the Lease.

   (c)    If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

   (d)    If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

12.    **Advance Royalty Payment: "70% of Estimated Future Royalty Payments".** At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or __497,645__ tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

13.    **No Reliance on Estimates or Representations.** Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 6 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

STD Lease
VA 8/89

## DEED OF MINING LEASE



961-1033

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on __October 13,_____ 19_89_____ by and between _G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA_ _G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA_ _Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife_ _Route 1, Box 60, Stony Creek, Virginia 23882_____ ("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1. **Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have that same meaning throughout this Lease.

2. **Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3. **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

4. **Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:
   (a) To enter the Property to survey, explore, drill, test, and sample the foregoing activities are defined as "Exploration");
   (b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");
   (c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;
   (d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;
   (e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;
   (f) To use all easements, means of access, and rights-of-way from and to the Property; and
   (g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.
   Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

5. **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of this Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

6. **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $24,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $24,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to 70% Limitation (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $24,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are nonrefundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Fifth, Tenth, and Fifteenth Anniversary Advance Royalty Payments.

7. **Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8. **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $15,000 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9. **Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

KC U

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

10.    **Safety.**    Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

11.    **RGC to Comply With Safety Laws and to Indemnify Lessor.**    RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

12.    **RGC's Right to Determine Whether, When and Where to Mine.**    Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings – Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

13.    **Compliance With Laws.**    RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

14.    **Reclamation.**    RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable law, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and abandoning settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

15.    **Audit.**    RGC will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that the auditor sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

16.    **Taxes.**    Taxes will be apportioned and paid as follows:

   (a)    RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, prorated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

   (b)    Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

   (c)    Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

   (d)    RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

17.    **Warranty of Title.**    Lessor warrants as follows:

   (a)    Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

   (b)    The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

   (c)    Lessor has full power and authority to execute this Lease;

   (d)    RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

   (e)    There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

   (f)    This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

18.    **Lessor Interest.**    In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may be proportionately reduced all payments otherwise payable under this Lease, (b) offset any prior payments related to the unvested portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

19.    **Termination.**    RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

20.    **Title Documents.**    Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

21.    **Compensation for Buildings.**

   (a)    **Principal Residence.**    If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or MFIA-approved appraisers supplied by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow for its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

- 2 -

(b)    **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.    **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.    **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.    **Entireties.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole and make all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will the Lease if the Property were owned in undivided fee simple by a single owner. ... total payment obligations that their incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.    **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.    **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)    The party making such an assignment must give the other party prior written notice thereof;

(b)    The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)    Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration Operations or Reclamation on the Property;

(d)    Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)    No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.    **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market price of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reason of Force Majeure.

28.    **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.    **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.    **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.    **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.    **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.    **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.    **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.    **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36.    **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.    **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.    **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

**39.** *Memorandum.* At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.** *Mortgagee Consent.* Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.** *Headings.* The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.** *Obligations That Survive This Lease.* In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

**43.** *Good Faith.* During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

*[signature]* [SEAL]

G. L. Parson, Jr.
(Print Name)

AKA George Lee Parson, Jr.
AKA C. L. Parson
AKA G. Lee Parson, Jr.

*[signature]* [SEAL]

Mary Elizabeth Parson
(Print Name)

AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. C. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this 18th day of October, 1989, by G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife.

My Commission Expires:

October 28, 1981

_Thomas N. Gray_
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: *Daniel P. Walcott*

Its: Vice President

[CORPORATE SEAL]

Attest: *[signature]*

Its: Secretary

STATE OF FLORIDA
COUNTY OF CLAY

The foregoing instrument was acknowledged before me this 13 day of February, ~~1989~~ 1990, by Daniel P. Walcott as Vice President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

*Ruth Rolino*
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 23, 1993

[NOTARIAL SEAL]

- 4 -

418TEMP2

STD Lease Mem
VA 8/89

STATE OF VIRGINIA
COUNTY OF _____Sussex_____

### MEMORANDUM OF MINING LEASE



RCC (USA) Minerals Inc., a Delaware corporation, ("RCC") and

("Lessor") have entered into a Deed of Mining Lease dated _____October 13, 1989_____
_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

    1.    RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

    2.    Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

    3.    The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

    4.    During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

    5.    The Lessor's name and address are:

        G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
        Route 1, Box 60
        Stony Creek, Virginia 23882

    6.    RCC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

    IN WITNESS WHEREOF, RGC and Lessor have executed this Memorandum of Lease as of _____October 13, 1989_____

LESSOR: _G. L. Parson, Jr._ (signature)

G. L. Parson, Jr.
**(Print Name)**
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_ (signature)

Its: _____Vice_____ President
[CORPORATE SEAL]

Attest: _____ (signature)

Its: _____ Secretary

_Mary Elizabeth Parson_ (signature)

Mary Elizabeth Parson
**(Print Name)**
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF _____FLORIDA_____

CITY/COUNTY OF _____CLAY_____

The foregoing instrument was acknowledged before me this _13_ day of _February_ 19_90_ by _Daniel P. Wolcott_ as _____Vice_____ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

Notary Public, State of Florida
My Commission Expires May 23, 199_

_____ (signature)
Notary Public

[NOTARIAL SEAL]

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 19_89_ by _G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife._

My Commission Expires: _October 28, 1991_

_____ (signature)
Notary Public

[NOTARIAL SEAL]

EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, _Sussex___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to _55.00_ acres, and which is described as follows:

That same tract or parcel of land conveyed to G.L. Parson Jr., by Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59 at page 559, in Clerk's Office of Circuit Court of Sussex County, Virginia.   To Wit:   ......all of that certain tract or parcel of land sold in bulk and not by acres, said to contain fifty (50) acres, be it the same more or less, and being in Stony Creek Magisterial District Sussex County, Virginia, with general warranty.   Bounded and described as follows, on the North by Public Road leading from Concord Church to Stony Creek, On the East by the 'Old Man-love Tract' formerly owned by Camp Manufacturing Company, on the South by a branch and on the West by said public road leading from Concord Church to Stony Creek, Va."; and being in all respects the identical real estate that was conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, by deed from J. Walter Harrison and wife, dated April 16, 1915 and duly recorded in the Clerk's Office of the aforesaid county in Deed Book 24 at page 303.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-17.

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

EXHIBIT A

Under the terms of the above-referenced mining lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, Sussex ____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to 55.00 acres, and which is described as follows:

That same tract or parcel of land conveyed to G.L. Parson Jr., by Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59 at page 559, in Clerk's Office of Circuit Court of Sussex County, Virginia.   To Wit:   ......all of that certain tract or parcel of land sold in bulk and not by acres, said to contain fifty (50) acres, be it the same more or less, and being in Stony Creek Magisterial District Sussex County, Virginia, with general warranty.  Bounded and described as follows, on the North by Public Road leading from Concord Church to Stony Creek, On the East by the 'Old Man-love Tract' formerly owned by Camp Manufacturing Company, on the South by a branch and on the West by said public road leading from Concord Church to Stony Creek, Va."; and being in all respects the identical real estate that was conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, by deed from J. Walter Harrison and wife, dated April 16, 1915 and duly recorded in the Clerk's Office of the aforesaid county in Deed Book 24 at page 303.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-17.

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

EXHIBIT B
TO
MINING LEASE
BY AND BETWEEN
C. L. Parson, Jr. and Mary Elizabeth Parson,
__husband and wife__
(Lessor)

AND

RGC (USA) MINERALS INC.
(RGC)

RGC's Royalty Policy for Virginia Operations

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1.  **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

 (a) "Principal Minerals" means Ilmenite, Rutile and Zircon.

 (b) "Minor Minerals" means Minerals other than Principal Minerals.

 (c) "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

 (d) "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral (following processing by the dry plant (net of returns, sales taxes, sales discounts and commission but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

 (e) "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

 (f) "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

 (g) "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2.  **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3.  **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

 (a) The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

 (b) Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

 (c) Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

 (d) Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

 (e) A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4.  **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5.  **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchasers), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6.  **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

 (a) RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

 (b) Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

  (i) "Mining" - extracting and delivery of mineral sand ore to the concentrator;

  (ii) "Concentrating" - removal of non-commercial material;

  (iii) "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

- 6 -

The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)     Within 30 days of the end of each Fiscal Year, RCC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

7.     **Royalty Payment Calculations.**

(a)     Principal Minerals Sold

(i)     Within 30 days of the end of each Quarter, RCC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)     The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii)     The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)     RCC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)     The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributable to the Property for the Quarter as reflected in the Stock Account.

(b)     Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)     Adjustments

At the end of each Fiscal Year, RCC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

8.     **Commingling and Stockpiling.** RCC will commingle Minerals from the Property with Minerals from other property, may engage in Mining on more than one property in a Quarter, and may in RCC's sole discretion from time to time stockpile Minerals depending on market conditions.

9.     **Sales to Affiliates.** RCC may in its sole discretion sell part or all of its Minerals to affiliates of RCC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RCC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RCC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RCC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06320209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

10.     **Most Favored Lessor.** If RCC agrees, after signing this Lease, to pay a higher initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RCC's then-current estimate of the lessor's total Advance Royalty Payment and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RCC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

11.     **Completion of Mining.**

(a)     RCC will send Lessor written notice when it has completed Mining on the Property.

(b)     The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RCC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 6 (Minimum Royalty) of the Lease.

(c)     If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, then Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)     If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RCC within 30 days, to either: (i) forfeit all rights to Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

12.     **Advance Royalty Payment: "70% of Estimated Future Royalty Payments".** At least one year before RCC commences Mining on the Property, RCC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or 12,193____ tons and applying reasonably expected Recovery Rates and prices, RCC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. That Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

13.     **No Reliance on Estimates or Representations.** Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 6 (Minimum Royalty) of the Lease applies only if RCC engages in Mining on the Property, and even then applies only to the total number of acres from which RCC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

511TEMP2

STD Lease
VA 8/89



961-1034

COPY

# DEED OF MINING LEASE

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on ___October 13,___ 1989 ___ by and between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1. Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized with have the same meaning throughout this Lease.

**2. Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

**3. Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

**4. Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:

(a) To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");

(b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");

(c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

(d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;

(e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

(f) To use all easements, means of access, and rights-of-way from and to the Property; and

(g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

**5. Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6. Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $3,500.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $3,500.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $3,500.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7. Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8. Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

**9. Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

3.5

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

10.    **Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

11.    **RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payment made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

12.    **RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings -- Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

13.    **Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

14.    **Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable State law, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

15.    **Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given; if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

16.    **Taxes.** Taxes will be apportioned and paid as follows:

(a)    RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)    Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)    Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)    RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

17.    **Warranty of Title.** Lessor warrants as follows:

(a)    Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b)    The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

(c)    Lessor has full power and authority to execute this Lease;

(d)    RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e)    There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f)    This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

18.    **Lessor Interest.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

19.    **Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

20.    **Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

21.    **Compensation for Buildings.**

(a)    *Principal Residence.* If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

418TEMP2

(b) **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22. **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23. **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24. **Entireties.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25. **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26. **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a) The party making such an assignment must give the other party prior written notice thereof;

(b) The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c) Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d) Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e) No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27. **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28. **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29. **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30. **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31. **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32. **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33. **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34. **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35. **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36. **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37. **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38. **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

418TEMP2

39. **Memorandum.** At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40. **Mortgage Consent.** Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41. **Headings.** The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42. **Obligations That Survive This Lease.** In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43. **Good Faith.** During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

_G L Parson Jr_ [SEAL]

G. L. Parson, Jr.
(Print Name)
  AKA George Lee Parson, Jr.
  AKA G. L. Parson
  AKA G. Lee Parson, Jr.

_Mary Elizabeth Parson_ [SEAL]

Mary Elizabeth Parson
(Print Name)
  AKA Mary Butterworth Parson
  AKA Mary B. Parson
  AKA Mary E. Parson
  AKA Mrs. G. L. Parson, Jr.


RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_

Its: __Vice__ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary


STATE OF __FLORIDA__
COUNTY OF __CLAY__

The foregoing instrument was acknowledged before me this __13__ day of __February__, 1989, 1990, by __Daniel P. Wolcott__ as __Vice__ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Robbins_
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993

[NOTARIAL SEAL]


STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this __18th__ day of __October__, 1989, by __G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife__

My Commission Expires:

_October 28, 1991_

_Thomas N. Perry_
Notary Public

[NOTARIAL SEAL]

EXHIBIT B
TO
MINING LEASE
BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

AND

RGC (USA) MINERALS INC.
(RGC)

RGC's Royalty Policy for Virginia Operations

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1.    **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

   (a)    "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b)    "Minor Minerals" means Minerals other than Principal Minerals.

   (c)    "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (1%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

   (d)    "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

   (e)    "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f)    "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

   (g)    "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2.    **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing this Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3.    **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a)    The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

   (b)    Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

   (c)    Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

   (d)    Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

   (e)    A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4.    **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5.    **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property, within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6.    **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a)    RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b)    Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

     (i)    "Mining" - extracting and delivery of mineral sand ore to the concentrator;

     (ii)    "Concentrating" - removal of non-commercial material;

     (iii)    "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(c) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)    Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

7.    *Royalty Payment Calculations.*

    (a)    Principal Minerals Sold

        (i)    Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

        (ii)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

        (iii)    The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

        (iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

        (v)    The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

    (b)    Minor Minerals Sold

        Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

    (c)    Adjustments

        At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

8.    *Commingling and Stockpiling.* RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

9.    *Sales to Affiliates.* RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of that Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

10.    *Most Favored Lessor.* If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre, or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

11.    *Completion of Mining.*

    (a)    RGC will send Lessor written notice when it has completed Mining on the Property.

    (b)    The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

    (c)    If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

    (d)    If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

12.    *Advance Royalty Payment: "70% of Estimated Future Royalty Payments".* At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using this information and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

13.    *No Reliance on Estimates or Representations.* Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, ___Sussex___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to __3.50__ acres, and which is described as follows:

That same tract or parcel of land conveyed to G. Lee Parson (also known as G. Lee Parson, Sr.), by Warranty Deed, dated December 24, 1947, and recorded in Deed Book 44 at page 126, in Clerk's Office of Circuit Court of Sussex County, Virginia.  To wit:  All of that certain track or parcel of land, with the appurtenances thereto belonging, containing Three and one-half (3 1/2) acres, more or less, lying, being and situate on both sides of the Milwaukee Road Little Mill Magisterial District, Sussex County, Va., and bounded as follows:  On the North, East and West by lands of Lee Parson and on the South by the land of Willis Robinson, the said tract of land hereby conveyed being situate about 300 yards West of the present residence of said G. Lee Parson.

The above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson and G. L. Parson, Jr.) from the Will of G. Lee Parson, Sr., deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-14.

STD Lease Mem
VA 8/89

STATE OF VIRGINIA
COUNTY OF ___Sussex___

### MEMORANDUM OF MINING LEASE



·RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

("Lessor") have entered into a Deed of Mining Lease dated ____October 13, 1989____
_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

    1.    RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

    2.    Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

    3.    The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

    4.    During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

    5.    The Lessor's name and address are:

        G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
        Route 1, Box 60
        Stony Creek, Virginia  23882

    6.    RGC's name and address are:·RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

    IN   WITNESS   WHEREOF,   RGC   and   Lessor   have   executed   this   Memorandum   of   Lease   as of ____October 13, 1989____

LESSOR: *G. L. Parson, Jr.* (signature)

        G. L. Parson, Jr.
        (Print Name)
        AKA George Lee Parson, Jr.
        AKA G. L. Parson
        AKA G. Lee Parson, Jr.

RGC (USA) MINERALS INC.:

By: *Daniel P. Wolcott* (signature)

Its: ____Vice____ President

[CORPORATE SEAL]

Attest: (signature)

Its: _____ Secretary

*Mary Elizabeth Parson* (signature)

    Mary Elizabeth Parson
    (Print Name)
    AKA Mary Butterworth Parson
    AKA Mary B. Parson
    AKA Mary E. Parson
    AKA Mrs. G. L. Parson, Jr.

STATE OF ____FLORIDA____

CITY/COUNTY OF ____CLAY____

The foregoing instrument was acknowledged before me this 13 day of February_____ 19 90 by Daniel P. Wolcott_____ as ____Vice____ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

(signature)
Notary Public

Notary Public, State of Florida
My Commission Expires May 21, 199.
Bonded Thru Troy Fain - Insurance Inc.

[NOTARIAL SEAL]

STATE OF VIRGINIA

CITY/COUNTY OF ___Sussex___

The foregoing instrument was acknowledged before me this 18th day of October_____ 19 89 by G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife

My Commission Expires: October 28, 1991

(signature)
Notary Public

[NOTARIAL SEAL]

416TEMP2

STD Lease
VA 8/89

96(-1035



# DEED OF MINING LEASE

**THIS DEED OF MINING LEASE**, including the attached Exhibits which are incorporated herein by this reference, ("Lease")

is made and entered into on <u>October 13,</u> 19<u>89</u> by and

between <u>G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA</u>

<u>G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA</u>

<u>Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife</u>

<u>Route 1, Box 60, Stony Creek, Virginia  23882</u>

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1.    Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

**2.    Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

**3.    Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

**4.    Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:

    (a)    To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");

    (b)    To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");

    (c)    To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

    (d)    To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;

    (e)    To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

    (f)    To use all easements, means of access, and rights-of-way from and to the Property; and

    (g)    To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

**5.    Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6.    Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $4,170.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $4,170.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $4,170.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7.    Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8.    Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not exceed $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

**9.    Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

4.11

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

10. **Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

11. **RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

12. **RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

13. **Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

14. **Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

15. **Audit.** RGC will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

16. **Taxes.** Taxes will be apportioned and paid as follows:

    (a)    RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

    (b)    Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

    (c)    Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

    (d)    RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

17. **Warranty of Title.** Lessor warrants as follows:

    (a)    Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

    (b)    The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

    (c)    Lessor has full power and authority to execute this Lease;

    (d)    RGC shall have the quiet and peaceful possession and enjoyment of the Property, the Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

    (e)    There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

    (f)    This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

18. **Lessor Interest.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

19. **Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

20. **Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will, if RGC fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

21. **Compensation for Buildings.**

    (a)    Principal Residence. If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

418TEMP2

(b)     **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.     **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any party's resolution thereof.

23.     **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.     **Entireties.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.     **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.     **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

    (a)     The party making such an assignment must give the other party prior written notice thereof;
    (b)     The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;
    (c)     Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;
    (d)     Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and
    (e)     No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.     **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.     **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.     **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.     **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.     **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.     **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.     **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.     **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.     **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36.     **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.     **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.     **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

418TEMP2

- 3 -

**39.**   *Memorandum.*  At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.**   *Mortgagee Consent.*  Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.**   *Headings.*  The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.**   *Obligations That Survive This Lease.*  In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

**43.**   *Good Faith.*  During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

**IN WITNESS WHEREOF,** the parties have executed this Lease under seal as of the date first above written.

**OWNER:**

_G. L. Parson, Jr._ [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.


_Mary Elizabeth Parson_ [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.


STATE OF VIRGINIA

~~CITY~~/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 1989, by _G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife_.


My Commission Expires:

_October 28, 1991_

_Thomas H. Reese_
Notary Public


[NOTARIAL SEAL]


**RGC (USA) MINERALS INC.:**

By: _Daniel P. Wolcott_

Its:  _Vice_  President

[CORPORATE SEAL]

Attest: _____

Its: _____  Secretary


STATE OF _FLORIDA_
COUNTY OF _CLAY_

The foregoing instrument was acknowledged before me this _13_ day of _February_, ~~1989,~~ 1990, by _Daniel P. Wolcott_ as _Vice_ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Robino_
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993
Bonded Thru Troy Fain Insurance Inc.


[NOTARIAL SEAL]


418TEMP2

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND


RGC (USA) MINERALS INC.
(RGC)

EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, __Sussex_____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to __4.17_ acres, and which is described as follows:

That same tract or parcel of land conveyed to G.L. Parson (also known as G. Lee Parson, Sr.) by Warranty Deed, dated November 14, 1959, and recorded in Deed Book 59 at page 279, in Clerk's Office of Circuit Court of Sussex County, Virginia. To wit: All of that certain track, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing four and seventeen hundredths (4.17) acres by actual survey, and being shown and designated on a certain plat of survey, dated March 1, 1952, made by H.C. Frye, C.E., which said plat of survey is recorded in the aforesaid Clerk's Office in Plat Book 7, at page 26, and reference thereto is hereby invited for a more perfect description of the real estate herein conveyed; and being more particularly described on said plat as follows:  Commencing on the West side of State Highway Route No. 619 at the Southeastern corner of a certain lot of land owned by B.J. Rideout, Jr.; thence S. $79^0$ 30' W. 443 ft. to a point; thence South $24^0$ 46' E. 494 ft. to a point; thence N. $62^0$ 30' E. 465 ft. to a point; thence along Route 619 N. $30^0$ 00' W. 370 ft. to the point of beginning; and being in all respects the same real estate that was conveyed to the parties of the first part, as husband and wife, by the entireties, with the right of survivorship as at common law, by deed from B.J. Rideout, Sr. and wife, and dated March 17, 1952, and recorded in the aforesaid Clerk's Office in Deed Book 48 at page 477.

The above stated land bequeathed and devised to Virgie Fraher Parson (also known as Virgie F. Parson) from the Will of G. Lee Parson, Sr., deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

AND ALSO the above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson, G. Lee Parson, Jr. and G. L. Parson, Jr.) from the Will of Virgie F. Parson (also known as Virgie Fraher Parson), deceased, in Will Book 31 at page 314 dated September 25, 1973, recorded October 15, 1982 in the Clerk's Office of Sussex Circuit Court.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-3.

SPL Roy Pol
VA 8/89

### EXHIBIT B
### TO
### MINING LEASE
### BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

### AND

### RGC (USA) MINERALS INC.
(RGC)

#### RGC's Royalty Policy for Virginia Operations

#### COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1.  *Definitions.* The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

    (a)  "Principal Minerals" means Ilmenite, Rutile and Zircon.

    (b)  "Minor Minerals" means Minerals other than Principal Minerals.

    (c)  "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

    (d)  "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

    (e)  "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

    (f)  "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

    (g)  "Recovery Rate" for any treatment means the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2.  *Calculating Royalties.* This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing this Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3.  *Stock Account and Stock Report.* From the commencement of Mining (as defined in Clause 6(b)(ii)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

    (a)  The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

    (b)  Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

    (c)  Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

    (d)  Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

    (e)  A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of all sales and production information in all Stock Reports.

4.  *Royalty Rate.* RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5.  *Royalty Payment.* Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6.  *Saleable Minerals Attributed to the Property.* Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

    (a)  RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

    (b)  Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

        (i)  "Mining" - extracting and delivery of mineral sand ore to the concentrator;

        (ii)  "Concentrating" - removal of non-commercial material;

        (iii)  "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

    Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

(c)    The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)    Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7. Royalty Payment Calculations.

### (a) Principal Minerals Sold

(i)    Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii)    The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)    The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

### (b) Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

### (c) Adjustments

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

**8. Commingling and Stockpiling.** RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

**9. Sales to Affiliates.** RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value per ton based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Series No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

**10. Most Favored Lessor.** If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to a even percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to equal retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

**11. Completion of Mining.**

(a)    RGC will send Lessor written notice when it has completed Mining on the Property.

(b)    The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c)    If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)    If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

**12. Advance Royalty Payment: "70% of Estimated Future Royalty Payments".** At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or ___9,304___ tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

**13. No Reliance on Estimates or Representations.** Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

STD Lease Mem
VA 8/89

STATE OF VIRGINIA
COUNTY OF ___Sussex___

<u>MEMORANDUM OF MINING LEASE</u>



RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

("Lessor") have entered into a Deed of Mining Lease dated ___October 13, 1989___
_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

1.    RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

2.    Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

3.    The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

4.    During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

5.    The Lessor's name and address are:
     G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
     Route 1, Box 60
     Stony Creek, Virginia  23882

6.    RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

   IN   WITNESS   WHEREOF,   RGC   and   Lessor   have   executed   this   Memorandum   of   Lease   as of ___October 13, 1989___

LESSOR: _~signature~_

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson, Jr.
AKA G. Lee Parson, Jr.

_~Mary Elizabeth Parson signature~_

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA
~CITY/~COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 19 8 9 by _G. L. Parson, Jr., and Mary_
   _Elizabeth Parson, husband and_
   _wife_
_____

My Commission Expires: _October 28, 1991_
_~signature~_
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: _~Daniel P. Wolcott~_

Its: ___Vice___ President

[CORPORATE SEAL]

Attest: _~signature~_

Its: _____ Secretary

STATE OF ___FLORIDA___
CITY/COUNTY OF ___CLAY___

The foregoing instrument was acknowledged before me this _13_ day of ___February___, 19 _90_ by ___Daniel P. Wolcott___
as ___Vice___ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

My Commission Expires:
_~signature~_
Notary Public

[NOTARIAL SEAL]

Notary Public, State of Florida
My Commission Expires May 23, 19__
Bonded thru Troy Fain Insurance Inc.

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
**AKA MRS. G. L. PARSON, JR., husband and wife**
**(LESSOR)**


**AND**


**RGC (USA) MINERALS INC.**
**(RGC)**

STD Lease
VA 8/89

**DEED OF MINING LEASE**



961-1036

COPY

**THIS DEED OF MINING LEASE,** including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on October 13, 1989 by and between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1. **Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

2. **Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3. **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

4. **Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:.
   (a) To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");
   (b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals from the Property (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");
   (c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;
   (d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;
   (e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;
   (f) To use all easements, means of access, and rights-of-way from and to the Property; and
   (g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

   Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

5. **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

6. **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $223,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $223,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $223,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7. **Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8. **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9. **Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. During Operations, RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

    **10.**   ***Safety.***  Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

    **11.**   ***RGC to Comply With Safety Laws and to Indemnify Lessor.***  RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

    **12.**   ***RGC's Right to Determine Whether, When and Where to Mine.***  Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and time, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings – Principal Residence (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

    **13.**   ***Compliance With Laws.***  RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

    **14.**   ***Reclamation.***  RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

    **15.**   ***Audit.***  Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of RGC's auditor's report.

    **16.**   ***Taxes.***  Taxes will be apportioned and paid as follows:

      (a)   RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

      (b)   Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

      (c)   Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

      (d)   RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

    **17.**   ***Warranty of Title.***  Lessor warrants as follows:

      (a)   Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

      (b)   The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

      (c)   Lessor has full power and authority to execute this Lease;

      (d)   RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

      (e)   There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

      (f)   This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

    **18.**   ***Lessor Interest.***  In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

    **19.**   ***Termination.***  RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations with respect to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

    **20.**   ***Title Documents.***  Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

    **21.**   ***Compensation for Buildings.***

      (a)   Principal Residence. If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

(b)   **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.   **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.   **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.   **Entireties.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.   **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.   **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)   The party making such an assignment must give the other party prior written notice thereof;

(b)   The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)   Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)   Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)   No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.   **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornadoes, winds, other damage from the elements, declared or undeclared war, strikes, labor dispute, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.   **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.   **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.   **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim. If RGC will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.   **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.   **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.   **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.   **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.   **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36.   **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.   **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will hereby be deemed to have petitioned the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.   **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

418TEMP2

39. **Memorandum.** At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40. **Mortgagee Consent.** Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41. **Headings.** The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42. **Obligations That Survive This Lease.** In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43. **Good Faith.** During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

**OWNER:**

_G. L. Parson, Jr._ [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_Mary Elizabeth Parson_ [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this 18th day of _October_, 1989, by G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife

My Commission Expires:
October 28, 1991
_Thomas H. Rose, Jr._
Notary Public

[NOTARIAL SEAL]

**RGC (USA) MINERALS INC.:**

By: _Daniel P. Wolcott_
Its: Vice President

[CORPORATE SEAL]
Attest:
Its: Secretary

STATE OF FLORIDA
COUNTY OF CLAY

The foregoing instrument was acknowledged before me this 13 day of February, 1990, by Daniel P. Wolcott as Vice President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Rollins_
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993

[NOTARIAL SEAL]

418TEMP2

- 4 -

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
**AKA MRS. G. L. PARSON, JR., husband and wife**
**(LESSOR)**


**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, _Sussex_____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to _446.00__ acres, and which is described as follows:

That same tract or parcel of land conveyed to G. Lee Parson, Jr., by Warranty Deed, dated March 22, 1960, and recorded in Deed Book 59 at page 524, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All that certain tract of land, with all the improvements thereon and the appurtenances thereto belonging, lying, being and situate on the East side of the Nottoway River in Stony Creek Magisterial District, Sussex County, Virginia, containing eight hundred (800) acres, more or less, and bounded as follows: On the north by the lands now or formerly belonging to Slate, C.R. Chappell, Robinson and Camp Manufacturing Company; on the east by the lands now or formerly belonging to Otho Chappell, Henry Poole, G. Lee Parson, Sr. and the Wyatt Mill Road; on the South by the lands now or formerly belonging to J. H. Poole and the Nottoway River; and on the West by said Nottoway River and the land now or formerly belonging to the Camp Manufacturing Company; the land hereby conveyed is the same that was conveyed to G. Lee Parson, Sr. from J. Thompson Wyatt, Special Commissioner, by deed dated June 11th, 1946 recorded in the Circuit Court Clerk's Office of said County in Deed Book 42, at page 180; by deed from Francis E. Wyatt, and others, dated May 3, 1945, and recorded in said Clerk's Office in Deed Book 41 at page 137; by deed from William E. Anderson, unmarried, dated November 7th, 1945, and recorded in said Clerk's Office, in Deed Book 41, at page 365, and by deed from Benjamin G. Anderson, unmarried, dated May 10th, 1945, and recorded in said Clerk's Office, in Deed Book 41, at page 136.

The above described property was resurveyed by J. C. Shearin, dated March 20, 1972, recorded May 30, 1989 in Plat Book 18 at Page 6 in the Sussex County, Virginia records. The above stated deed recites 800.0 acres which is now corrected to recite 933.30 acres which is an increase of 133.30 acres, stated as follows: Tract No. 1 contains 50.0 acres, Tract No. 2 contains 343.0 acres, Tract No. 3 contains 379.0 acres and an open tract of land not presently surveyed containing approximately 161.30 acres, more or less.

LESS and EXCEPT from this tract of land the westerly portion thereof, containing 487.30 acres.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-36.

SPL Roy Pol
VA 8/89

EXHIBIT B
TO
MINING LEASE
BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

AND

RGC (USA) MINERALS INC.
(RGC)

RGC's Royalty Policy for Virginia Operations

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1.  **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

    (a)  "Principal Minerals" means Ilmenite, Rutile and Zircon.

    (b)  "Minor Minerals" means Minerals other than Principal Minerals.

    (c)  "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

    (d)  "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but net net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to Affiliates contained in Clause 9 (Sales to Affiliates) below.

    (e)  "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

    (f)  "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

    (g)  "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2.  **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By using the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3.  **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

    (a)  The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

    (b)  Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

    (c)  Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

    (d)  Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

    (e)  A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4.  **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5.  **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6.  **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

    (a)  RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

    (b)  Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

        (i)   "Mining" - extracting and delivery of mineral sand ore to the concentrator;

        (ii)  "Concentrating" - removal of non-commercial material;

        (iii) "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

        Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

(c) The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d) Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7. *Royalty Payment Calculations.*

(a) Principal Minerals Sold

(i) Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii) The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii) The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv) RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v) The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b) Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c) Adjustments

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

**8. *Commingling and Stockpiling.*** RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

**9. *Sales to Affiliates.*** RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

**10. *Most Favored Lessor.*** If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

## 11. *Completion of Mining.*

(a) RGC will send Lessor written notice when it has completed Mining on the Property.

(b) The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c) If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d) If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

**12. *Advance Royalty Payment: "70% of Estimated Future Royalty Payments".*** At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or 644,029 tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

**13. *No Reliance on Estimates or Representations.*** Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

STD Lease Mem
VA 8/89

STATE OF VIRGINIA
COUNTY OF ___Sussex___

### MEMORANDUM OF MINING LEASE



RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

_____ ("Lessor") have entered into a Deed of Mining Lease dated _____October 13, 1989_____

_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

    1.   RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

    2.   Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

    3.   The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

    4.   During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

    5.   The Lessor's name and address are:

        G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
        Route 1, Box 60
        Stony Creek, Virginia  23882

    6.   RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

   IN WITNESS WHEREOF, RGC and Lessor have executed this Memorandum of Lease as of ___October 13, 1989___.

LESSOR: _G. L. Parson Jr_

_____
G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.


_Mary Elizabeth Parson_

__Mary Elizabeth Parson__
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.


RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_

Its: _____Vice_____ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary


STATE OF _____FLORIDA_____

CITY/COUNTY OF ___CLAY_____

The foregoing instrument was acknowledged before me this 13 day of February_____, 1990 by _Daniel P. Wolcott_____ as ____Vice_____ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

My Commission Expires: _____

_____
Notary Public

Notary Public, State of Florida
My Commission Expires May 21, 1993
Bonded Thru Troy Fain Insurance Inc.

[NOTARIAL SEAL]


STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 19_89_ by _G. L. Parson, Jr., and Mary__ _Elizabeth Parson, husband and__ _wife_____

My Commission Expires: _October 28, 1991_

_____
Notary Public

[NOTARIAL SEAL]

STD Lease
VA 8/89

**DEED OF MINING LEASE**

961-1037



THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease")

is made and entered into on _____ October 13, _____ 19 89 _____ by and

between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA

G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA

Mary B. Parson, and AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife

Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1.** *Defined Terms.* Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

**2.** *Purpose.* The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are removed from the Property.

**3.** *Grant of Lease.* Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

**4.** *Grant of Rights.* Lessor grants to RGC the following exclusive rights with regard to the Property:
(a) To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");
(b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or structures, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area", are defined as "Operations");
(c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;
(d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;
(e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;
(f) To use all easements, means of access, and rights-of-way from and to the Property; and
(g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

**5.** *Term of Lease.* This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts at necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6.** *Initial Payment and Advance Royalty Payments.* Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment | |
|---|---|---|---|
| Lease Date | Initial Payment | $250 per acre | *G. L. P.Ja* GLP, Jr *DPW* |
| Lease Date | Advance Royalty | $1,431.93 $750 per acre | *M.E.P* MEP |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre | |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $107,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) | |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $107,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) | |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $107,000.00 lump sum, subject to 70% Limitation | |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) | |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7.** *Royalty Payments.* RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8.** *Minimum Royalty.* If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

**9.** *Lessor's Use of the Property.* During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

125.00

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10. _Safety._** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will have RGC identification at all times that they are on the Property.

**11. _RGC to Comply With Safety Laws and to Indemnify Lessor._** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12. _RGC's Right to Determine Whether, When and Where to Mine._** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive Lessor of access to a public road, utilities, and water supply until RGC complies with Section 21(n) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13. _Compliance With Laws._** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14. _Reclamation._** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15. _Audit._** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16. _Taxes._** Taxes will be apportioned and paid as follows:

  (a)   RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

  (b)   Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

  (c)   Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

  (d)   RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17. _Warranty of Title._** Lessor warrants as follows:

  (a)   Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

  (b)   The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

  (c)   Lessor has full power and authority to execute this Lease;

  (d)   RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

  (e)   There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

  (f)   This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18. _Lessor Interest._** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionally reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19. _Termination._** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the Released Land not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Released Land. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20. _Title Documents._** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills, conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21. _Compensation for Buildings._**

  (a)   **Principal Residence.** If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of each residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

- 2 -

418TEMP2

(b) **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers of the character described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22. **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23. **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of this Lease subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24. **Entireties.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25. **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26. **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a) The party making such an assignment must give the other party prior written notice thereof;

(b) The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c) Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d) Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e) No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27. **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28. **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29. **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30. **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31. **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32. **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33. **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34. **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35. **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36. **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37. **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if that Lease did not contain the unenforceable or illegal provision.

38. **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

418TEMP2

39. **Memorandum.** At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40. **Mortgagee Consent.** Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41. **Headings.** The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42. **Obligations That Survive This Lease.** In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43. **Good Faith.** During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

*G. L. Parson, Jr.* [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

*Mary Elizabeth Parson* [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 1989, by _G. L. Parson, Jr., and Mary_ _Elizabeth Parson, husband and_ _wife_ _____

My Commission Expires:

_October 28, 1991_

_Thomas H. Rose_
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: *Daniel P. Wolcott*

Its: _Vice_____ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF _FLORIDA_
COUNTY OF _CLAY_

The foregoing instrument was acknowledged before me this _13_ day of _February_, 1989, 1990, by _Daniel P. Wolcott_ as _Vice_____ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

*Ruth Robbins*
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993

[NOTARIAL SEAL]

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
**AKA MRS. G. L. PARSON, JR., husband and wife**
**(LESSOR)**


**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

## EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___ Stony Creek ___ Magisterial District, Sussex _____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to 125.00 acres, and which is described as follows:

That same tract or parcel of land bequeathed to G. L. Parson, Jr. by Last Will and Testament of G. Lee Parson, Sr. (also known as G. L. Parson and also known as G. L. Parson, Sr.), dated May 3, 1966, recorded March 8, 1973, in Volume 23, page 430 through 436 of the Clerk's Office of Sussex Circuit Court, Sussex County, Virginia. To Wit: The farm that I own, situate near Concord Church in Sussex County, Virginia, and known as "The Walter Harrison Farm", across State Road No. 619, from Berry Ridout Farm, the side where the home part is situated and containing approximately 125 acres.

ALSO, being that same tract or parcel of land conveyed to G. L. Parson, by Warranty Deed, dated February 8, 1924, and recorded in Deed Book 28 at page 519, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: ...... all that certain tract or parcel of land situated in the Stony Creek Magisterial District, County of Sussex, State of Virginia; containing one hundred and twenty five acres, more or less and bounded as follows: on the North and West by the Walker's Mill Road, on the East by the lands of C. W. Parsons and Willis Roberson, (Willis Robinson) and on the South by the land of B. Wesley Barns and the public road leading to Stony Creek, Virginia.

EXEMPTING from this tract of land all mining operations for a cemetery, situated upon 0.50 acres, more or less and six (6) bulk barns, situated upon 2.00 acres more or less.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-7.

SPL Roy Pol
VA 8/89

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
**(Lessor)**

**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

**RGC's Royalty Policy for Virginia Operations**

**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

**1.** *Definitions.* The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

(a) "Principal Minerals" means Ilmenite, Rutile and Zircon.

(b) "Minor Minerals" means Minerals other than Principal Minerals.

(c) "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

(d) "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

(e) "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

(f) "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

(g) "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

**2.** *Calculating Royalties.* This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

**3.** *Stock Account and Stock Report.* From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

(a) The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

(b) Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

(c) Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

(d) Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

(e) A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

**4.** *Royalty Rate.* RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

**5.** *Royalty Payment.* Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

**6.** *Saleable Minerals Attributed to the Property.* Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

(a) RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

(b) Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

(i) "Mining" - extracting and delivery of mineral sand ore to the concentrator;

(ii) "Concentrating" - removal of non-commercial material;

(iii) "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

(c)    The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)    Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

### 7. *Royalty Payment Calculations.*

**(a)**    <u>Principal Minerals Sold</u>

(i)    Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii)    The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)    The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

**(b)**    <u>Minor Minerals Sold</u>

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

**(c)**    <u>Adjustments</u>

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

**8.** *Commingling and Stockpiling.* RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

**9.** *Sales to Affiliates.* RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

**10.** *Most Favored Lessor.* If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

**11.** *Completion of Mining.*

(a)    RGC will send Lessor written notice when it has completed Mining on the Property.

(b)    The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c)    If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)    If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

**12.** *Advance Royalty Payment: "70% of Estimated Future Royalty Payments".* At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or 493,939 tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

**13.** *No Reliance on Estimates or Representations.* Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

511TEMP2

STD Lease Mem
VA 8/89

STATE OF VIRGINIA
COUNTY OF ___ Sussex ___

## MEMORANDUM OF MINING LEASE



RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

_____ ("Lessor") have entered into a Deed of Mining Lease dated ___ October 13, 1989 _____

_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

1.    RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

2.    Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

3.    The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

4.    During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

5.    The Lessor's name and address are:

G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
Route 1, Box 60
Stony Creek, Virginia  23882

6.    RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

IN  WITNESS  WHEREOF,  RGC  and  Lessor  have  executed  this  Memorandum  of  Lease  as of ___ October 13, 1989 _____

LESSOR: _G. L. Parson, Jr._

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.


_Mary Elizabeth Parson_

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.


RGC (USA) MINERALS INC:

By: _Daniel P. Wolcott_

Its: _____ Vice _____ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF ___ FLORIDA ___
CITY/COUNTY OF ___ CLAY ___

The  foregoing  instrument  was  acknowledged  before  me this _13_ day of _February_____, 19 _90_. by _Daniel P. Wolcott_____ as _____ Vice _____ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Collins_
Notary Public

Notary Public, State of Florida
My Commission Expires May 23, 1993
Bonded Thru Troy Fain—Insurance Inc.

[NOTARIAL SEAL]

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 19 _89_, by _G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife_

_____
_____
_____

My Commission Expires: _October 28, 1991_

_Thomas H. Diah_
Notary Public

[NOTARIAL SEAL]

416TEMP2

STD Lease
VA 8/89



961-1038

COPY

## DEED OF MINING LEASE

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on _____October 13,_____ 19<u>89</u> _____ by and between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA G. Lee Parson, Jr. and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1.   **Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

2.   **Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3.   **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

4.   **Grant of Rights.** Lessor grants to RGC the following rights with regard to the Property:
   (a)   To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");
   (b)   To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailings ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations;
   (c)   To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;
   (d)   To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;
   (e)   To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;
   (f)   To use all easements, means of access, and rights-of-way from and to the Property; and
   (g)   To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

5.   **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

6.   **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $10,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $10,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $10,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7.   **Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Value of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8.   **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9.   **Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.    _Safety_.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.    _RGC to Comply with Safety Laws and to Indemnify Lessor_.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12.    _RGC's Right to Determine Whether, When and Where to Mine_.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.    _Compliance With Laws_.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.    _Reclamation_.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of the Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.    _Audit_.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 – June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.    _Taxes_.** Taxes will be apportioned and paid as follows:

(a)     RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)     Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)     Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)     RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.    _Warranty of Title_.** Lessor warrants as follows:

(a)     Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b)     The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

(c)     Lessor has full power and authority to execute this Lease;

(d)     RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e)     There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f)     This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.    _Lessor Interest_.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.    _Termination_.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.    _Title Documents_.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.    _Compensation for Buildings_.**

(a)     **Principal Residence.** If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

-2-



    (b)    *Other Buildings.* If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

    22.    *Third-Party Claims.* If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

    23.    *Additional and After-Acquired Rights.* If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

    24.    *Entireties.* If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in area, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

    25.    *Multiple Owners.* Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

    26.    *Assignment.* Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

        (a)    The party making such an assignment must give the other party prior written notice thereof;

        (b)    The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

        (c)    Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

        (d)    Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

        (e)    No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

    27.    *Force Majeure.* Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

    28.    *No Broker.* Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

    29.    *Condemnation.* Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

    30.    *Dispute Resolution.* Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

    31.    *No Interference With RGC's Operations.* Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

    32.    *No Implied or Continuing Waiver.* Either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

    33.    *Notices.* Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

    34.    *Entire Agreement; No Oral Modification.* This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

    35.    *Choice of Law.* This Lease will be construed, interpreted and governed by the laws of Virginia.

    36.    *Successors and Assigns.* This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

    37.    *Severability.* In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of this Lease. The remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

    38.    *Modification to Cure Any Violation of the Rule Against Perpetuities.* Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

39. *Memorandum.* At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40. *Mortgagee Consent.* Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41. *Headings.* The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42. *Obligations That Survive This Lease.* In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43. *Good Faith.* During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

*G. L. Parson, Jr.* [SEAL]
G. L. Parson, Jr.
(Print Name)
    AKA George Lee Parson, Jr.
    AKA G. L. Parson
    AKA G. Lee Parson, Jr.

*Mary Elizabeth Parson* [SEAL]
Mary Elizabeth Parson
(Print Name)
    AKA Mary Butterworth Parson
    AKA Mary B. Parson
    AKA Mary E. Parson
    AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 1989, by _G. L. Parson, Jr., and Mary_
    _Elizabeth Parson, husband and_
    _wife_
_____
_____

My Commission Expires:

_____
_____
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_
Its: _Vice_                    President

[CORPORATE SEAL]
Attest: _____
Its: _____ Secretary

STATE OF _FLORIDA_
COUNTY OF _____CLAY_____

The foregoing instrument was acknowledged before me this _13_ day of _February_ , 1989, 1990, by _Daniel P. Wolcott_
as _Vice_ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Rollins_
Notary Public

My Commission Expires, State of Florida
    My Commission Expires May 21, 1993
        Bonded Thru Troy Fain - Insurance Inc.

[NOTARIAL SEAL]

418TEMP2

- 4 -

STD Lease
V.A. 8/89

961-1058



# DEED OF MINING LEASE

**THIS DEED OF MINING LEASE**, including the attached Exhibits which are incorporated herein by this reference, ("Lease")

is made and entered into on ___October 13,___ ___1989___ by and

between __G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA__

__G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA__

__Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife__

__Route 1, Box 60, Stony Creek, Virginia 23882__

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

    **1.**   **Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

    **2.**   **Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

    **3.**   **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

    **4.**   **Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:

      (a)   To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");

      (b)   To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");

      (c)   To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

      (d)   To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;

      (e)   To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

      (f)   To use all easements, means of access, and rights-of-way from and to the Property; and

      (g)   To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

    Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

    **5.**   **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

    **6.**   **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $10,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $10,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $10,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

    **7.**   **Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

    **8.**   **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

    **9.**   **Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

SPL Roy Pol
VA 8/89

EXHIBIT B
TO
MINING LEASE
BY AND BETWEEN
C. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

AND

RGC (USA) MINERALS INC.
(RGC)

RGC's Royalty Policy for Virginia Operations

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. *Definitions.* The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

(a) "Principal Minerals" means Ilmenite, Rutile and Zircon.

(b) "Minor Minerals" means Minerals other than Principal Minerals.

(c) "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

(d) "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to Affiliates contained in Clause 9 (Sales to Affiliates) below.

(e) "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

(f) "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

(g) "Recovery Rate" for any treatment means the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. *Calculating Royalties.* This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. *Stock Account and Stock Report.* From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

(a) The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

(b) Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

(c) Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

(d) Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

(e) A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. *Royalty Rate.* RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5. *Royalty Payment.* Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the Fiscal Year (July 1 - June 30) in which they were sold.

6. *Saleable Minerals Attributed to the Property.* Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

(a) RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

(b) Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

(i) "Mining" - extracting and delivery of mineral sand ore to the concentrator;

(ii) "Concentrating" - removal of non-commercial material;

(iii) "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

(c)      The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)      Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

### 7. Royalty Payment Calculations.

(a)    **Principal Minerals Sold**

    (i)      Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

    (ii)      The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

    (iii)      The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

    (iv)      RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

    (v)      The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b)    **Minor Minerals Sold**

     Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)    **Adjustments**

     At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

### 8. Commingling and Stockpiling. 
RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

### 9. Sales to Affiliates. 
RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

### 10. Most Favored Lessor. 
If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

### 11. Completion of Mining.

(a)      RGC will send Lessor written notice when it has completed Mining on the Property.

(b)      The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c)      If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)      If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

### 12. Advance Royalty Payment: "70% of Estimated Future Royalty Payments". 
At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located thereon. Using the higher of this estimated tonnage or _____ 26 _____ tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

### 13. No Reliance on Estimates or Representations. 
Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, __Sussex_____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to __10.00__ acres, and which is described as follows:

That same tract or parcel of land conveyed to G. L. Parson (also known as G. Lee Parson, Sr.), from M. L. Pinney, as grantor, by Trustees Deed dated January 25, 1941 and recorded in Book 38 at page 100 in the Clerk's Office of Sussex Circuit Court.

The property is a small part of "The Wesley Barnes Farm", between the parsonage and the two branches down beside the public road and around the grave-yard to the road and back to the branch again, in fee-simple, as found in Deed Book 11, page 464, Deed Book 5, page 613, Deed Book 11, page 196 and Deed Book 22 page 409.

The above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson, G. Lee Parson, Jr. and G. L. Parson, Jr.) from the Will of G. Lee Parson, Sr. deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

EXEMPTING from all mining operations a one acre parcel of land lying in a southerly direction from the present cemetery adjacent to this tract of land. This parcel of land is presently unsurveyed and is to be used as a cemetery.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-6.

VA 8/89

STATE OF VIRGINIA
COUNTY OF ____Sussex____

### MEMORANDUM OF MINING LEASE



RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

_____ ("Lessor") have entered into a Deed of Mining Lease dated ____October 13, 1989____
_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

   1.    RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

   2.    Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

   3.    The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

   4.    During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

   5.    The Lessor's name and address are:

         G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
         Route 1, Box 60
         Stony Creek, Virginia 23882

   6.    RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

   IN WITNESS WHEREOF, RGC and Lessor have executed this Memorandum of Lease as of ____October 13, 1989____

LESSOR: *G. L. Parson Jr.*

G. L. Parson, Jr.
(Print Name)
 AKA George Lee Parson, Jr.
 AKA G. L. Parson
 AKA G. Lee Parson, Jr.


*Mary Elizabeth Parson*
Mary Elizabeth Parson
(Print Name)
 AKA Mary Butterworth Parson
 AKA Mary B. Parson
 AKA Mary E. Parson
 AKA Mrs. G. L. Parson, Jr.



STATE OF VIRGINIA

~~CITY~~/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this 18th day of _October_ 19 89 by _G. L. Parson, Jr., and Mary_ _Elizabeth Parson, husband and_ _wife_ _____ _____

My Commission Expires: _October 28, 1991_

*Thomas N. Ray*
Notary Public

[NOTARIAL SEAL]


RGC (USA) MINERALS INC.:

By: *Daniel P. Wolcott*

Its: ____Vice____ President

[CORPORATE SEAL]

Attest: *[signature]*

Its: _____ Secretary


STATE OF ____FLORIDA____

CITY/COUNTY OF _____CLAY____

The foregoing instrument was acknowledged before me this 13 day of ____February____ 1990 by _Daniel P. Wolcott_ as ____Vice____ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

My Commission Expires:        Notary Public, State of Florida
                             My Commission Expires May 29, 1993
*Ruth Hollins*                Bonded Thru Troy Fain - Insurance Inc.
Notary Public

[NOTARIAL SEAL]

416TEMP2

961-1040


COPY

STD Lease
VA 8/89

DEED OF MINING LEASE

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease")
is    made    and    entered    into    on    _____October 13,_____    1989    by    and
between  G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA
G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA
Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wi
Route 1, Box 60, Stony Creek, Virginia  23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove
Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable
consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:
 1. **Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term
and when it is capitalized will have the same meaning throughout this Lease.
 2. **Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine,
remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other
property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite,
Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to
any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.
 3. **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and
conditions in this Lease.
 4. **Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:
  (a)    To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as
    "Exploration");
  (b)    To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other
    structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its
    absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to
    construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailings ponds,
    settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other
    structures and facilities on the Property; to take steps for mining on the Property; and to
    develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process,
    ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property
    in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");
  (c)    To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from
    RGC's Operations;
  (d)    To use water from or appurtenant to the Property and to drain through and from the Property and to
    draw into any course in the Property any water from RGC's Operations;
  (e)    To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;
  (f)    To use all easements, means of access, and rights-of-way from and to the Property; and
  (g)    To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration,
    Operations and Reclamation on other property.
 Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a
processing plant for the final separation of the concentrate into saleable Minerals.
 5. **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a)
the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons
other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to
commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is
automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate
upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive
days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in
effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.
 6. **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease,
RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and
payments per acre of the Property retained under the Lease at the time of payment:

| Payment Date | Payment Type | Payment | |
|---|---|---|---|
| Lease Date | Initial Payment | $250 per acre | GLP, ~~Jr.~~ |
| Lease Date | Advance Royalty | $880.20 $750 per acre | DPW MEP |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre | |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $16,500.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) | |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $16,500.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) | |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $16,500.00 lump sum, subject to 70% Limitation | |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) | |

 The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty
Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty
Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full
any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.
 7. **Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the
Sales Values of Minerals attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and
paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").
 8. **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under
this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for mining
("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment
will be determined and paid in accordance with Clause 11 of the Royalty Policy.
 9. **Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate
Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's
Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of
the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings,
irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC
notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

16.5

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.    Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.    RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not used but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12.    RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings – Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.    Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.    Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.    Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.    Taxes.**  Taxes will be apportioned and paid as follows:

(a)    RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)    Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)    Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)    RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.    Warranty of Title.**  Lessor warrants as follows:

(a)    Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b)    The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

(c)    Lessor has full power and authority to execute this Lease;

(d)    RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e)    There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f)    This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.    Lessor Interest.**  In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.    Termination.**  RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC may (a) not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.    Title Documents.**  Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.    Compensation for Buildings.**

(a)    Principal Residence. If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

-2-

416TEMP2

(b)     **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.    **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.    **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.    **Entireties.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the claim or payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.    **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.    **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)     The party making such an assignment must give the other party prior written notice thereof;

(b)     The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)     Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)     Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)     No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.    **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.    **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commission's in connection with this Lease or any of the transactions contemplated under this Lease.

29.    **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.    **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.    **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.    **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.    **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.    **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.    **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36.    **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.    **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.    **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

-3-

**39.** **_Memorandum._** At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.** **_Mortgagee Consent._** Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.** **_Headings._** The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.** **_Obligations That Survive This Lease._** In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

**43.** **_Good Faith._** During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

_G. L. Parson, Jr._ [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_Mary Elizabeth Parson_ [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

~~CITY/~~COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this 18th day of October 1989, by G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife

My Commission Expires:

_October 28, 1991_

_Thomas H. Ray_
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_

Its: Vice President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF FLORIDA
COUNTY OF CLAY

The foregoing instrument was acknowledged before me this 13 day of February 1989, 1990 by Daniel P. Wolcott as Vice President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Robbins_
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993
~~Bonded Thru Troy Fain Insurance Inc.~~

[NOTARIAL SEAL]

-4-

418TEMP2

EXHIBIT B
TO
MINING LEASE
BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

AND

RGC (USA) MINERALS INC.
(RGC)

RGC's Royalty Policy for Virginia Operations

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1.  **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

(a)  "Principal Minerals" means Ilmenite, Rutile and Zircon.

(b)  "Minor Minerals" means Minerals other than Principal Minerals.

(c)  "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

(d)  "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to Affiliates contained in Clause 9 (Sales to Affiliates) below.

(e)  "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

(f)  "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

(g)  "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2.  **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3.  **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

(a)  The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

(b)  Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

(c)  Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

(d)  Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

(e)  A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4.  **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5.  **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6.  **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

(a)  RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

(b)  Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

(i)  "Mining" - extracting and delivery of mineral sand ore to the concentrator;

(ii)  "Concentrating" - removal of non-commercial material;

(iii)  "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

(c)    The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)    Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

**7.   _Royalty Payment Calculations_.**

    (a)    <u>Principal Minerals Sold</u>

        (i)    Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

        (ii)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

        (iii)    The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

        (iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

        (v)    The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

    (b)    <u>Minor Minerals Sold</u>

        Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

    (c)    <u>Adjustments</u>

        At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

**8.   _Commingling and Stockpiling_.** RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

**9.   _Sales to Affiliates_.** RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value used only on RGC's sales to non-affiliates or (b) the Indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

**10.   _Most Favored Lessor_.** If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

**11.   _Completion of Mining_.**

    (a)    RGC will send Lessor written notice when it has completed Mining on the Property.

    (b)    The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC has removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

    (c)    If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payment payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

    (d)    If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

**12.   _Advance Royalty Payment: "70% of Estimated Future Royalty Payments"_.** At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or _51,388_ tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate; (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

**13.   _No Reliance on Estimates or Representations_.** Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, ___Sussex___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to ___16.50___ acres, and which is described as follows:

That same tract or parcel of land conveyed to G. L. Parson, Jr. by Warranty Deed, dated April 15, 1960, and recorded in Deed Book 59 at page 579, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All "that certain tract or parcel of land lying and being situate in the County of Sussex and State of Virginia containing sixteen and five tenths acres (16.5) more or less and herein after described as follows: Beginning at an iron stob on the Cabin Point Road, running thence along the said Road South 79° 15' East 983 feet, thence North 32° 00' East 343 feet along the said Road, thence North 7° 00' West 1013 feet to a pine tree, thence South 41° 45' West 1537 feet to the point of beginning.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-13.

VA 8/89

STATE OF VIRGINIA
COUNTY OF ___Sussex___

### MEMORANDUM OF MINING LEASE



RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

_____ ("Lessor") have entered into a Deed of Mining Lease dated ___October 13, 1989___

_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

    1.    RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

    2.    Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

    3.    The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

    4.    During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

    5.    The Lessor's name and address are:

        G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
        Route 1, Box 60
        Stony Creek, Virginia  23882

    6.    RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

    IN WITNESS WHEREOF, RGC and Lessor have executed this Memorandum of Lease as of ___October 13, 1989___

LESSOR: *G. L. Parson, Jr.* (signature)

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

RGC (USA) MINERALS INC.:

By: (signature)

Its: _____Vice_____ President

[CORPORATE SEAL]

Attest: (signature)

Its: _____ Secretary

*Mary Elizabeth Parson* (signature)

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF ___FLORIDA___

CITY/COUNTY OF ___CLAY___

The foregoing instrument was acknowledged before me this 13 day of ___February___, 19 90 by ___Daniel P. Wolcott___ as ___Vice___ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

My Commission Expires:

(signature) Notary Public

Notary Public, State of Florida
My Commission Expires May 21, 1993
Bonded Thru Troy Fain's Insurance Inc.

[NOTARIAL SEAL]

STATE OF VIRGINIA

~~CITY~~/COUNTY OF ___Sussex___

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 19_89_ by _G. L. Parson, Jr., and Mary_ _Elizabeth Parson, husband and_ _wife_
_____
_____

My Commission Expires: _October 28, 1991_

(signature)
Notary Public

[NOTARIAL SEAL]

416TEMP2

961-104

STD Lease
VA 8/89



# DEED OF MINING LEASE

**THIS DEED OF MINING LEASE**, including the attached Exhibits which are incorporated herein by this reference, ("Lease")
is   made   and   entered   into   on _____ October 13, _____ 19 89 _____ by   and
between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA
G. Lee Parson, Jr. and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA
Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife
Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and **RGC (USA) MINERALS INC.**, a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1. **Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

2. **Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3. **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

4. **Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:
   (a) To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");
   (b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailings ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");
   (c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;
   (d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;
   (e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;
   (f) To use all easements, means of access, and rights-of-way from and to the Property; and
   (g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

5. **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, include both the initial 20-year term and any extended term.

6. **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty    $842.11 | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $ 145,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $ 145,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $ 145,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

GLP, Jr.

MEP

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7. **Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Value of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8. **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9. **Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

200.0

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.** *Safety.* Except as otherwise provided in those parts of the Property on which Operations are being conducted. All RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC employees and visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.** *RGC to Comply With Safety Laws and to Indemnify Lessor.* RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12.** *RGC's Right to Determine Whether, When and Where to Mine.* Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.** *Compliance With Laws.* RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.** *Reclamation.* RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.** *Audit.* Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.** *Taxes.* Taxes will be apportioned and paid as follows:

(a) RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b) Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c) Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d) RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.** *Warranty of Title.* Lessor warrants as follows:

(a) Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b) The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

(c) Lessor has full power and authority to execute this Lease;

(d) RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e) There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f) This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.** *Lessor Interest.* In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.** *Termination.* RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.** *Title Documents.* Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.** *Compensation for Buildings.*

(a) *Principal Residence.* If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

- 2 -

(b)    **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.    **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any payments therefrom.

23.    **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.    **Entireties.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.    **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and payment orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.    **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)    The party making such an assignment must give the other party prior written notice thereof;

(b)    The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)    Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)    Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)    No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.    **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.    **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.    **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.    **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.    **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.    **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.    **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.    **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.    **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36.    **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.    **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.    **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

418TEMP2

39.  _Memorandum._  At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40.  _Mortgage Consent._  Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41.  _Headings._  The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42.  _Obligations That Survive This Lease._  In addition to other obligations in this Lease that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43.  _Good Faith._  During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

**IN WITNESS WHEREOF,** the parties have executed this Lease under seal as of the date first above written.

OWNER:

_G. L. Parson, Jr._  [SEAL]

G. L. Parson, Jr.
(Print Name)
   AKA George Lee Parson, Jr.
   AKA G. L. Parson
   AKA G. Lee Parson, Jr.

_Mary Elizabeth Parson_ [SEAL]

Mary Elizabeth Parson
(Print Name)
   AKA Mary Butterworth Parson
   AKA Mary B. Parson
   AKA Mary E. Parson
   AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 1989, by _G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife_

My Commission Expires: _October 28, 1991_

_Thomas H. Ring_
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_

Its: _Vice_ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF  _FLORIDA_
COUNTY OF  _CLAY_

The foregoing instrument was acknowledged before me this _13_ day of _February_, ~~1989,~~ 1990, by _Daniel P. Wolcott_ as _Vice_ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Robins_
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993.
Bonded Thru Troy Fain - Insurance Inc.

[NOTARIAL SEAL]

416TBMP2

V.A 8/89

STATE OF VIRGINIA
COUNTY OF ___Sussex___

### MEMORANDUM OF MINING LEASE

 COPY

RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

_____ ("Lessor") have entered into a Deed of Mining Lease dated _____October 13, 1989_____

_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

1.  RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

2.  Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

3.  The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

4.  During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

5.  The Lessor's name and address are:

    G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
    Route 1, Box 60
    Stony Creek, Virginia  23882

6.  RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

IN WITNESS WHEREOF, RGC and Lessor have executed this Memorandum of Lease as of _____October 13, 1989_____.

LESSOR: *G. L. Parson, Jr.*

___G. L. Parson, Jr.___
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.


*Mary Elizabeth Parson*

___Mary Elizabeth Parson___
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.


RGC (USA) MINERALS INC.:

By: *Daniel P. Wolcott*

Its: _____Vice_____ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary


STATE OF _____FLORIDA_____

CITY/COUNTY OF _____CLAY_____

The foregoing instrument was acknowledged before me this 13 day of _____February_____ 19 90, by _Daniel P. Wolcott_ as _____Vice_____ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

My Commission Expires:

_____
Notary Public

Notary Public, State of Florida
My Commission Expires May 23, 1993
Bonded Thru Troy Fain Insurance Inc

[NOTARIAL SEAL]


STATE OF VIRGINIA

~~CITY~~/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this 18th day of _October_, 19 89 by _G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife_

My Commission Expires: October 28, 1991

_____
Notary Public

[NOTARIAL SEAL]


416TEMP2

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, ___Sussex___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to ___200.00___ acres, and which is described as follows:

That same tract or parcel of land conveyed to G.L. Parson, Jr. by Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59 at page 559, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: ...... all that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing, by estimation, two hundred (200) acres, and bounded as follows: On the North by G. Lee Parson; on the East by W. S. Barnes; on the South by the public road leading from Stewart's to Concord Church; on the West by R. C. Chappell and said public road leading from Stewart's to Concord Church and Wesley Barnes, reserving a certain road or passage-way which leads from the house now owned by W. S. Barnes through said tract of land to the public road at the forks of the road, on of which leads to Purdy, as and for an outlet of the occupants of the said house now occupied by W. S. Barnes, with the right or privilege of the purchaser of straightening said road, if he shall so desire."; and being in all respects the identical real estate that was conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, by deed from John H. Cole, Special Commissioner, dated June 1, 1927, and duly recorded in the Clerk's Office of the aforesaid county in Deed Book 31 at page 244.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-31.

EXHIBIT B
TO
MINING LEASE
BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

AND

RGC (USA) MINERALS INC.
(RGC)

RGC's Royalty Policy for Virginia Operations

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

*1. Definitions.* The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

(a)  "Principal Minerals" means Ilmenite, Rutile and Zircon.

(b)  "Minor Minerals" means Minerals other than Principal Minerals.

(c)  "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

(d)  "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to Affiliates contained in Clause 9 (Sales to Affiliates) below.

(e)  "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

(f)  "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

(g)  "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

*2. Calculating Royalties.* This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

*3. Stock Account and Stock Report.* From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

(a)  The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

(b)  Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

(c)  Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

(d)  Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

(e)  A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

*4. Royalty Rate.* RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

*5. Royalty Payment.* Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

*6. Saleable Minerals Attributed to the Property.* Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

(a)  RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

(b)  Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

(i)  "Mining" - extracting and delivery of mineral sand ore to the concentrator;

(ii)  "Concentrating" - removal of non-commercial material;

(iii)  "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

.) The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d) Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7. Royalty Payment Calculations.

(a) Principal Minerals Sold

(i) Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii) The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii) The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv) RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v) The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b) Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c) Adjustments

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionally from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

## 8. Commingling and Stockpiling. RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

## 9. Sales to Affiliates. RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

## 10. Most Favored Lessor. If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Advance Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

## 11. Completion of Mining.

(a) RGC will send Lessor written notice when it has completed Mining on the Property.

(b) The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c) If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d) If that Stock Report reflects that any tons of Mineral attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

## 12. Advance Royalty Payment: "70% of Estimated Future Royalty Payments". At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or 601,913 tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

## 13. No Reliance on Estimates or Representations. Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)



961-1043

COPY

STD Lease
VA 8/89

## DEED OF MINING LEASE

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on ___October 13,___ 1989 by and between ___G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA___ ___G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA___ ___Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife___ ___Route 1, Box 60, Stony Creek, Virginia 23882___

("Lessor" and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1. **Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

2. **Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3. **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

4. **Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:
   (a) To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");
   (b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");
   (c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;
   (d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;
   (e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;
   (f) To use all easements, means of access, and rights-of-way from and to the Property; and
   (g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

   Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

5. **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

6. **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $65,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $65,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to 70% Limitation (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $65,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7. **Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8. **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9. **Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

197 A

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any governmental allotment, subsidy, stabilization or conservation programs that may apply to the Property.

10.　　**Safety.**　Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

11.　　**RGC to Comply With Safety Laws and to Indemnify Lessor.**　RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

12.　　**RGC's Right to Determine Whether, When and Where to Mine.**　Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 31(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

13.　　**Compliance With Laws.**　RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

14.　　**Reclamation.**　RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property that may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

15.　　**Audit.**　Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor is a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

16.　　**Taxes.**　Taxes will be apportioned and paid as follows:

(a)　RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion in which Operations is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)　Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)　Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)　RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

17.　　**Warranty of Title.**　Lessor warrants as follows:

(a)　Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b)　The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

(c)　Lessor has full power and authority to execute this Lease;

(d)　RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e)　There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f)　This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

18.　　**Lessor Interest.**　In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

19.　　**Termination.**　RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

20.　　**Title Documents.**　Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

21.　　**Compensation for Buildings.**

(a)　**Principal Residence.**　If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

-2-

418TEMP2



    (b)    <u>Other Buildings</u>. If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

    22.    <u>Third-Party Claims</u>. If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

    23.    <u>Additional and After-Acquired Rights</u>. If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easement appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

    24.    <u>Entireties</u>. If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under this Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

    25.    <u>Multiple Owners</u>. Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

    26.    <u>Assignment</u>. Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

        (a)    The party making such an assignment must give the other party prior written notice thereof;

        (b)    The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

        (c)    Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

        (d)    Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

        (e)    No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

    27.    <u>Force Majeure</u>. Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

    28.    <u>No Broker</u>. Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing compulsions in connection with this Lease or any of the transactions contemplated under this Lease.

    29.    <u>Condemnation</u>. Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

    30.    <u>Dispute Resolution</u>. Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

    31.    <u>No Interference With RGC's Operations</u>. Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

    32.    <u>No Implied or Continuing Waiver</u>. If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

    33.    <u>Notices</u>. Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

    34.    <u>Entire Agreement; No Oral Modification</u>. This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

    35.    <u>Choice of Law</u>. This Lease will be construed, interpreted and governed by the laws of Virginia.

    36.    <u>Successors and Assigns</u>. This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

    37.    <u>Severability</u>. In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

    38.    <u>Modification to Cure Any Violation of the Rule Against Perpetuities</u>. Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

-3-

418TEMP2

39. *Memorandum.* At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40. *Mortgage Consent.* Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41. *Headings.* The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42. *Obligations That Survive This Lease.* In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43. *Good Faith.* During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

*G L Parson, Jr* [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

*Mary Elizabeth Parson* [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this __18th__ day of __October__, 1989, by _G. L. Parson, Jr., and Mary_ _Elizabeth Parson, husband and_ _wife_

My Commission Expires:
_October 28, 1991_

*Thomas H Ray*
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: *Daniel P. Wolcott*

Its: __Vice_____ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF __FLORIDA__
COUNTY OF ___CLAY___

The foregoing instrument was acknowledged before me this __13__ day of __February__, 1989 1990, by _Daniel P. Wolcott_ as __Vice__ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

*Ruth Robbins*
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993.

[NOTARIAL SEAL]

418TEMP2

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
**AKA MRS. G. L. PARSON, JR., husband and wife**
**(LESSOR)**


**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

# EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, ___Sussex___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to ___187.00___ acres, and which is described as follows:

That same tract or parcel of land conveyed to G. Lee Parson, Jr. by Warranty Deed, dated February 16, 1970, and recorded in Deed Book 73 at page 600, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All that certain tract, piece or parcel of land, lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing one hundred and eighty-seven (187) acres, more or less, adjoining the lands of Markham B. Chappell; Old Eppes Tract; Green Church Road; and Wyatt Mill Road, being in all respects the same land which was devised unto Nannie B. Chappell by John E. Stewart, as will be seen by reference to the first clause of his last will and testament, of record in the clerk's Office of the Circuit Court of Sussex County, Virginia, except a portion thereof, containing about twenty-five (25) acres, which was conveyed to Nannie B. Chappell to Markham B. Chappell by deed recorded in the aforesaid Clerk's Office in Deed Book 27, at page 323; and being in all respects the same real estate conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, from John H. Cole, Special Commissioner, by deed dated the 29th day of December, 1934, and recorded in the aforesaid Clerk's Office in Deed Book 34, at page 283.

EXEMPTING from this tract of land three (3) bulk barns, situated upon two (2) acres, more or less.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-38.

SPL Roy Pol
VA 8/89

EXHIBIT B
TO
MINING LEASE
BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

AND

RGC (USA) MINERALS INC.
(RGC)

RGC's Royalty Policy for Virginia Operations

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1.  **Definitions.**  The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

(a)  "Principal Minerals" means Ilmenite, Rutile and Zircon.

(b)  "Minor Minerals" means Minerals other than Principal Minerals.

(c)  "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

(d)  "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

(e)  "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

(f)  "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

(g)  "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2.  **Calculating Royalties.**  This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3.  **Stock Account and Stock Report.**  From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

(a)  The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

(b)  Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

(c)  Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

(d)  Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

(e)  A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4.  **Royalty Rate.**  RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5.  **Royalty Payment.**  Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6.  **Saleable Minerals Attributed to the Property.**  Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

(a)  RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

(b)  Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

(i)  "Mining" - extracting and delivery of mineral sand ore to the concentrator;

(ii)  "Concentrating" - removal of non-commercial material;

(iii)  "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

- 6 -

    (c)    The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

    (d)    Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7. Royalty Payment Calculations.

    (a)    Principal Minerals Sold

        (i)    Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

        (ii)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

        (iii)    The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

        (iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

        (v)    The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

    (b)    Minor Minerals Sold

        Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

    (c)    Adjustments

        At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

## 8. Commingling and Stockpiling. RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

## 9. Sales to Affiliates. RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

## 10. Most Favored Lessor. If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof, or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in future will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

## 11. Completion of Mining.

    (a)    RGC will send Lessor written notice when it has completed Mining on the Property.

    (b)    The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

    (c)    If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

    (d)    If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

## 12. Advance Royalty Payment: "70% of Estimated Future Royalty Payments." At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or ___88,637___ tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

## 13. No Reliance on Estimates or Representations. Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

511TEMP2

# EXHIBIT D

June, 30 2023

To: Iluka Resources, Inc. Via registered agent: CT Corporation System 1200 S Pine Island Road Plantation, FL 33324

Dear Sir:

You are hereby notified that the royalty payment address of PO Box 170225 Boston, MA 02117 with corresponding street address of 133 Clarendon St #170225 Boston, MA 02117 which were previously changed are now changed to 481 N Santa Cruz Ave #178 Los Gatos, CA 95030; accordingly, the 7548 South US Hwy 1 #198 Port St Lucie, FL 34952 address for Betty has been replaced by this 481 N Santa Cruz Ave #178 Los Gatos, CA 95030 address and the 2625 Alcatraz Ave #179 Berkeley, CA 94705 address for Laurence has been replaced by this 481 N Santa Cruz Ave #178 Los Gatos, CA 95030 address.

As we previously notified you, the October 13, 1989 Deeds of Mining Lease entered into by George Lee Parson, Jr. and Mary Elizabeth Parson and RGC (USA) Minerals, Inc. may be rescinded in central Los Angeles, CA, Culver City, CA, Berkeley, CA, San Francisco, CA, and Santa Clara County, CA and the Superior Court for Santa Clara County, CA is the repository for all rescission money. For reference, there are ten leases that the minerals conveyed by the 97 Deed were conveyed subject to, and said leases have memorandums of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, and we hereby again notify you that said leases may be rescinded and hereby notify you that such rescission may be in any of the following venues: Culver City, CA, Berkeley, CA, or San Francisco, CA.

This document is not a waiver of any rights held by Betty P. Graham. This document is not a waiver of any claims held by Betty P. Graham This document is not a waiver of any rights held by Laurence J. Graham. This document is not a waiver of any claims held by Laurence J. Graham. All rights are reserved.

Sincerely,

Betty P. Graham for Betty P. Graham: *Betty P. Graham*

Laurence J. Graham for Laurence J. Graham: *[signature]*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *[signature]*

UNITED STATES POSTAL SERVICE.

MIDTOWN
301 UNION ST
SEATTLE, WA 98101-9998
(800)275-8777

06/30/2023                          05:13 PM

Product          Qty    Unit    Price
                        Price

Priority Mail®    1              $12.55
Fort Lauderdale, FL 33324
Weight: 0 lb 0.30 oz
Expected Delivery Date
Mon 07/03/2023
Insurance                $0.00
Up to $100.00 included
Certified Mail®          $4.15
Tracking #:
9589 0710 5270 0702 8236 45
Affixed Postage          -$0.63
Affixed Amount: $0.63

Total                   $16.07

Grand Total:            $16.07

Cash                    $50.00
Change                 -$33.93

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
1-800-222-1811.

Save this receipt as evidence of
insurance. For information on filing an
insurance claim go to
https://www.usps.com/help/claims.htm
or call 1-800-222-1811

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device.

June, 30 2023

To: Iluka Resources, Inc. Via registered agent: CT Corporation System 1200 S Pine Island Road Plantation, FL 33324

Dear Sir:

You are hereby notified that the royalty payment address of PO Box 170225 Boston, MA 02117 with corresponding street address of 133 Clarendon St #170225 Boston, MA 02117 which were previously changed are now changed to 481 N Santa Cruz Ave #178 Los Gatos, CA 95030; accordingly, the 7548 South US Hwy 1 #198 Port St Lucie, FL 34952 address for Betty has been replaced by this 481 N Santa Cruz Ave #178 Los Gatos, CA 95030 address and the 2625 Alcatraz Ave #179 Berkeley, CA 94705 address for Laurence has been replaced by this 481 N Santa Cruz Ave #178 Los Gatos, CA 95030 address.

As we previously notified you, the October 13, 1989 Deeds of Mining Lease entered into by George Lee Parson, Jr. and Mary Elizabeth Parson and RGC (USA) Minerals, Inc. may be rescinded in central Los Angeles, CA, Culver City, CA, Berkeley, CA, San Francisco, CA, and Santa Clara County, CA and the Superior Court for Santa Clara County, CA is the repository for all rescission money. For reference, there are ten leases that the minerals conveyed by the 97 Deed were conveyed subject to, and said leases have memorandums of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, and we hereby again notify you that said leases may be rescinded and hereby notify you that such rescission may be in any of the following venues: Culver City, CA, Berkeley, CA, or San Francisco, CA, and Santa Clara County, CA. ~~IS~~ BPD 6/30/23

This document is not a waiver of any rights held by Betty P. Graham. This document is not a waiver of any claims held by Betty P. Graham This document is not a waiver of any rights held by Laurence J. Graham. This document is not a waiver of any claims held by Laurence J. Graham. All rights are reserved. 7/01/23

Sincerely,

Betty P. Graham for Betty P. Graham: *Betty P. Graham*    *Betty P. Graham* 7/01/23

Laurence J. Graham for Laurence J. Graham: *Lzy Graham*    *Lzy Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Lzy Graham*    *Lzy Graham* 7/01/23

UNITED STATES POSTAL SERVICE ®

SANTA MONICA
1653 7TH ST
SANTA MONICA, CA 90401-9997
(800)275-8777

07/03/2023                                    05:04 PM

Product                        Qty    Unit      Price
                                      Price

Fort Lauderdale, FL 33324       1                $0.63
Weight: 0 lb 0.30 oz
Estimated Delivery Date
Mon 07/10/2023
Certified Mail ®                                 $4.15
Tracking #:
70220410000174458328
Return Receipt                                   $3.35
Tracking #:
9590 9402 2634 6336 3877 88
Total                                            $8.13

First-Class Mail ®                    1
Letter
Fort Lauderdale, FL 33324

Grand Total:                                    $8.13

Cash                                           $20.00
Change                                        -$11.87

Text your tracking number to 28777 (2USPS) to get the latest status. Standard Message and Data rates may apply. You may also visit www.usps.com USPS Tracking or call 1-800-222-1811.

In a hurry? Self-service kiosks offer quick and easy check-out. Any Retail Associate can show you how.

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage. Refunds for guaranteed services only. Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos or scan this code with your mobile device.

Iluka Resources, Inc. c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324.

This letter will be mailed by USPS certified mail Adult signature requested to Iluka Resources, Inc. c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324 and served,

1/30/24

Officers:

We have not received any indication that you are ready to admit to the liability that you have to us so we write this letter.

Iluka Resources, Inc. (hereinafter "Iluka") is already in receipt of a copy of Betty P. Graham's FLORIDA GENERAL DURABLE POWER OF ATTORNEY dated 7/18/2014; I, Laurence J. Graham, am Betty P. Graham's Agent (also known as her attorney-in-fact); I have the powers to bring, prosecute, and settle all claims held by Betty P. Graham. Betty P. Graham may be referred to as "Betty" herein. I may be referred to as "Laurence" herein.

I, Betty Patrick Graham, may be referred to as Betty P. Graham herein; and, I Betty Patrick Graham may be referred to as Betty herein.

Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") which, by its written language, is said to be drafted by one attorney who, although we did not know it at the time, had a history of performing work for RGC (USA) Minerals, Inc. (hereinafter, "RGC"); but, we did know that he was working on the 97 Deed with RGC and that the McGuire Woods law firm was involved.

With the conveyance of title to more than 1,150 acres of subsurface minerals located below surface of ten parcels of land, the 97 Deed also conveyed the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the

maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; furthermore, the 97 Deed also transferred all of Betty's parent's royalties due under ten certain October, 13 1989 Deeds of Mining Lease to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments; said ten certain October, 13 1989 Deeds of Mining Lease were signed by Betty's father George L. Parson, Jr. and Betty's mother Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases"). The 97 Deed severed the 1,169.86 acre lease from the 1,196.61 acre lease that Betty's parents and RGC entered into.

Accordingly, Betty P. Graham, Julia P. Boyd, and Ann P. Everett were each conveyed title to a separate one-third share of the tangible real property minerals located below the surface of ten parcels of land totaling more than 1,150 acres of land by the 97 Deed together with the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals, and each of them also received one-third of the royalties due under the Leases by the 97 Deed except for the next two annual advance royalty payments.

We allege that the Leases, pertaining to the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed which were located below the surface of ten parcels of land totaling more than 1,150 acres of land and later recovered, as saleable minerals, from the ore that Iluka extracted from those ten parcels of land, have been rescinded; however, if Iluka currently claims that said Leases, pertaining to the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed which were located below the surface of ten parcels of land totaling more than 1,150 acres of land and later recovered, as saleable minerals, from the ore that Iluka extracted from those ten parcels of land, have not been rescinded, they are claiming that it has a duty to deliver royalties and our address for receipt of all such royalties is 2210 W Sunset Blvd PMB 201 Los Angeles, CA 90026 c/o Laurence John Graham; **if Iluka currently claims that any of the ten October 13, 1989 Deeds of Mining Lease,** (pertaining to the one-third share of the

minerals conveyed to Betty P. Graham by the 97 Deed which were located below the surface of the ten parcels of land listed in the 97 Deed that were later recovered, as saleable minerals, from the ore that Iluka extracted from those ten parcels of land), **have not been rescinded, Iluka is thereby claiming that it has a duty to deliver royalties and our address for receipt of all such royalties is 2210 W Sunset Blvd PMB 201 Los Angeles, CA 90026 c/o Laurence John Graham** however, **this change is made without any agreement from us that the Leases,** pertaining to the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed which were located below the surface of ten parcels of land listed in the 97 Deed and later recovered, as saleable minerals, from the ore that Iluka extracted from those ten parcels of land, **have not been rescinded as we allege that they have been rescinded**; accordingly, all changes made herein are done with the reservation of all rights and claims; all rights are reserved.

You have been served our 1/7/24 VERIFIED AMENDED COMPLAINT FOR RESCISSION OF CONTRACT[S]; AND, DEMAND FOR JURY TRIAL. As you know, you are involved in a massive fraud that is clearly one of largest examples of criminal racketeering by corporations in the modern era and it has caused us severe harm and loss; we are going to get justice against you; and, DuPont de Nemours, Inc.; and, The Dow Chemical Company (also known as Dow, Inc.); and, The Chemours Company; and, Corteva, Inc.; and, DOES 1-25, inclusive in court as we are going to file the 1/7/24 VERIFIED AMENDED COMPLAINT FOR RESCISSION OF CONTRACT[S]; AND, DEMAND FOR JURY TRIAL in the SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY OF SAN FRANCISCO.

Sincerely,

Betty Patrick Graham for Betty Patrick Graham: _Betty Patrick Graham_

Laurence J. Graham as attorney-in-fact for Betty P. Graham: _Larry Graham_

Laurence J. Graham as Agent for Betty P. Graham: _Larry Graham_

Laurence J. Graham for Laurence J. Graham: _Larry Graham_

Laurence John Graham for Laurence John Graham: _Larry Graham_



Address:                3225 FILLMORE ST
                        SAN FRANCISCO
                        CA 94123
                        SFOKK
Location:               -BTCO1
Device ID:              940387296276
Transaction:

FedEx 2Day AM
Tracking Number:                        51.29
   270412507689        0.15 lb (S)
      Declared Value    0
Recipient Address:
   ILUKA RESOURCES,INC.
   C/O CT CORPORATION SYSTEM
   1200 S PINE ISLAND RD STE 250
   Plantation, FL 33324
   0000000000

Scheduled Delivery Date 02/01/2024

Pricing option:
   STANDARD RATE

Package Information:
   FedEx Envelope

        Shipment subtotal:      $51.29

             Total Due:         $51.29

                  Cash:         $100.00

             Change Due:        $48.71


             M = Weight entered manually
             S = Weight read from scale
             1 = Taxable item

Terms and conditions apply, including terms that limit
FedEx's liability. The estimated shipping charge
may be different than the actual charges for your
shipment. Differences may occur based on actual weight,
dimensions and other factors. Shipment-related terms
and conditions and details on how shipping charges
are calculated are available upon request or at
fedex.com/serviceguide.

             Visit us at: fedex.com
             or call 1.800.GoFedEx
                              3339

| ATTORNEY OR PARTY WITHOUT ATTORNEY:<br>Laurence John Graham<br><br>TELEPHONE NO.: (954) 288-5138<br>EMAIL ADDRESS: grahamlarrybetty@gmail.com<br>ATTORNEY FOR: | **FOR COURT USE ONLY** |
|---|---|

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES<br>STREET ADDRESS:<br>MAILING ADDRESS:<br>CITY AND ZIP CODE:<br>BRANCH NAME: | |
|---|---|

| PLAINTIFF: Laurence J. Graham<br><br>DEFENDANT: E.I. Du Pont De Nemours and Company, Iluka<br>Resources, Inc., The Dow Chemical Company, | CASE NUMBER: |
|---|---|

| **DECLARATION OF MAILING** | Ref. No. or File No.: |
|---|---|

1. I, Louis Pardo, am at least 18 years of age and not a party to this action.

2. Documents mailed:

   Letter

3. A true copy of the documents were sealed in an envelope and placed in the United States mail with First Class postage prepaid as follows:

   Date:            1/30/2024
   Location:        MIAMI BEACH, FLORIDA
   Addressed:       Iluka Resources, Inc. By serving CT Corporation Systems as it's statutory
                    registered agent, 1200 S. Pine Island Road, Suite 240, Plantation, FL
                    33324

4. Person performing mailing:

   Name:            Louis Pardo
   Firm:            COURTESY FLORIDA PROCESS SERVERS
   Address:         Payment Center, P.O. Box 40-3621, Miami Beach, FL 33140
   Telephone Number:  (888) 319-2205

5. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____
          Louis Pardo
        (PRINTED NAME)

▶  _____
              (SIGNATURE)

**Page 1 of 1**

**DECLARATION OF MAILING**          Job Number JGS-2024000638





# U.S. Postal Service™
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

**For delivery information, visit our website at *www.usps.com*®.**

Fort Lauderdale, FL 33324

| | |
|---|---|
| Certified Mail Fee | $4.40 |
| $ | $3.45 |

**Extra Services & Fees** *(check box, add fee as appropriate)*
- ☐ Return Receipt (hardcopy) $ $0.00
- ☐ Return Receipt (electronic) $ $0.00
- ☐ Certified Mail Restricted Delivery $ $0.00
- ☐ Adult Signature Required $ $0.00
- ☐ Adult Signature Restricted Delivery $

Postage $0.68
$

**Total Postage and Fees**
$ $8.73

Postmark Here

07/30/2024

Sent To ILUKA RESOURCES, INC. C/O ITS REGISTERED
AGENT CT CORPORATION SYSTEMS
Street and Apt. No., or PO Box No.
1200 S. PINE ISLAND ROAD, SUITE 250
City, State, ZIP+4°
PLANTATION, FL 33324

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

LAWRENCE JOHN GRAHAM AND
BETTY PATRICK GRAHAM c/O
WHOEVER JOHN GRAHAM
2610 N. SUNSET BLVD.
#201
LOS ANGELES CA 90026



**CERTIFIED MAIL**

9589 0710 5270 0714 8079 78

RDC 99

02924

U.S. POSTAGE
FCM LETTER
MIAMI BEACH, FL
JAN 30, 2024
**$8.73**
R2304M114503-33

ILUKA RESOURCES, INC,
c/o ITS REGISTERED AGENT
CT CORPORATION SYSTEM
1200 S. PINE ISLAND ROAD
SUITE 250
PLANTATION, FL 33324





POS-020

| ATTORNEY OR PARTY WITHOUT ATTORNEY:<br>Laurence John Graham<br><br> TELEPHONE NO.: (954) 288-5138<br> EMAIL ADDRESS: grahamlarrybetty@gmail.com<br> ATTORNEY FOR: | *FOR COURT USE ONLY* |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**<br> STREET ADDRESS:<br> MAILING ADDRESS:<br> CITY AND ZIP CODE:<br> BRANCH NAME: | |
| PLAINTIFF: Laurence J. Graham<br>DEFENDANT: E.I. Du Pont De Nemours and Company, Iluka<br>        Resources, Inc., The Dow Chemical Company, | CASE NUMBER: |
| **PROOF OF PERSONAL SERVICE--CIVIL** | Ref. No. or File No.: |

1.  I am over 18 years of age and **not a party to this action.**
2.  I served the following **documents:**
    Letter

3.  I personally served the following **persons** at the address, date, and time stated:
    a.   Name: Donna Mock
    b.   Address: 1200 S. Pine Island Road, Suite 240, Plantation, FL 33324
    c.   Date: 1/30/2024
    d.   Time: 2:10 pm

4.  I am
    a.    not a registered California process server.

5.  My name, address, telephone number, and, if applicable, county of registration and number are:
    CARLOS PARDO
    COURTESY FLORIDA PROCESS SERVERS
    Payment Center, P.O. Box 40-3621, Miami Beach, FL 33140
    Telephone number:  (888) 319-2205
    Registration Number:  SPS # 519
    County:  Broward County, Florida

6.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:


   CARLOS PARDO                                          ▶ _____
   (TYPE OR PRINT NAME OF PERSON WHO SERVED THE PAPERS)          (SIGNATURE OF PERSON WHO SERVED THE PAPERS)

Page 1 of 1

Z; /0 /ꞇꞀ
//30/2ꞇ
L.L
SꞀSꞀSꞀ

Iluka Resources, Inc. c/o its registered agent CT Corporation System at 1200 S Pine Island Road
Suite 250 Plantation, FL 33324.

This letter will be mailed by USPS certified mail Adult signature requested to Iluka Resources,
Inc. c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250
Plantation, FL 33324 and served,

1/30/24

Officers:

We have not received any indication that you are ready to admit to the liability that you have to
us so we write this letter.

Iluka Resources, Inc. (hereinafter "Iluka") is already in receipt of a copy of Betty P. Graham's
FLORIDA GENERAL DURABLE POWER OF ATTORNEY dated 7/18/2014; I, Laurence J.
Graham, am Betty P. Graham's Agent (also known as her attorney-in-fact); I have the powers to
bring, prosecute, and settle all claims held by Betty P. Graham. Betty P. Graham may be
referred to as "Betty" herein. I may be referred to as "Laurence" herein.

I, Betty Patrick Graham, may be referred to as Betty P. Graham herein; and, I Betty Patrick
Graham may be referred to as Betty herein.

Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P,
Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and
character located below the surface of ten parcels of land totaling more than 1,150 acres of land
by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office
of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County,
VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") which, by its written language, is
said to be drafted by one attorney who, although we did not know it at the time, had a history of
performing work for RGC (USA) Minerals, Inc. (hereinafter, "RGC"); but, we did know that he
was working on the 97 Deed with RGC and that the McGuire Woods law firm was involved.

With the conveyance of title to more than 1,150 acres of subsurface minerals located below
surface of ten parcels of land, the 97 Deed also conveyed the right of ingress and egress, and
possession at all times for the purpose of mining, drilling and operating for said minerals and the

Signed in Miami Beach, Florida on Feb 10, 2024 and then mailed to Iluka Resources, Inc. c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324 from Miami Beach January, 28, 2024 by USPS Priority Express overnight letter with signature requested and then served c/o CT Corporation System at the same address at approximately 9AM on 2/12/24.

Officers: Iluka Resources, Inc. is already in receipt of a copy of Betty P. Graham's FLORIDA GENERAL DURABLE POWER OF ATTORNEY dated 7/18/2014; I, Laurence J. Graham, am Betty P. Graham's Agent (also known as her attorney-in-fact); I have the powers to bring, prosecute, and settle all claims held by Betty P. Graham. Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") With the conveyance of title to more than 1,150 acres of subsurface minerals located below surface of ten parcels of land, the 97 Deed also conveyed the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; furthermore, the 97 Deed also transferred all of Betty's parent's royalties due under ten certain October, 13 1989 Deeds of Mining Lease to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments; said ten certain October, 13 1989 Deeds of Mining Lease were signed by Betty's father George L. Parson, Jr. and Betty's mother Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases"). Iluka is hereby notified that my 133 Clarendon St #170225 Boston, MA 02117 royalty payment address is hereby changed to 2625 Alcatraz Ave PMB 179 Berkeley, CA 94705; this is now my only royalty payment address and this change is made with the reservation of all rights and claims; accordingly, all rights are reserved. Sincerely, Laurence J. Graham: *Larry Graham*

2^10-2 2/10/24



**UNITED STATES POSTAL SERVICE**

MIAMI BEACH
1300 WASHINGTON AVE
MIAMI BEACH, FL 33119-9998
(800)275-8777

02/10/2024                          02:09 PM

------------------------------------------------

| Product | Qty | Unit Price | Price |
|---------|-----|-----------|-------|
| PM Express 2-Day | 1 | | $30.45 |

Flat Rate Env
    Fort Lauderdale, FL 33324
    Flat Rate
    Signature Requested
    Scheduled Delivery Date
        Mon 02/12/2024 06:00 PM
    Money Back Guarantee
    Tracking #:
        EI046316457US
    Insurance                        $0.00
        Up to $100.00 included
Total                               $30.45

------------------------------------------------

Grand Total:                        $30.45

------------------------------------------------

Cash                                $40.00
Change                              -$9.55

------------------------------------------------

Save this receipt as evidence of
insurance. For information on filing an
insurance claim go to
https://www.usps.com/help/claims.htm
or call 1-800-222-1811

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
1-800-222-1811.

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device.



or call 1-800-410-7420.

------------------------------------------------

UFN: 115345-0410
Receipt #: 840-53300050-1-4872492-1
Clerk: 55

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | *FOR COURT USE ONLY* |
|---|---|
| BETTY P. GRAHAM, LAURENCE J GRAHAM AND LAURENCE J GRAHAM<br>PO BOX 470213<br>SAN FRANCISCO, CA 94147<br><br>  TELEPHONE NO.:<br>  ATTORNEY FOR: | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO | |
|---|---|
| STREET ADDRESS: 400 MCALLISTER STREET<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: SAN FRANCISCO, 94102<br>BRANCH NAME: SAN FRANCISCO | |

| PLAINTIFF: Laurence J, Graham (also known as: Laurence<br>  John Graham, Laurence Graham, and Larry<br>  Graham), on behalf of himself, and as attorney-<br>  in-fact for Betty P. Graham (also known as:<br>  Betty Patrick Graham, Betty Graham, and Betty<br>  Pat Graham), and as Agent for Betty P. Graham;<br>  Betty Patrick Graham<br>DEFENDANT: DUPONT DE NEMOURS INC. ET AL. | CASE NUMBER:<br>CGC-24-611963 |

| AMENDED PROOF OF SERVICE | Ref. No. or File No.: |
|---|---|

1.   I am over 18 years of age and not a party to this action.

2.   Received by ACCURATE SUPPORT RESOURCES on 2/11/2024 at 8:30 pm to be served on **ILUKA RESOURCES INC, R/A CT CORPORATION SYSTEM, 1200 S PINE ISLAND RD.,, PLANTATION, FL 33324.**

3.   Served the within named corporation by delivering a true copy of the **LETTER** with the date and hour of service endorsed thereon by me to DONNA MOCH / SERVICE OF PROCESS MANAGER / CT CORP. as **Registered Agent** of the within named corporation, in compliance with State Statutes.

4.   Date and Time of service: 2/12/2024 at 9:00 am

5.   I am not a registered California process server.

6.   My name, address, telephone number, and, if applicable, county of registration and number are:

   Name: Richard Lang
   Firm: ACCURATE SUPPORT RESOURCES
   Address: P.O. Box 350096, Ft. Lauderdale, FL 33335
   Telephone number: (954) 761-9977
   Registration Number: Sps #259
   County: Broward County

7.   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:   6/04/2025

Richard Lang
(TYPE OR PRINT NAME OF PERSON WHO SERVED THE PAPERS)

▶          (SIGNATURE OF PERSON WHO SERVED THE PAPERS)

Page 1 of 1

**AMENDED PROOF OF SERVICE**          Job Number ARL-2024000108

# 415167

Signed in Miami Beach, Florida on Feb 10, 2024 and then mailed to Iluka Resources, Inc. c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324 from Miami Beach January, 28, 2024 by USPS Priority Express overnight letter with signature requested and then served c/o CT Corporation System at the same address at approximately 9AM on 2/12/24.

Officers: Iluka Resources, Inc. is already in receipt of a copy of Betty P. Graham's FLORIDA GENERAL DURABLE POWER OF ATTORNEY dated 7/18/2014; I, Laurence J. Graham, am Betty P. Graham's Agent (also known as her attorney-in-fact); I have the powers to bring, prosecute, and settle all claims held by Betty P. Graham. Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") With the conveyance of title to more than 1,150 acres of subsurface minerals located below surface of ten parcels of land, the 97 Deed also conveyed the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; furthermore, the 97 Deed also transferred all of Betty's parent's royalties due under ten certain October, 13 1989 Deeds of Mining Lease to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments; said ten certain October, 13 1989 Deeds of Mining Lease were signed by Betty's father George L. Parson, Jr. and Betty's mother Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases"). Iluka is hereby notified that my 133 Clarendon St #170225 Boston, MA 02117 royalty payment address is hereby changed to 2625 Alcatraz Ave PMB 179 Berkeley, CA 94705; this is now my only royalty payment address and this change is made with the reservation of all rights and claims; accordingly, all rights are reserved. Sincerely, Laurence J. Graham: *Larry Graham*

Signed on 2/12/24 and then mailed to Iluka Resources, Inc. "Iluka" c/o its registered agent CT
Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324 from Orlando,
FL on 2/12/24 by USPS certified mail hardcopy return receipt adult signature requested and
served c/o CT Corporation System at the same address at approximately 9AM on 2/12/24.
Officers: Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and
Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every
kind and character located below the surface of ten parcels of land totaling more than 1,150 acres
of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the
Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of
Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") With the
conveyance of title to more than 1,150 acres of subsurface minerals located below surface of ten
parcels of land, the 97 Deed also conveyed the right of ingress and egress, and possession at all
times for the purpose of mining, drilling and operating for said minerals and the maintenance of
facilities and means necessary or convenient for producing, treating and transporting such
minerals; furthermore, the 97 Deed also transferred all of Betty's parent's royalties due under ten
certain October, 13 1989 Deeds of Mining Lease to Betty P. Graham, Julia P. Boyd, and Ann P.
Everett except for the next two annual advance royalty payments; said ten certain October, 13
1989 Deeds of Mining Lease were signed by Betty's father George L. Parson, Jr. and Betty's
mother Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are
also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the
97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court
of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County,
Virginia (hereinafter "the Leases"). Iluka is here again notified by this letter and was notified by
**my prior letter mailed on 2/10/24 with USPS Tracking # EI046316457US, which is served
herewith and will be arriving to Iluka this morning on 2/12/24, that my 133 Clarendon St
#170225 Boston, MA 02117 royalty payment address has been changed to 2625 Alcatraz
Ave PMB 179 Berkeley, CA 94705 and that this is now my only royalty payment address and
Iluka is hereby notified that 2625 Alcatraz Ave PMB 179 Berkeley, CA 94705 is also my
correspondence address and that these changes are made with the reservation of all rights
and claims; accordingly, all rights are reserved.**
Sincerely, Laurence J. Graham: _Larry Graham_ 2/12/24

Signed on 5/31/24 in Miami, FL and then mailed to Iluka Resources, Inc. "Iluka" c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324 from Miami, FL on 5/31/24 by USPS certified mail hardcopy return receipt adult signature requested and served c/o CT Corporation System at the same address.

Officers:

Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P. Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") With the conveyance of title to more than 1,150 acres of subsurface minerals located below surface of ten parcels of land, the 97 Deed also conveyed the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; furthermore, the 97 Deed also transferred all of Betty's parent's royalties due under ten certain October, 13 1989 Deeds of Mining Lease to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments; said ten certain October, 13 1989 Deeds of Mining Lease were signed by George Lee Parson, Jr. and Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases"). With the reservation of all rights and claims, Iluka is hereby notified that we are replacing all previously provided addresses with one single address; accordingly, all previously provided royalty payment addresses and correspondence address are hereby replaced with PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham and notify you that these changes are made with the reservation of all rights and claims; accordingly, all rights are reserved. This letter is not a waiver of any rights held by Betty P. Graham and is not a waiver of any claims held by Betty P. Graham and this letter is not a waiver of any rights held by Laurence J. Graham and is not a waiver of any claims held by Laurence J. Graham. Also, this letter is not a waiver of any rights held by Betty Patrick Graham and is not a waiver of any claims held by Betty Patrick Graham. All rights are reserved.

Sincerely,

Betty Patrick Graham for Betty Patrick Graham: _Betty Patrick Graham_

Laurence J. Graham as attorney-in-fact for Betty P. Graham: _Lamy Graham_

Laurence J. Graham as Agent for Betty P. Graham: _Lamy Graham_

Laurence J. Graham for Laurence J. Graham: _Lamy Graham_

Laurence John Graham for Laurence John Graham: _Lamy Graham_

**UNITED STATES POSTAL SERVICE.**

COCONUT GROVE
3191 GRAND AVE
MIAMI, FL 33133-9998
(800)275-8777

06/01/2024                                    02:04 PM

----------------------------------------

| Product | Qty | Unit Price | Price |
|---------|-----|------------|-------|
| Priority Mail® | 1 | | $9.85 |

Window FR Env
  Fort Lauderdale, FL 33324
  Flat Rate
  Expected Delivery Date
    Mon 06/03/2024
Insurance                                     $0.00
  Up to $100.00 included
Certified Mail®                               $4.40
  Tracking #:
    9589 0710 5270 1206 0820 40
Return Receipt                                $3.65
  Tracking #:
    9590 9402 8629 3244 6711 07
Total                                        $17.90

Grand Total:                                 $17.90

Cash                                        $100.00
Change                                      -$82.10

In a hurry? Self-service kiosks offer
  quick and easy check-out. Any Retail
      Associate can show you how.

Text your tracking number to 28777 (2USPS)
 to get the latest status. Standard Message
   and Data rates may apply. You may also
 visit www.usps.com. USPS Tracking or call
           1-800-222-1811.

    Save this receipt as evidence of
insurance. For information on filing an
         insurance claim go to
  https://www.usps.com/help/claims.htm
       or call 1-800-222-1811

         Preview your Mail
         Track your Packages
         Sign up for FREE @
  https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
    Thank you for your business.

   Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device,



    or call 1-800-410-7420

----------------------------------------

UFN: 115866-0109



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

Fort Lauderdale, FL 33324

| Certified Mail Fee | | |
|---|---|---|
| $ | | |
| Extra Services & Fees (check box, add fee as appropriate) | | |
| ☑ Return Receipt (hardcopy) | $ | |
| ☐ Return Receipt (electronic) | $ | |
| ☐ Certified Mail Restricted Delivery | $ | |
| ☑ Adult Signature Required | $ | |
| ☐ Adult Signature Restricted Delivery | $ | |
| Postage | | |
| $9.85 | $0.00 | |
| Total Postage and Fees | | |
| $17.90 | $9.85 | |

06/01/2024

Sent To
Ihuka Resources Inc W/agistrat CTCorp System
Street and Apt. No., or PO Box No.
1200 S Pine Island Rd Ste 250
City, State, ZIP+4®
Plantation FL 33324

PS Form 3800, January 2023 PSN 7530-02-000-9047  See Reverse for Instructions

## VERIFIED RETURN OF SERVICE

State of _____                                                    County of

Case Number: _____

Plaintiff:
**Betty Patrick Graham and Laurence J. Graham**

vs.

Defendant:
**Iluka Resources, Inc.**

For:
Laurence J. Graham
Laurence John Graham and Betty Patrick Graham

Received by COURTESY FLORIDA PROCESS SERVERS on the 3rd day of June, 2024 at 11:08 am to be served on Iluka Resources, Inc. By serving CT Corporation Systems as it's statutory registered agent, 1200 S. Pine Island Road, Suite 240, Plantation, FL 33324.

I, CARLOS PARDO, do hereby affirm that on the **3rd day of June, 2024** at **11:52 am, I:**

**CORPORATE: served** by delivering a true copy of the LETTER with the date and hour of service endorsed thereon by me, to: **Donna Mock** as **Registered Agent** at the address of: **1200 S. Pine Island Road, Suite 240, Plantation, FL 33324** on behalf of **Iluka Resources, Inc.,** and informed said person of the contents therein, in compliance with state statutes.

Under penalty of perjury, I declare that I have read the foregoing affidavit and that the facts stated in it are true and correct, that I am a sheriff appointed, SPECIAL PROCESS SERVER IN GOOD STANDING for the in the county in which service was effected in accordance with Florida Statutes, and have no interest in the above action pursuant to F.S. 92.525 ( 2 ).

**CARLOS PARDO**
SPS # 519

**COURTESY FLORIDA PROCESS SERVERS**
**Payment Center**
**P.O. Box 40-3621**
**Miami Beach, FL 33140**
**(888) 319-2205**

Our Job Serial Number: JGS-2024005404

Copyright © 1992-2024 DreamBuilt Software, Inc. - Process Server's Toolbox V8.0a

*11:52 am*
*6-8-2024*
*(?)*
*Sast 5/9*

Signed on 5/31/24 in Miami, FL and mailed to Iluka Resources, Inc. "Iluka" c/o its registered agent CT Corporation System at 1200 S. Pine Island Road Suite 250 Plantation, FL 33324 from Miami, FL on 5/31/24 by USPS certified mail hardcopy return receipt adult signature requested and will be served to Iluka on Monday c/o its registered agent CT Corporation System at 1200 S. Pine Island Road Suite 250 Plantation, FL 33324.

Officers:

Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") With the conveyance of title to more than 1,150 acres of subsurface minerals located below surface of ten parcels of land, the 97 Deed also conveyed the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; furthermore, the 97 Deed also transferred all of Betty's parent's royalties due under ten certain October, 13 1989 Deeds of Mining Lease to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments; said ten certain October, 13 1989 Deeds of Mining Lease were signed by George Lee Parson, Jr. and Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases"). With the reservation of all rights and claims, Iluka is hereby notified that we are replacing all previously provided addresses with one single address; accordingly, all previously provided address including, but not limited to, royalty payment addresses and correspondence addresses are hereby replaced with PO Box 470213 San Francisco, CA 94147 and notify you that these changes are made with the reservation of all rights and claims; accordingly, all rights are reserved. We have both been receiving mail at PO Box 470213 San Francisco, CA 94147; however, if any mail sent to Betty P. Graham at this address gets returned to sender, send it again to Betty P. Graham c/o Laurence J. Graham at PO Box 470213 San Francisco, CA 94147. This letter is not a waiver of any rights held by Betty P. Graham and is not a waiver of any claims held by Betty P. Graham and this letter is not a waiver of any rights held by Laurence J. Graham and is not a waiver of any claims held by Laurence J. Graham. Accordingly, this letter is not a waiver of any rights held by Betty Patrick Graham and is not a waiver of any claims held by Betty Patrick Graham. All rights are reserved.

Sincerely,

Betty Patrick Graham for Betty Patrick Graham: *Betty Patrick Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Larry Graham*

Laurence J. Graham as Agent for Betty P. Graham: *Larry Graham*

Laurence J. Graham for Laurence J. Graham: *Larry Graham*

Laurence John Graham for Laurence John Graham: *Larry Graham*

Signed on 2/08/2025 and mailed by United States Postal Service PRIORITY MAIL EXPRESS, signature required with tracking # **ER 121 593 885 US** to:

Iluka Resources, Inc.
c/o Karen Jennings Evans, Esq.
Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Officers: You are already in receipt of Betty P. Graham's DURABLE POWER OF ATTORNEY dated 7/18/2014 which was executed in Massachusetts and the 9/29/03 Settlement Agreement both of which authorize Laurence J. Graham to act on Betty P. Graham's behalf which he does herein. Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed"). The 97 Deed also transferred all of Betty's parents' royalties due under ten certain October 13, 1989 Deeds of Mining Lease, (the "Leases") and lessor rights in the Leases to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments. As you are aware, we are litigating in the United States District Court for the Northern District of California (Case#: 2:24-cv-01551-RFL) and the United States District Court for the Central District of California (Case #:2:24-cv-09444-FLA-SK) and we contend that the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed has been rescinded; however, you are claiming that said portion of the Leases has not been rescinded; therefore, you are claiming that you have a contractual duty and fiduciary duty to pay royalty payments under the Leases and deliver reporting about the minerals extracted from the ten parcels of land listed in the 97 Deed, and the saleable minerals recovered from the ten parcels of land listed in the 97 Deed, and deliver other correspondence. With the reservation of all rights and claims, we hereby notify you that PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham is our address for receipt of all correspondence, royalty payments, etc.; accordingly, PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham shall be our address for royalty payments for any portion of the Leases for which a recovery cannot be made by our current and all future actions for relief under Cal. Civil. Code Sec. 1692. This letter is not a waiver of any rights held by Betty Patrick Graham and is not a waiver of any claims held by Betty Patrick Graham. This letter is not a waiver of any rights held by Betty P. Graham and is not a waiver of any claims held by Betty P. Graham. This letter is not a waiver of any rights held by Laurence J. Graham and is not a waiver of any claims held by Laurence J. Graham. This letter is not a waiver of any rights held by Laurence John Graham and is not a waiver of any claims held by Laurence John Graham. All rights are reserved.
Sincerely,

Betty Patrick Graham for Betty Patrick Graham: _____

Betty P. Graham for Betty P. Graham: _____

Laurence J. Graham as attorney-in-fact for Betty P. Graham: _____

Laurence J. Graham as Agent for Betty P. Graham: _____

Laurence John Graham as Agent and attorney-in-fact for Betty P. Graham: _____

Laurence J. Graham for Laurence J. Graham: _____

Laurence John Graham for Laurence John Graham: _____

Signed on 2/10/2025 and mailed by United States Postal Service PRIORITY MAIL EXPRESS, signature required with tracking # **ER 121 594 143 US** to:

Iluka Resources, Inc.

c/o Karen Jennings Evans, Esq.

Hunton Andrews Kurth LLP

50 California Street, Suite 1700

San Francisco, CA 94111

Officers: You are already in receipt of Betty P. Graham's DURABLE POWER OF ATTORNEY dated 7/18/2014 which was executed in Massachusetts and the 9/29/03 Settlement Agreement both of which authorize Laurence J. Graham to act on Betty P. Graham's behalf which he does herein. Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed"). The 97 Deed also transferred all of Betty's parents' royalties due under ten certain October 13, 1989 Deeds of Mining Lease, (the "Leases") and lessor rights in the Leases to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments. As you are aware, we are litigating in the United States District Court for the Northern District of California (Case#: 2:24-cv-01551-RFL) and the United States District Court for the Central District of California (Case #:2:24-cv-09444-FLA-SK) and we contend that the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as valuable minerals, from the ten parcels of land listed in the 97 Deed has been rescinded; however, you are claiming that said portion of the Leases has not been rescinded; therefore, you are claiming that you have a contractual duty and fiduciary duty to pay royalty payments under the Leases and deliver reporting about the valuable minerals extracted from the ten parcels of land listed in the 97 Deed, and the saleable minerals recovered from the ten parcels of land listed in the 97 Deed, and deliver other correspondence. With the reservation of all rights and claims, we hereby notify you that PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham is our address for receipt of all royalty payments and Laurence J. Graham's correspondence address; accordingly, PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham shall be our address for royalty payments for any portion of the Leases for which a recovery cannot be made by our current and all future actions for relief under Cal. Civil Code Sec. 1692 and is our only royalty payment address. We also notify you that 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 c/o Laurence J. Graham is Betty P. Graham's correspondence address. This letter is not a waiver of any rights held by Betty Patrick Graham and is not a waiver of any claims held by Betty Patrick Graham. This letter is not a waiver of any rights held by Betty P. Graham and is not a waiver of any claims held by Betty P. Graham. This letter is not a waiver of any rights held by Laurence J. Graham and is not a waiver of any claims held by Laurence J. Graham. This letter is not a waiver of any rights held by Laurence John Graham and is not a waiver of any claims held by Laurence John Graham. All rights are reserved.

Sincerely,

Betty Patrick Graham for Betty Patrick Graham: *Betty Patrick Graham*

Betty P. Graham for Betty P. Graham: *Betty P. Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Larry Graham*

Laurence J. Graham as Agent for Betty P. Graham: *Larry Graham*

Laurence John Graham as Agent and attorney-in-fact for Betty P. Graham: *Larry Graham*

Laurence J. Graham for Laurence J. Graham: *Larry Graham*

Laurence John Graham for Laurence John Graham: *Larry Graham*

Signed on 2/08/2025 and mailed by United States Postal Service PRIORITY MAIL EXPRESS, signature required with tracking # ER 121 593 885 US to:

Iluka Resources, Inc.
c/o Karen Jennings Evans, Esq.
Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Officers:  You are already in receipt of Betty P. Graham's DURABLE POWER OF ATTORNEY dated 7/18/2014 which was executed in Massachusetts and the 9/29/03 Settlement Agreement both of which authorize Laurence J. Graham to act on Betty P. Graham's behalf which he does herein.  Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed"). The 97 Deed also transferred all of Betty's parents' royalties due under ten certain October 13, 1989 Deeds of Mining Lease, (the "Leases") and lessor rights in the Leases to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments. As you are aware, we are litigating in the United States District Court for the Northern District of California (Case#: 2:24-cv-01551-RFL) and the United States District Court for the Central District of California (Case #:2:24-cv-09444-FLA-SK) and we contend that the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed has been rescinded; however, you are claiming that said portion of the Leases has not been rescinded; therefore, you are claiming that you have a contractual duty and fiduciary duty to pay royalty payments under the Leases and deliver reporting about the minerals extracted from the ten parcels of land listed in the 97 Deed, and the saleable minerals recovered from the ten parcels of land listed in the 97 Deed, and deliver other correspondence. With the reservation of all rights and claims, we hereby notify you that PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham is our address for receipt of all correspondence, royalty payments, etc.; accordingly, PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham shall be our address for royalty payments for any portion of the Leases for which a recovery cannot be made by our current and all future actions for relief under Cal. Civil. Code Sec. 1692. This letter is not a waiver of any rights held by Betty Patrick Graham and is not a waiver of any claims held by Betty Patrick Graham. This letter is not a waiver of any rights held by Betty P. Graham and is not a waiver of any claims held by Betty P. Graham. This letter is not a waiver of any rights held by Laurence J. Graham and is not a waiver of any claims held by Laurence J. Graham.  This letter is not a waiver of any rights held by Laurence John Graham and is not a waiver of any claims held by Laurence John Graham. All rights are reserved.
Sincerely,

Betty Patrick Graham for Betty Patrick Graham:  *Betty Patrick Graham*

Betty P. Graham for Betty P. Graham:  *Betty P. Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham:  *Larry Graham*

Laurence J. Graham as Agent for Betty P. Graham:  *Larry Graham*

Laurence John Graham as Agent and attorney-in-fact for Betty P. Graham:  *Larry Graham*

Laurence J. Graham for Laurence J. Graham:  *Larry Graham*

Laurence John Graham for Laurence John Graham:  *Larry Graham*

# EXHIBIT E

09/30/2024

# REED MAYO LAW FIRM, P.C.

(757) 648-1376 - Office
(757) 648-1379 - Fax

4604 Berrywood Road
Virginia Beach, VA 23464

K. Reed Mayo
Rmayo@reedmayolaw.com

February 12, 2023

Mr. Laurence J. Graham
481 N. Santa Cruz Ave. #178
Los Gatos, CA 95030

7548 South US Hwy 1, #198
Port St. Lucie, FL 34952

> Re:     Iluka Resources Inc.:  Payment of Royalties Held in Escrow

Dear Mr. Graham:

I am writing to see if I can make arrangements to deliver a check to you for over $2.5 million.

As you may know, because of disputes over the ownership of royalties initially assigned to your mother by your grandparents, Iluka Resources Inc. ("Iluka") for many years deposited the royalties into an escrow account.  As a result of various interpleader actions, much of those funds were paid out to various creditors and to your brother directly.  Last September, the Sussex Circuit Court entered an order holding (among other things) that the balance of royalties being held in escrow belong to you.

Rather than paying those funds over to Florida or some other state as unclaimed property (to be held until you claim them), I would like to see if Iluka can pay those funds to you directly.  To ensure that you actually receive the funds, however, Iluka will need to deliver its check to you in person, confirm your identity with a state or federal government issued ID bearing your picture, and have you sign an acknowledgement that you received the check.

Are you willing and able to meet these conditions?  Please call ((757 648-1376) or email me at Rmayo@reedmayolaw.com and let me know.

Thank you in advance.

Very truly yours,

K. Reed Mayo

KRM/0200

# EXHIBIT F



**ILUKA**

June 12, 2023

BY CERTIFIED MAIL/RETURN RECEIPT

Mr. Laurence J. Graham
481 N. Santa Cruz Ave. #178
Las Gatos, CA 95030

Notice of Termination of Mining Lease

Dear Mr. Graham:

This letter shall serve as formal written notice from Iluka Resources Inc., a Delaware corporation, as successor by merger to RGC (USA) Minerals Inc. ("Iluka"), of its election to terminate that certain Deed of Mining Lease dated October 13, 1989, as amended by First Amendment to Deed of Mining Lease dated June 30, 1994, made by and between G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife, and RGC (USA) Minerals Inc., as assigned by Assignment of Mineral Leases effective as of October 6, 2006, made by and between G. L. Parson, Jr. and Mary Elizabeth Parson and Ann P. Everett, and as assigned (as to future rents) by Assignment of Mineral Leases dated September 29, 2008, made by and between G. L. Parson, Jr. and Mary Elizabeth Parson and Ann P. Everett and Julia H. Parson (collectively, the "Lease"), such termination to be effective as of September 30, 2023. Enclosed is an executed copy of the Memorandum of Termination of Mining Lease which we plan to record in the Clerk's Office of the Circuit Court of Sussex County, Virginia, within the next few weeks.

We appreciate the opportunity you have given us to do business with you on this parcel over these past several years.

Please don't hesitate to call me if you have any questions or concerns.

Kind Regards,

Ryan Inocco
US Country Manager

Enclosure

Lease No. 961-1033
Parcels 101-A-17 & 101-A-17A



Prepared by and return to:                        Tax Map No.:    101-A-17, 101-A-17M and
                                                                 101-A-17A

Hunton Andrews Kurth LLP
951 East Byrd Street
Richmond, Virginia 23219
Attn: Daniel M. Campbell, Esquire

## MEMORANDUM OF TERMINATION OF MINING LEASE

THIS MEMORANDUM OF TERMINATION OF MINING LEASE (this "Memorandum") dated as of June 12, 2023 made by and between ANN P. EVERETT, as the lessor under the Lease and as a mineral rights owner, JULIA H. PARSON also known of record as JULIA P. BOYD, ANN P. EVERETT, TRUSTEE FOR CHRISTOPHER LANCE EVERETT AND LEE RANDOLPH EVERETT UNDER AGREEMENT DATED DECEMBER 12, 1994, LAURENCE J. GRAHAM, and LUKE P. GRAHAM, collectively as mineral rights owners, and ILUKA RESOURCES, INC., a Delaware corporation, as successor by merger to RGC (USA) Minerals Inc. ("Iluka"). recites and provides:

### RECITALS:

WHEREAS, by Deed of Mining Lease dated October 13, 1989, as amended by First Amendment to Deed of Mining Lease dated June 30, 1994, made by and between G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife, and RGC (USA) Minerals Inc., as assigned to Ann P. Everett by Assignment of Mineral Leases dated October 6, 2006, and as further assigned (as to future rents payable under the Lease) by Assignment of Mineral Leases dated September 29, 2008, made by and between G. L. Parson, Jr. by Christopher L. Everett, his attorney-in-fact, and Mary Elizabeth Parson by Ann P. Everett, her attorney-in-fact, and Ann P. Everett and Julia H. Parson (collectively, the "Lease"), Iluka leased certain real property identified as Tax Map Parcels 101-A-17 and 101-A-17A located in Sussex County, Virginia (the "Property"). The Lease is evidenced by that certain Memorandum of Mining Lease dated October 13, 1989, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia (the "Clerk's Office") on August 17, 1990, in Deed Book 124 at page 513, and by Memorandum of First Amendment to Mining Lease dated June 30, 1994, recorded in the Clerk's Office on August 30, 1994, in Deed Book 141 at page 215, and by Assignment of Mineral Leases dated October 6, 2006, recorded in the Clerk's Office on October 20, 2006 in Deed Book 225 at page 460.

By Deed of Gift dated December 12, 1994, and recorded in the Clerk's Office on December 22, 1994, in Deed Book 143 at page 250, G. L. Parson, Jr. and Mary Elizabeth Parson, conveyed all of their right title and interest in and to a 1.0 acre portion of the Property known as "Dink's House Lot" identified as TM # 101-A-17A to Julia P. Boyd, now known as Julia H. Parson.

By Deed of Gift dated May 19, 1997, and recorded in the Clerk's Office on July 7, 1997, in Deed Book 155 at page 626, George Lee Parson, Jr. and Mary Elizabeth Parson, conveyed all of their right title and interest in and to the minerals underlying the Property, to Betty P. Graham, Ann P. Everett, and Julia P. Boyd, in equal shares, subject to the terms of the Lease.

By Deed dated May 18, 1998, and recorded in the Clerk's Office on May 28, 1998, in Deed Book 160 at page 596, G. L. Parson, Jr. and Mary Elizabeth B. Parson, conveyed the remaining 54 acre portion of the Property to Ann P. Everett, as Trustee for Christopher Lance Everett and Lee Randolph Everett under Agreement dated December 12, 1994.

By Deed of Gift dated October 23, 2000, and recorded in the Clerk's Office on November 2, 2000, in Deed Book 175 at page 181, Betty P. Graham conveyed all of her right title and interest in the minerals to Laurence J. Graham and Luke P. Graham.

WHEREAS, Iluka has terminated the Lease, and by this Memorandum Iluka now desires to provide record notice of the termination of the Lease.

TERMINATION:

1.    <u>Recitals</u>.  The foregoing Recitals are hereby incorporated herein and made a part hereof to the same extent as if set forth in full in this Memorandum.

2.    <u>Termination of Lease</u>.  Pursuant to Section 19 of the Lease, Iluka hereby confirms that the Lease and all rights and obligations of the parties thereunder are terminated effective as of September 30, 2023; and hereby provides notice of its release and relinquishment of all right, title, and interest, if any, it has or may have in the Property pursuant to the Lease.

*[Remainder of Page Intentionally Left Blank;*
*Signatures and Notary Acknowledgement Appears on Following Pages.]*

Iluka:

**ILUKA RESOURCES INC.**, a Delaware corporation, successor by merger to RGC (USA) Minerals Inc., a Delaware corporation

By:

Name:    Ryan Inocco

Title:    US Country Manager

COMMONWEALTH OF VIRGINIA,
COUNTY OF SUSSEX, to-wit:

The foregoing instrument was acknowledged before me this 12th day of June, 2023, by Ryan Inocco, as US Country Manager of Iluka Resources Inc., a Delaware corporation, successor by merger to RGC (USA) Minerals Inc., a Delaware corporation, on behalf of the corporation.

My commission expires:  December 31, 2026

Notary Public

DONNA J. HUFF
NOTARY PUBLIC
MY
COMMISSION
NUMBER
303803
COMMONWEALTH OF VIRGINIA

-3-

DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT
*July Term 2007*

**LAURENCE GRAHAM,**
Appellant,

v.

**FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES,** and
**CATHOLIC CHARITIES OF THE DIOCESE OF PALM BEACH, INC.,**
Appellees.

No. 4D07-996

[ December 5, 2007 ]

HAZOURI, J.

Appellant, Laurence J. Graham (Laurence Graham), appeals the following orders entered by the trial court: (1) Judgment of Guilt on Order to Show Cause Why Laurence Graham Should Not be Held in Contempt of Court; (2) Order Appointing Plenary Guardian of Person and Property Over Betty Pat Graham (Betty Graham)/Letters of Plenary Guardianship of Person and Property of Betty Pat Graham; and (3) Denial of Laurence Graham's Motion for Continuance. Luke Graham, Laurence's brother, is the only appellee who filed an answer brief in this case, in which appellee, Catholic Charities of the Diocese of Palm Beach, Inc. (Catholic Charities), joined. We reverse.

On November 8, 2005, the Department of Children and Families (DCF), filed a petition for appointment of plenary guardian, alleging that Betty Graham, Laurence and Luke Graham's mother, was incapacitated by mental illness. The petition alleged that Betty, a 61-year old woman, was presently located in a psychiatric facility in Fair Oaks Pavilion on the campus of Delray Medical Center. The petition alleged further that Betty had over $500,000 of real estate assets and $350,000 in a Merrill Lynch account. DCF claimed that Laurence and Luke Graham were trying to hide Betty from one another and get her assets in their respective names. However, DCF determined that Luke is the son who most has Betty's best interests in mind. Finally, the petition alleged that the situation is an emergency because DCF learned that the Merrill Lynch account was closed, and the money was suspected to be in Laurence's name.

Simultaneously, DCF filed a petition for appointment of emergency temporary guardian, raising the same allegations.

The trial court appointed Catholic Charities as Betty's emergency temporary plenary guardian. Upon Catholic Charities' petition following its discovery that $200,000.00 was transferred from Betty's joint account with her son Laurence, made payable to "Laurence Graham ITF Betty Graham," the trial court entered an order securing Betty's assets, freezing her accounts, and directing Betty's financial institutions and accountant(s) to provide information to Catholic Charities.

Shortly thereafter, Laurence Graham filed a petition for appointment as Betty's guardian. Laurence alleged he was being denied access to Betty and was denied his right to exercise health care decisions for Betty in violation of a health care advance directive ("the Directive") executed by Betty on July 22, 2006, designating Laurence as her health care surrogate.    Catholic Charities filed a verified petition for an order compelling Laurence to disclose Betty's location and show cause why he should not be held in contempt of court.  The trial court granted the petition and entered an order accordingly.   The order mandated that Laurence appear before the trial court on a date certain, to show cause why he should not be held in indirect criminal contempt of court. Laurence filed a response to the order to show cause, motion to dismiss order and request for statement of particulars, but did not appear before the trial court.  Luke Graham filed a petition to be appointed as Betty's permanent plenary guardian.    The trial court granted the petition, appointing Luke Graham as temporary plenary guardian of Betty's person and property.

Thereafter, Laurence filed an emergency motion for continuance of the hearing on the petition for appointment of a permanent guardian and motion for order for rule to show cause. His counsel claimed he did not have adequate time to prepare for the hearing because he had just been retained by Laurence Graham, and there was additional evidence necessary for the court to make a meaningful determination of the issues.  The trial court denied the motion for continuance.  After the hearing, the trial court denied the motion to dismiss and request for statement of particulars, and entered a judgment of guilt on the order to show cause why Laurence Graham should not be held in contempt of court. Specifically, the trial court stated:

> As to the merits of the alleged contempt, the Court finds that Laurence Graham is in fact in violation of the Court's Orders, voluntarily and freely, knowing at all times

that he has been in violation, and having at all times the ability to comply with the Court's Orders.    The Court is convinced beyond a reasonable doubt, based on the record before it, that Laurence Graham is in contempt of Court as described in the Order to Show Cause, i.e., his participation in the removal and disappearance of Betty Pat Graham from this jurisdiction and his subsequent failure to immediately disclose her location, in violation of this Court's Order Appointing Emergency Temporary Guardian (dated November 8, 2006) and the Letters of Emergency Temporary Guardianship (dated November 9, 2006), both of which delegated plenary emergency temporary guardianship powers to Catholic Charities of the Diocese of Palm Beach Inc.

The trial court scheduled sentencing, and ordered Laurence Graham to appear in person with Betty Graham at that time.

At the sentencing hearing, the trial court withheld sentencing for 90 days. The trial court encouraged the parties to determine what is best for Betty during that time and "revise these proceedings with the Court in its guardianship capacity rather than in its contempt capacity if necessary." This appeal followed.[1]

---

[1] Sheridan Weissenborn (Weissenborn), Betty Graham's attorney, previously filed a petition for writ of certiorari in this court, attempting to seek review of the lower court's denial of a motion to discharge an emergency, temporary guardian and to dismiss the guardianship proceedings, but the petition actually sought review of the trial court's denial of Weissenborn's *ore tenus* request to substitute counsel. *See Weissenborn v. Graham*, 963 So. 2d 275, 276 (Fla. 4th DCA Aug. 1, 2007).    The trial court had found that Weissenborn had no standing to bring motions on behalf of Betty Graham. *Id*. This court denied the petition, but Weissenborn filed for rehearing, arguing that the guardianship proceedings pending below violated Betty Graham's right to due process of law. *Id*. This court denied rehearing on the basis that Weissenborn was not properly substituted as counsel and was actually working on behalf of Laurence Graham, and thus, was not permitted to represent Betty Graham.    *Id*. Although this court denied rehearing, it wrote to address Weissenborn's claim that Florida's continued exercise of jurisdiction in the case violates due process because Betty Graham is living in California.    It concluded that "[Laurence's] improper act of subsequently removing Betty from Florida to a 'secret location' cannot divest the Florida court of jurisdiction." *Weissenborn*, 963 So. 2d at 279.

Laurence Graham argues first that the trial court erred in finding him guilty of indirect criminal contempt on two grounds: (1) the court failed to comply with the procedural requirements of Florida Rule of Criminal Procedure 3.840; and (2) there was no evidence that he violated a court order. Because we agree with the first ground, we do not reach the second.

Failure to strictly follow the dictates of Rule 3.840, governing indirect criminal contempt, constitutes fundamental, reversible error. *Hagan v. State*, 853 So. 2d 595, 597 (Fla. 5th DCA 2003).

Laurence Graham argues that the trial court's order is based upon a statement from Catholic Charities, which is not in affidavit form and was not issued upon personal knowledge, that he did not receive notice of the contempt proceedings, and that he was not properly served. Rule 3.840(a) provides:

> The judge, on the judge's own motion or on affidavit of any person having knowledge of the facts, may issue and sign an order directed to the defendant, stating the essential facts constituting the criminal contempt charged and requiring the defendant to appear before the court to show cause why the defendant should not be held in contempt of court. The order shall specify the time and place of the hearing, with a reasonable time allowed for preparation of the defense after service of the order on the defendant.

Fla. R. Crim. P. 3.840(a). We reject without comment Laurence's arguments concerning an insufficient affidavit and lack of notice, but agree with his contention that he was not properly served.

The order indicates that copies were furnished to Laurence and his attorney; however, this is insufficient service under Rule 3.840. In *Giles v. Renew*, 639 So. 2d 701 (Fla. 2d DCA 1994), the Second District reversed an adjudication of guilt for indirect criminal contempt where the trial court and state did not strictly comply with Rule 3.840 in serving the appellant with the order to show cause. The court held: "Giles was entitled to have the order served upon him, not sent by facsimile to his attorney." *Giles*, 639 So. 2d at 702; *see also Transp. & Gen. Ins. Co., Ltd. v. Receiverships of Ins. Exch. of the Ams.*, 576 So. 2d 1351, 1352 (Fla. 1st DCA 1991) (concluding that the trial court erred in denying appellant's motion to dismiss order to show cause in the absence of proper service of process). It is undisputed here that Laurence was not personally served with the order to show cause and thus, reversal is warranted. *See Van*

*Hare v. Van Hare*, 870 So. 2d 125, 127 (Fla. 4th DCA 2003) (reversing order of criminal contempt for lack of compliance with Rule 3.840).

Laurence Graham contends next that, in appointing Luke Graham as Betty's temporary plenary guardian, the trial court effectively revoked Betty's valid Directive, and did so without the necessary proof under section 765.105, Florida Statutes (2007), and without notice and a hearing, in violation of section 744.3115, Florida Statutes (2007). We agree in part.

"Statutory interpretation is a question of law subject to *de novo* review." *BellSouth Telecomm. Inc., v. Meeks*, 863 So. 2d 287, 289 (Fla. 2003).

Section 744.3115, Florida Statutes (2007), governing advance directives for health care, states:

> In each proceeding in which a guardian is appointed under this chapter, the court shall determine whether the ward, prior to incapacity, has executed any valid advance directive under chapter 765. If any advance directive exists, the court shall specify in its order and letters of guardianship what authority, if any, the guardian shall exercise over the surrogate. Pursuant to the grounds listed in s. 765.105, the court, upon its own motion, may, with notice to the surrogate and any other appropriate parties, modify or revoke the authority of the surrogate to make health care decisions for the ward. For purposes of this section, the term "health care decision" has the same meaning as in s. 765.101.

In appointing Luke Graham as Betty's temporary plenary guardian, an act which effectively revoked her Directive, the trial court failed to comply with the requirements of section 744.3115. The court failed to determine whether the Directive was valid before appointing a guardian. When the trial court appointed Catholic Charities as Betty's emergency temporary guardian, it accepted the Directive as valid, when it stated in its order: "The guardian shall not exercise any authority over any health care surrogate appointed by any valid advance directive executed by the Ward pursuant to Chapter 765, Florida Statutes, nor designate a health care surrogate pursuant to Chapter 765, Florida Statutes, except upon further order of this Court." However, when the trial court issued its letters of plenary guardianship appointing Luke as Betty's temporary guardian, it stated that Luke's authority under the letters "shall exist

irrespective of any valid advanced [sic] directive executed by the Ward under Chapter 765 of the Florida Statutes." These letters essentially revoked Betty's Directive without expressing which grounds supported revocation and absent evidence of any of the grounds set forth in section 765.105. *See* § 744.3115, Fla. Stat. (2007).

We reject Laurence Graham's claim that he did not receive proper notice, as the letters were provided to Laurence's attorney, and there is no authority for the proposition that any specific form of notice was required.

Luke Graham argues in response that this court should interpret section 744.331(6)(b), Florida Statutes (2007), as mandating that "[a] person possessing a health care surrogate has the burden to come forward, present that instrument to the court, and permit the parties and the court to address the issue of the instrument's validity." Section 744.331(6)(b) provides:

> When an order determines that a person is incapable of exercising delegable rights, the court must consider and find whether there is an alternative to guardianship that will sufficiently address the problems of the incapacitated person. A guardian must be appointed to exercise the incapacitated person's delegable rights unless the court finds there is an alternative. A guardian may not be appointed if the court finds there is an alternative to guardianship which will sufficiently address the problems of the incapacitated person.

§ 744.331(6)(b), Fla. Stat. (2007). Nothing in this section places the burden on a health care surrogate to come forward with the instrument to prove its validity, and Luke Graham asserts no authority to that effect. Moreover, section 765.202(7), Florida Statutes (2007), provides: "A written designation of a health care surrogate executed pursuant to this section establishes a rebuttable presumption of clear and convincing evidence of the principal's designation of the surrogate." Luke Graham does not argue that the Directive was not executed properly pursuant to section 765.202 and there is no evidence of such. The Directive, as it appears in the record, complies with the dictates of section 765.202, and thus it "establishes a rebuttable presumption of clear and convincing evidence" of Betty's intent to designate Laurence as her health care surrogate. Accordingly, no authority mandates that Laurence come forward and establish the validity of the Directive.

Therefore, we reverse and remand on this issue for a determination by the trial court of whether Betty's Directive is valid, and if so, what grounds under section 765.105 require its revocation.

After finding Laurence in contempt, the trial court found that Betty's incapacity was established and appointed Luke Graham as her temporary plenary guardian. Laurence claims the trial court erred in doing so without sufficient evidence of Betty's incapacity pursuant to section 744.331, Florida Statutes. We agree.

A trial court's ruling on mental capacity cannot be disturbed "unless the evidence shows it is clearly erroneous." *Fleming v. Fleming*, 352 So. 2d 895, 898 (Fla. 1st DCA 1977) (citing *Waterman v. Higgins*, 28 Fla. 660, 10 So. 97 (1891)). "In the adjudicatory hearing on a petition alleging incapacity, the partial or total incapacity of the person must be established by clear and convincing evidence." § 744.331(5)(c), Fla. Stat. (2007). Further, section 744.331(5)(a), Florida Statutes (2007), states:

> Upon appointment of the examining committee, the court shall set the date upon which the petition will be heard. The date for the adjudicatory hearing must be set no more than 14 days after the filing of the reports of the examining committee members, unless good cause is shown. The adjudicatory hearing must be conducted at the time and place specified in the notice of hearing and in a manner consistent with due process.

Laurence Graham relies on *LeWinter v. Guardianship of LeWinter*, 606 So. 2d 387 (Fla. 3d DCA 1992), which is analogous to the instant case. In *LeWinter*, the Second District reversed a finding of incapacity and the appointment of a guardian, concluding that there was no competent evidence to support the order. The court found that although the report of the examining committee established under section 744.331(3)(a) contained findings that the ward lacked the capacity to perform the functions that served the basis for the guardianship, it was filed over six weeks before the hearing, and there was evidence that the ward's condition had improved in the meantime. *LeWinter*, 606 So. 2d at 388.

Similarly, in the instant case, two of the three examining committee reports were filed two months or more before the hearing. The hearing took place on February 8, 2007. One report was filed on November 21, 2006, and another on December 8, 2006. Further, Laurence Graham submitted a sworn affidavit dated January 20, 2007, from Dr. Clyde Rouse Jr., who was Betty's previous psychiatrist for 2 years, and again

- 7 -

evaluated her in January 2007, stating that Betty's condition had improved. Dr. Rouse claimed, *inter alia:* "She looks very well and shows no evidence of any psychiatric symptoms. She reviewed her health care advance directive with me and verbally acknowledged that she had named her son Larry as her surrogate in that document." He also stated that her condition improved due to medication and in his opinion she "is perfectly competent to make financial decisions, to execute any legal documents such as power of attorney, health care advance directives, etc." Notably, a report by Dr. David Trader, board certified in general psychiatry and geriatric psychiatry, dated February 14, 2007, a few days after the hearing in question, indicated that "[t]he present examination suggests that Betty Graham has sufficient mental capacity to make financial, medical, testamentary and general personal decisions at this time."

Because Dr. Rouse's report indicated an improvement in Betty's condition and the committee member reports were filed two months prior to the hearing, the record evidence failed to establish Betty's incapacity by clear and convincing evidence. Thus, we reverse and remand with directions to dismiss the guardianship proceeding. *See LeWinter*, 606 So. 2d at 388.

We need not reach Laurence's argument that the trial court erred in denying his motion to continue, as this argument is moot in light of the foregoing.

*Reversed and Remanded with Directions.*

STONE and STEVENSON, JJ., concur.

\*       \*       \*

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; John L. Phillips, Judge; L.T. Case Nos. 502006GA000650XXXXSB & 502006MH002068XXXXSB.

Joseph S. Shook of Law Office of Joseph S. Shook, Coral Gables, for appellant.

Edward A. Shipe, Boca Raton, for appellee Luke Graham.

Ronald E. Crescenzo of Casey Ciklin Lubitz Martens & O'Connell, West Palm Beach, for appellee Catholic Charities of the Diocese of Palm Beach, Inc.

*Not final until disposition of timely filed motion for rehearing*

PO2175



**ILUKA RESOURCES INC.**

August 20, 1999

Amendment Section
Division of Corporations
409 E. Gaines Street
Tallahassee, FL  32399

Re:    Application By Foreign Profit Corporation to File Amendment to
       Application for Authorization to Transact Business in Florida

Dear Sir/Madam:

Enclosed please find the following:

1.  Application to Amend Authorization to Transact Business in Florida;

2.  Original Certificate of Amendment from the State of Delaware; and

3.  $52.50 check to cover filing fee, Certified Copy and Certificate of Status.

If you have any questions please call me at (904) 529-5001.

Sincerely,

J/L. Scott
Administration Manager – US

JLS/cl                                                  N/c

Enclosure

**ILUKA RESOURCES INC.**
1223 Warner Road, Green Cove Springs, Florida 32043
Tel: 1 904 284 9832   Fax: 1 904 284 4006

V. SHEPARD   AUG 3 1 1999

# PROFIT CORPORATION
## APPLICATION BY FOREIGN PROFIT CORPORATION TO FILE AMENDMENT TO APPLICATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA
### (Pursuant to s. 607.1504, F.S.)

## SECTION I
### (1-3 MUST BE COMPLETED)

*99 AUG 24 AM 8: 31 FILED SECRETARY OF STATE TALLAHASSEE, FLORIDA*

1. __RGC (USA) Mineral Sands Inc.__
   Name of corporation as it appears on the records of the Department of State.

2. __Delaware, USA__               3. __May 24, 1984__
   Incorporated under laws of          Date authorized to do business in Florida

## SECTION II
### (4-7 COMPLETE ONLY THE APPLICABLE CHANGES)

4. If the amendment changes the name of the corporation, when was the change effected under the laws of

   its jurisdiction of incorporation?  __July 30, 1999__

5. __Iluka Resources Inc.__
   Name of corporation after the amendment, adding suffix "corporation" "company" or "incorporated," or appropriate abbreviation, if not contained in new name of the corporation.

6. If the amendment changes the period of duration, indicate new period of duration.

   n/a                    _____
                              New Duration

7. If the amendment changes the jurisdiction of incorporation, indicate new jurisdiction.

   n/a                    _____
                              New Jurisdiction

   _____          __August 20, 1999__
            Signature                        Date

   __Jimmie L. Scott__                __Director__
       Typed or printed name                 Title

*State of Delaware*    PAGE   1

## Office of the Secretary of State

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF AMENDMENT OF "RGC (USA) MINERAL SANDS
INC.", CHANGING ITS NAME FROM "RGC (USA) MINERAL SANDS INC." TO
"ILUKA RESOURCES INC.", FILED IN THIS OFFICE ON THE THIRTIETH
DAY OF JULY, A.D. 1999, AT 2:30 O'CLOCK P.M.





*Edward J. Freel, Secretary of State*

2035818   8100

991341917

AUTHENTICATION:    9925154

DATE:    08-17-99

JUL -30 99 (FRI) 14:15    ALSTON & BIRD LLP 24B           TEL:404 881 4777          P. 003/003

## CERTIFICATE OF AMENDMENT
## OF
## CERTIFICATE OF INCORPORATION
## FOR
## RGC (USA) MINERAL SANDS INC.

RGC (USA) Mineral Sands Inc., a corporation organized and existing under and by virtue of the Delaware General Corporation Law (the "Corporation"), DOES HEREBY CERTIFY:

FIRST:      That on 24 June, 1999 the Board of Directors of the Corporation adopted resolutions setting forth a proposed amendment of the Certificate of Incorporation of the Corporation, declaring said amendment to be advisable and submitting the proposed amendment to the sole stockholder of the Corporation for its consideration and approval. The proposed amendment is as follows:

NOW, THEREFORE, BE IT HEREBY RESOLVED that paragraph 1 of the Certificate of Incorporation of the Corporation is hereby amended in its entirety to read as follows:

"1.    The name of the corporation is Iluka Resources Inc."

SECOND:     That thereafter on 24 June, 1999, the stockholders of the Corporation adopted the proposed amendment by written consent in accordance with Section 228 of the Delaware Corporation Law.

THIRD:      That said amendment was duly adopted in accordance with the provisions of Section 242 of the Delaware General Corporation Law.

IN WITNESS WHEREOF, RGC (USA) Mineral Sands Inc. has caused this certificate to be signed by a duly authorized officer this 24th day of June, 1999.

RGC (USA) Mineral Sands Inc.

Jimmie L. Scott
Secretary/Director

# 2012 FOR PROFIT CORPORATION ANNUAL REPORT

**FILED**
**Mar 15, 2012**
**Secretary of State**

DOCUMENT# P25152

**Entity Name:** RGC (USA) MINERALS INC.

**Current Principal Place of Business:**

12472 ST. JOHN CHURCH ROAD
STONY CREEK, VA  23882     US

**New Principal Place of Business:**

**Current Mailing Address:**

1301 RIVERPLACE BOULEVARD
SUITE 2601
JACKSONVILLE, FL  32207     US

**New Mailing Address:**

**FEI Number:** 59-2931722     **FEI Number Applied For ( )**     **FEI Number Not Applicable ( )**     **Certificate of Status Desired ( )**

**Name and Address of Current Registered Agent:**

CT CORPORATION SYSTEM
1200 S PINE ISLAND RD
PLANTATION, FL  33324     US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent                                    Date

## OFFICERS AND DIRECTORS:

| | |
|---|---|
| **Title:** | PD |
| **Name:** | BLACKWELL, MATTHEW B |
| **Address:** | 12472 ST. JOHNS CHURCH ROAD |
| **City-St-Zip:** | STONY CREEK, VA  23882 US |

| | |
|---|---|
| **Title:** | D |
| **Name:** | WILSON, CAMERON |
| **Address:** | 12472 ST. JOHN CHURCH ROAD |
| **City-St-Zip:** | STONY CREEK, VA  23882 US |

| | |
|---|---|
| **Title:** | VD |
| **Name:** | DARROCH, GLEN |
| **Address:** | 12472 ST. JOHN CHURCH ROAD |
| **City-St-Zip:** | STONY CREEK, VA  23882 US |

| | |
|---|---|
| **Title:** | S |
| **Name:** | MULLINS, JOSEPH D |
| **Address:** | 1301 RIVERPLACE BOULEVARD, SUITE 2601 |
| **City-St-Zip:** | JACKSONVILLE, FL  32207 US |

| | |
|---|---|
| **Title:** | D |
| **Name:** | GREEN, SIMON |
| **Address:** | 12472 ST. JOHN CHURCH ROAD |
| **City-St-Zip:** | STONY CREEK, VA  23882 US |

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE:  JOSEPH MULLINS                                    S                    03/15/2012

Electronic Signature of Signing Officer or Director                                    Date

Carbon Resources, Llc imports from Iluka Resources | Customs Trade Data    https://portexaminer.com/trade/data/iluka-resources-carbon-resources-l...

# Port Examiner

Supplier Name   ⌄     Search here      Search

# Bill of Lading

| Shipper | Consignee | Notify Party |
|---|---|---|
| ILUKA RESOURCES LEVEL 23, 140 ST GEORGE'S TERRACE PERTH WA 6001 AUSTRALIA | CARBON RESOURCES, LLC 2535 JASON COURT OCEANSIDE CA 92056 UNITED STATES | **CARBON RESOURCES, LLC** 2535 JASON COURT OCEANSIDE CA 92056 UNITED STATES |

# Details

| Bill of Lading No. | Vessel Name | Voyage No. | Place of Receipt | Port of Loading |
|---|---|---|---|---|
| MSCUFT863328 | KOTA PELANGI | 415N | FREMANTLE | Taoranga, New Zealand |

| Port of Discharg | Place of Delivery | Number of Pieces | Gross Weight | Total Volume | Arrival Date |
|---|---|---|---|---|---|

Case 3:25-cv-06296-TSH    Document 1    Filed 07/28/25    Page 257 of 304

e                        577 BAG       276574 KG                    2015-03-07

Long Beach,
California

# Customs Declaration

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| CARU9764353 | | | |
| | 38 PCS | | |

### Description of Cargo

268.624 MTS ACTIVATED CARBON ECO STANDARD FRE IGHT PREPAID PACKED IN BAGS
SHIPPING LINE GR ANTS 14 DAYS FREE DETENTION TIME AT PORT OF D ESTINATION
ACTIVATED CARBON NETT WEIGHT: 18.2 04MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| FCIU8836168 | | | |
| | 39 PCS | | |

### Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 18.091MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|

5/14/2024, 11:34 AM

Carbon Resources, Llc Imports from Inika Resources | Customs Trade Data | https://portexaminer.com/trade-data/inika-resources-carbon-resources-l...

GLDU7303400          38 PCS

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.681MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8029030 | 36 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.311MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8147963 | 40 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.701MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8329802 | 38 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.921MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8476697 | 38 PCS | | |

Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 18.094MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8616757 | 40 PCS | | |

Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.943MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8783625 | 40 PCS | | |

Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.917MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|

Carbon Resources, LLc imports from Mika Resources | Customs Trade Data at https://portexaminer.com/trade-data/mika-resources-carbon-resources-l...

MSCU7709571          39 PCS

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.953MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MSCU8117474 | | | |
| | 38 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 18.083MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| TCNU7278684 | | | |
| | 38 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.591MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| TGHU6178933 | | | |
| | 39 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.835MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| TGHU7516763 | | | |
| | 38 PCS | | |

Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 18.001MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| TGHU8779717 | | | |
| | 38 PCS | | |

Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 18.298MT

# Container Data

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| CARU9764353 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container | Load Status | Container Dimensions |
|---|---|---|

No.                    Loaded                              40'00" L x 9'00" H x 8'00" W

FCIU8836168

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| GLDU7303400 | | |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| MEDU8029030 | | |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| MEDU8147963 | | |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| MEDU8329802 | | |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| MEDU8476697 | | |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| MEDU8616757 | | |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| MEDU8783625 | | |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| MSCU7709571 | | |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| MSCU8117474 | | |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| TCNU7278684 | | |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| TGHU6178933 | | |

5/14/2024, 11:34 AM

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| TGHU7516763 | | |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| TGHU8779717 | | |

US Customs Import Data from Port Examiner • Pax Mercatoria MMXXIV • Contact

# Port Examiner

| Supplier Name    ⌄ | Search here ... | Search |

## Bill of Lading

| Shipper | Consignee | Notify Party |
|---|---|---|
| ILUKA RESOURCES LEVEL 23, 140 ST GEORGE'S TERRACE PERTH WA 6001 AUSTRALIA | CARBON RESOURCES, LLC 2535 JASON COURT OCEANSIDE CA 92056 UNITED STATES | **CARBON RESOURCES, LLC** 2535 JASON COURT OCEANSIDE CA 92056 UNITED STATES |

## Details

| Bill of Lading No. | Vessel Name | Voyage No. | Place of Receipt | Port of Loading |
|---|---|---|---|---|
| MSCUFT849871 | ANL BAREGA | 411N | FREMANTLE | Taoranga, New Zealand |

| Port of Discharg | Place of Delivery | Number of Pieces | Gross Weight | Total Volume | Arrival Date |
|---|---|---|---|---|---|

e                          206 BAG        94287 KG                    2015-01-05

Long Beach,
California


# Customs Declaration


Container No.          Number of          Net Weight          Declared Value
                       Pieces
FCIU8791422
                       41 PCS


Description of Cargo

ACTIVATED CARBON STANDARD


Container No.          Number of          Net Weight          Declared Value
                       Pieces
MEDU8267022
                       41 PCS


Description of Cargo

ACTIVATED CARBON STANDARD

| Container No. | Number of Pieces | Net Weight | Declared Value |
| --- | --- | --- | --- |
| MEDU8572561 | | | |
| | 41 PCS | | |

## Description of Cargo

91.637MTS ACTIVATED CARBON STANDARD FREIGHT P REPAIDPACKED IN BAGS
SHIPPING LINE GRANTS 14 DAYS FREE DETENTION TIME AT PORT OF DESTINATI ON
ACTIVATED CARBON STANDARD

| Container No. | Number of Pieces | Net Weight | Declared Value |
| --- | --- | --- | --- |
| MSCU9536393 | | | |
| | 41 PCS | | |

## Description of Cargo

ACTIVATED CARBON STANDARD

| Container No. | Number of Pieces | Net Weight | Declared Value |
| --- | --- | --- | --- |
| TRLU6855799 | | | |
| | 42 PCS | | |

## Description of Cargo

ACTIVATED CARBON STANDARD

# Container Data

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| FCIU8791422 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| MEDU8267022 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| MEDU8572561 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| MSCU9536393 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
| --- | --- | --- |
| TRLU6855799 | Loaded | 40'00" L x 9'00" H x 8'00" W |

3/23/2024, 4:21 PM

US Customs Import Data from Port Examiner • Pax Mercatoria MMXXIV • Contact

Case 3:25-cv-06296-TSH    Document 1    Filed 07/28/25    Page 270 of 304

# Port Examiner

| Supplier Name ▾ | Search here ... | Search |

# Bill of Lading

### Shipper

TRONOX MINERAL
SALES PTY LTD
1 BRODIE HALL DRIVE
BENTLEY WA
AUSTRALIA

Tel: 93651333

### Consignee

M/S. CARBON
RESOURCES LLC.,
2535 JASON COURT P.
O. BOX 4444
OCEANSIDE CA
UNITED STATES

Tel: 6309930

### Notify Party

**UNIVERSAL SHIPPING
INC**
2855 S. RESERVOIR ST.
POMONA CA UNITED
STATES

# Details

| Bill of Lading No. | Vessel Name | Voyage No. | Place of Receipt | Port of Loading |
|---|---|---|---|---|
| OOLU2020474490 | OOCL MEMPHIS | 15E | FREMANTLE | Kao Hsiung, China (Taiwan) |

| Port of Discharge | Place of Delivery | Number of Pieces | Gross Weight | Total Volume | Arrival Date |
|---|---|---|---|---|---|
| | | 88 BAG | 36564 KG | | 2014-12-15 |
| Long Beach, California | | | | | |

# Customs Declaration

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| OOLU8494437 | | | |
| | 44 PCS | | |

Description of Cargo

ACTIVATED CARBON RC830

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| OOLU8957721 | | | |
| | 44 PCS | | |

Description of Cargo

ACTIVATED CARBON RC830

M/S. Carbon Resources-US Imports from Breton Mineral Sales Pty Ltd.   https://portexaminer.com/trade-data/from-of-mineral-sales-pty-ltd-m-s-c...

# Container Data

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| OOLU8494437 | | |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| OOLU8957721 | | |

US Customs Import Data from Port Examiner • Pax Mercatoria MMXXIV • Contact

5/14/2024, 1:09 PM

|  |  |
|---|---|
| 1 | **UNITED STATES DISTRICT COURT** |
| 2 | **NORTHERN DISTRICT OF CALIFORNIA**<br>**San Francisco Division** |
| 3 |  |

|  |  |
|---|---|
| 4 | LAURENCE J. GRAHAM; and BETTY |
| 5 | PATRICK GRAHAM, |

CASE NO.: 3:24-CV-01551-AGT

6        *Plaintiffs,*

7    *v.*

8    DUPONT DE NEMOURS, INC.; THE DOW
9    CHEMICAL COMPANY; DOW, INC.;
     CORTEVA, INC.; THE CHEMOURS
10   COMPANY; ILUKA RESOURCES, INC.;
     TRONOX, LLC; TRONOX PLC;
11   HUNTSMAN CORPORATION; KRONOS
     (US), INC.; KRONOS WORLDWIDE, INC.;
12   TITANIUM METALS CORPORATION;
     VENATOR MATERIALS, LLC; VENATOR
13   MATERIALS, PLC; OCCIDENTAL
     PETROLEUM CORPORATION; INEOS
14   PIGMENTS USA INC.; KINDER MORGAN,
15   INC.; AND DOES 1-25,

16       *Defendants.*

17

18   **DECLARATION OF JOSEPH MULLINS IN SUPPORT OF ILUKA RESOURCES,**
19   **INC.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

20       1.      My name is Joseph Mullins.  I am over 18 years of age, of sound mind and otherwise

21   competent to make this Declaration, which I submit in support of the Motion to Dismiss Plaintiffs'

22   Complaint for Lack of Personal Jurisdiction and Inappropriate Venue filed in this litigation by Iluka

23   Resources, Inc. ("Iluka").

24       2.      The facts stated in this Declaration are based on information known to me through

25   my work as U.S. Corporate Counsel/Secretary for Iluka.  I have served in this role since 2003.  If

26   called as a witness, I could competently testify to these statements.

27

28

1      3.     Iluka is incorporated in Delaware. Iluka's headquarters is located at 12472 St. John

2   Church Road, Stony Creek, Virginia 23882, which is also the site of Iluka's mineral separation

3   plant.

4      4.     Iluka is in the mining business. Iluka mined surface heavy mineral sands for

5   minerals like zircon, ilmenite, and staurolite on various properties in Sussex County and Dinwiddie

6   County, Virginia.

7      5.     Iluka supplied minerals within a geographic market that almost exclusively included

8   consumers of mineral sands products primarily in Ohio, Delaware, South Carolina, Alabama,

9   Tennessee, New York, and New Hampshire.

10      6.     Iluka does not generally purchase any goods or services from within California or

11   directly supply any goods or services into California.

12      7.     Iluka does not maintain an office in California or conduct any business in California.

13      8.     Iluka does not own, lease, or use any real property in California.

14      9.     Iluka does not solicit business from within California or initiate business in

15   California. Iluka's affiliate Iluka Resources (TN) LLC, a Tennessee limited liability company, has

16   conducted mineral sands exploration in California. Iluka Resources, Inc. is the sole member and

17   the manager of Iluka Resources (TN) LLC. Iluka Resources (TN) LLC's exploration never led to

18   the development of any business in California.

19      10.    Iluka does not employ any persons in California, and does not have any independent

20   contractors or agents conducting business on its behalf in California.

21      11.    I have been at Iluka since 2002. During my tenure, to the best of my knowledge,

22   Iluka has never supplied minerals or any other good to any entity in California.

23      12.    Iluka has been trying to pay royalties to Plaintiffs Betty Pat Graham and Laurence

24   J. Graham for almost two decades.

25      13.    Ms. Graham's parents, G. L. Parson and Mary Elizabeth Parson (the "Parsons")

26   were the owners of certain real property in Dinwiddie and Sussex Counties in Virginia. In the late

27   1980s and early 1990s, the Parsons entered into approximately ten mining leases (the "Leases"), in

28

1    Virginia, pursuant to which Iluka had the right to mine the Parsons' properties in Dinwiddie and

2    Sussex Counties (the "Property").

3        14.    The Parsons had three daughters, including Betty Pat Graham. On or about May 19,

4    1997, the Parsons executed a Deed of Gift in favor of their three daughters. The Parson Deed of

5    Gift conveyed to each daughter a one-third interest in the minerals on or under the Property. In

6    addition, it conveyed to the daughters the right to receive future royalty payments under the Leases.

7        15.    Pursuant to the Leases, Iluka mined the Property and processed the minerals from

8    the Property in Stony Creek, Virginia. Iluka has calculated and distributed all royalties pursuant to

9    the Leases at its offices in Virginia.

10       16.    On or about October 23, 2000, Betty Pat executed a Deed of Gift (the "Graham Deed

11   of Gift") in favor of her two sons, Luke Graham ("Luke") and Laurence J. Graham ("Larry").

12       17.    In early 2002, Betty Pat and Luke filed a Bill of Complaint against Larry seeking an

13   order rescinding and setting aside the Graham Deed of Gift on the grounds that it was executed

14   under duress. Iluka was made a defendant in that litigation so that it could be ordered to pay all

15   royalties into court pending resolution of the case.

16       18.    In 2003, Betty Pat, Luke, and Larry entered into a confidential settlement agreement

17   that resolved the rescission litigation. The terms of the 2003 Settlement Agreement were not

18   disclosed to Iluka. As part of the settlement, the Court entered an order disbursing the funds Iluka

19   had deposited into court and validating the Graham Deed of Gift.

20       19.    Notwithstanding the 2003 Settlement Agreement, Betty Pat did not direct Iluka in

21   writing or otherwise to pay her share of future royalties to her sons. In February 2004, faced with

22   conflicting demands for payment of the royalties, Iluka exercised its rights under the Leases and

23   began depositing the royalties allocable to Betty Pat into an escrow account at The Bank of

24   Southside Virginia, pending a resolution of the various parties' entitlement to the funds.

25       20.    Since 2005, Iluka has filed and served several interpleader actions in Virginia

26   successfully seeking to interplead additional royalties that had been deposited into escrow. Despite

27   being appropriately served, neither Betty Pat nor Larry entered appearances or otherwise made

28

1    claims to the funds. Only Luke entered an appearance and made a claim to 40-50% of the royalty

2    funds.

3         21.      On September 26, 2022, after Iluka had interpled the last of the proceeds from the

4    minerals on the Graham property, the Virginia court entered a final order declaring that Larry was

5    entitled to over $2.5 million in royalties based on the 2003 Settlement Agreement.

6         22.      Although Iluka has repeatedly sought to meet with Larry to pay over the funds, he

7    has ignored those offers. In response to Iluka's outreach efforts, Larry has asked Iluka to contact

8    him or send money to him at various P.O. boxes in Florida, Massachusetts, New York, and

9    California.

10        I declare under penalty of perjury that the foregoing is true and correct to the best of my

11    knowledge.

12    Executed this 19th day of March 2024.

13

14                          By: _____

15                            Joseph Mullins

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT K

# Americas Sales of Domestic Production - 2004



- **Warehouses**
- **Customers**
- **Major rivers**
- **States**

Kinder Morgan
Ashtabula, OH

Paducah Riverport
Paducah, KY

Kinder Morgan
Chesapeake, VA

Port of Entry
New Orleans, LA

Kinder Morgan
Tampa, FL

## Americas Sales of Domestic Production - 2004
### (USD 96,000,000)

|  | Domestic | Export |
|---|---|---|
| Zircon | 65000 Mt | 30000 Mt |
| Rutile | 34000 Mt | - |
| Ilmenite | 315000 Mt | - |
| Leucoxene | 17000 Mt | - |

# EXHIBIT L

Thomas H. Rose, Jr.
Stony Creek, Va. 12-30-9

Deed #94-4203      143 PAGE 229

THIS DEED OF GIFT, made this 12th day of
December         , 19 94, by G. L. PARSON, Jr. and Mary
Elizabeth B. PARSON, his wife, Parties of the First Part and
hereinafter styled "Grantors" and Ann P. EVERETT, Party of
the Second Part and hereinafter styled "Grantee".

W I T N E S S E T H

That for and in consideration of the natural love
and affection the Grantors bear for their daughter, Ann P.
Everett, the Grantors do hereby give, grant and convey with
General Warranty and English Covenants of Title, unto Ann P.
Everett, the following described real estate with the
buildings and improvements thereon and the appurtenances
thereunto belonging, to-wit:

1.   All that certain tract, piece or parcel of land lying
and being situate in Sapony District, Dinwiddie County,
Virginia, South of what is called Dover Spring Branch,
containing 137.32 acres, more or less, being the residue of
a certain 140 acre tract of land and "bounded on the North
by Dover Spring Branch, on the East by the land of Charlie
Pride and the land of Lee Parson, on the South by the land
of S. T. Rideout, and on the West by the land of Mrs. C. C.
Rideout".

Being in all respects the same real estate conveyed to G. L.
Parson, Jr. from G. Lee Parson, also known as G. L. Parson,
Sr., and Virgie F. Parson, his wife, by deed dated the 18th
day of December, 1972, and recorded in the Clerk's Office of
the Circuit Court of Dinwiddie County, Virginia, in Deed
Book 160, at page 61, less and except 2.68 acres conveyed
therefrom to Lance V. Everett and Ann P. Everett by G. L.
Parson, Jr. and Mary B  Parson, his wife, by deed dated the
18th day of December, 1976, and recorded in the Clerk's
Office of the Circuit Court of Dinwiddie County, Virginia,
in Deed Book 142, at page 259.

2.   All that certain tract, piece or parcel of land lying
and being situate in Stony Creek Magisterial District,
Sussex County, Virginia, containing 13.98 acres, more or
less, and being the residue of that part of the "Wesley
Barnes Tract" devised to G. L. Parson, Jr. under the will of
his father, G. Lee Parson, Sr., probated in the Clerk's
Office of the Circuit Court of Sussex County, Virginia, on
the 8th day of March, 1973, and recorded in Will Book 23, at
page 430, less and except 1.63 acres conveyed by G. L.
Parson, Jr. and Mary E. Parson, his wife, to the Trustees of
Concord United Methodist Church by deed of exchange dated
the 2nd day of January, 1990, and recorded in the Clerk's
Office of the Circuit Court of Sussex County, Virginia, in
Deed Book 122, at page 481.

3.   All that certain lot, piece or parcel of land lying and
being situate in Stony Creek Magisterial District, Sussex
County, Virginia, containing 0.39 acre, more or less, being
shown and described as Parcel "A" on a plat of survey
entitled "Survey Of Parcels A, B, C, and D Located At the
Intersection Of Routes 619 & 681", made by Kenneth O.
Peterson, L.S., dated November 6, 1989, and recorded in the
Clerk's Office of the Circuit Court of Sussex County,
Virginia, in Deed Book 122, at page 483.

Being in all respects the same real estate conveyed to G. L.
Parson, Jr. from the Trustees of Concord United Methodist

1

DEED BOOK 364    PAGE 39
continued on back

Church, by deed of exchange dated the 2nd day of January, 1990, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Deed Book 122, at page 484.

4. All that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing four and seventeen hundredths (4.17) acres by actual survey, and being shown and described on a certain plat of survey, dated March 1, 1952, by H. C. Frye, C.E., which said plat of survey is recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Plat Book 7, at page 26, and reference thereto is hereby invited for a more perfect description of the real estate hereby conveyed; and being the same real estate conveyed to G. L. Parson from Frederick L. Crowder and Alma A. Crowder, husband and wife, by deed dated the 14th day of November, 1959, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Deed Book 59, at page 279.

Being in all respects a part or portion of the same real estate devised to G. L. Parson, Jr. under the will of his mother, Virgie F. Parson, probated in the Clerk's Office of the Circuit Court of Sussex County, Virginia, on the 15th day of October, 1982, and recorded in Will Book 31, at page 314.

5. All that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, known as the "Walter Harrison Farm", containing 125 acres, more or less, and bounded as follows: "on the north and west by the Walker's Mill Road, on the east by the lands of C. Parsons and Willis Roberson and on the south by the land of B. Wesley Barns and the public road leading to Stony Creek, Virginia", and being the same real estate conveyed to G. L. Parson from J. Walter Harrison and Blanche R. Harrison, his wife, by deed dated the 8th day of February, 1924, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Deed Book 28, at page 519.

Being in all respects a part or portion of the same real estate devised G. L. Parson, Jr. under the will of his father, G. Lee Parson, Sr., probated in the Clerk's Office of the Circuit Court of Sussex County, Virginia, on the 8th day of March, 1973, and recorded in Will Book 23, at page 430.

6. All that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, known as the "Adams Shands Proper-ty", containing 3 1/2 acres, more or less, situate on both sides of the "Milwaukee Road", and bounded as follows: "On the North, East and West by the lands of Lee Parsons and on the South by the land of Willie Robinson", and being the same real estate conveyed to G. Lee Parson from Adele Shands Robinson, et als, by deed dated the 24th day of December, 1947, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Deed Book 44, at page 126.

Being in all respects a part or portion of the same real estate devised to G. L. Parson, Jr. under the will of his father, G. Lee Parson, Sr., probated on the 8th day of March, 1973, and recorded in the Clerk's Office of the

2

Circuit Court of Sussex County, Virginia, in Will Book 23, at page 430.

7. All right, title and interest in that certain lot, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, known as the "Old Fellows Lot", containing 1/4ths of an acre, "said lot or parcel of land being a three corner lot or a one-half diamond shape lot, and described as follows: On the North by the lands of Mary Shands; on the West by the lands of Mary Shands; on the South by Stony Creek public road; and on the West by J. Walter Harrison" and being the same real estate conveyed to G. Lee Parson from Issac Robinson and Stephen Goode, surviving Trustees for Chappell Grove Lodge Old Fellows Society No. 9455, by deed dated the 22nd day of August, 1931, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Deed Book 34, at page 168.

The interest of G. L. Parson, Jr. in said lot was acquired by him under the will of his mother, Virgie F. Parson, probated in the Clerk's Office of the Circuit Court of Sussex County, Virginia, on the 15th day of October, 1982, and recorded in Will Book 31, at page 314.

8. All right, title and interest in and to that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing .25 acres, more or less, on the North side of Milwaukee Road, and bounded as follows, to-wit: "On the North by the land of A. P. Parson; on the South by Milwaukee Road, and on the East and West by land of G. Lee Parson, Sr." and being the same property of which Willis Robinson died seized and possessed.

The interest of G. L. Parson, Jr. in said tract was acquired as follows: Deed from Edward B. Threatt, Jr. and wife dated the 26th day of August, 1966, and recorded in Deed Book 68, at page 49; deed from John W. Browder, et als, dated the 1st day of October, 1965, and recorded in Deed Book 67, at page 337; deed from Georgianna Gurley, et als, dated the 29th day of August, 1962, and recorded in Deed Book 63, at page 227; deed from Theodore O. Thweatt and wife by deed dated the 13th day of December, 1967, and recorded in Deed Book 70, at page 190; and by the will of his mother, Virgie F. Parson.

9. All that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing sixteen and five tenths (16.5) acres, more or less, and described as follows: "Beginning at an iron stob on the Cabin Point Road, running thence along said Road South 79° 15' East 983 feet, thence North 32° 00' East 343 feet along the said Road, thence North 7° 00' West 1013 feet to a pine tree, thence South 41° 45' West 1537 feet to the point of beginning".

Being in all respects the same real estate conveyed to G. L. Parson, Jr. from G. Lee Parson, Sr. and Virgie F. Parson, his wife, by deed dated the 15th day of April, 1960, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Deed Book 59, at page 579.

10. All that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing 23.5 acres, more or less, bounded as follows: "On the North by the lands of

3

Otho Chappell; on the South and East by the Spring Branch
running between the Stewart and Eppes estates, now both of
these said tracts stand in other parties names", and being
the same real estate conveyed to G. Lee Parson from Charley
B. Hill and wife by deed dated the 22nd day of August, 1934,
and recorded in the Clerk's Office of the Circuit Court of
Sussex County, Virginia, in Deed Book 34, at page 167.

Being in all respects a part or portion of the real estate
devised to G. L. Parson, Jr. under the will of his mother,
Virgie F. Parson, probated in the Clerk's Office of the
Circuit Court of Sussex County, Virginia, and recorded in
Will Book 31, at page 314.

11.  A one-fifth (1/5th) undivided interest in that certain
lot, piece or parcel of land lying and being situate in
Stony Creek Magisterial District, Sussex County, Virginia,
containing one (1) acre, more or less, described and bounded
"on the north by land of G. Lee Parson, on the east by the
lands of G. Lee Parson, on the south by the land of G. Lee
Parson, and on the west by land belonging to Richard
Chappell and lands of Sussex County School Board. Being the
identical tract of land deeded to J. E. Mitchell by Sussex
County School Board.

Being in all respects the same real estate conveyed to G.
Lee Parson from J. E. Mitchell and wife by deed dated the
18th day of April, 1936, and recorded in the Clerk's Office
of the Circuit Court of Sussex County, Virginia, in Deed
Book 34, at page 573.  The interest of G. L. Parson, Jr. was
acquired under the will of his mother, Virgie F. Parson,
which was probated on the 15th day of October, 1982, in the
Clerk's Office of the Circuit Court of Sussex County,
Virginia, and recorded in Will Book 31, at page 314.

12.  All that certain tract, piece or parcel of land lying
and being situate in Rowanty District, Dinwiddie County,
Virginia, containing seventeen and eight-tenths (17.8)
acres, more or less, designated as Tract "C" on plat of H.
L. Butterworth, C.L.S., dated March and April, 1952, and
recorded in the Clerk's Office of the Circuit Court of
Dinwiddie County, Virginia, with a deed dated the 1st day of
May, 1952, from G. L. Parson, et als, to Continental Can
Co., Inc., to which plat reference is hereby made for a more
particular description of the tract herein conveyed.

Being in all respects a part or portion of the same real
estate conveyed to I. M. Butterworth and G. L. Parson, Jr.
from W. T. Grimes, Jr. and wife, by deed dated the 27th day
of February, 1952, and recorded in Deed Book 84, at page
541.  By deed dated the 1st day of May, 1952, I. M.
Butterworth and Eva C. Butterworth, his wife, conveyed their
undivided one-half interest in the tract to G. L. Parson,
Jr.


        This conveyance is made subject, however, to all
easements, conditions, restrictions and reservations appear-
ing of record which affect said property.

        RESERVATIONS:  The Grantors reserve and except
from this conveyance all of the minerals within and underly-
ing the premises, together with mining rights, privileges
and immunities thereto belonging as set out in various
mineral leases between the Grantors and RGC (USA) Minerals,
Inc., memorandum of said leases being of record in the
Clerk's Offices of the Counties of Sussex and Dinwiddie,

4

BOOK 143 PAGE 224

Virginia.  The Grantors specifically reserve all of the royalties and rents due under the terms of the lease.

The Grantors reserve and except from this conveyance all of the timber and timber trees now standing, being and growing on the tract of land known as the Walter Harrison Farm containing 125 acres together with the right to cut and remove the same at any time during their natural lives and for three years after the death of the survivor of the Grantors.

The Grantors further reserve and except from this conveyance all of the timber and timber trees now standing, being and growing on the tract known as "Charlie Bucks" containing 23.5 acres, more or less, the rights to the timber and timber trees having been conveyed to Betty P. Graham, Trustee, by timber deed of even date herewith.

WITNESS the following signatures and seals:

_G. L. Parson, Jr._ (SEAL)
G. L. Parson, Jr.

_Mary Elizabeth B. Parson_ (SEAL)
Mary Elizabeth B. Parson

STATE OF VIRGINIA
~CITY~/COUNTY OF Sussex                , to-wit:

The foregoing instrument was acknowledged before me this 22th day of December , 1994 , by G. L. Parson, Jr. and Mary Elizabeth B. Parson, his wife.

My term expires: August 31 1997

_Margaret W. Rose_ (SEAL)
Notary Public

Grantee's Address:
26819 Courthouse Road
Stony Creek, Virginia 23882

VIRGINIA:    In the Clerk's Office of the Circuit Court of Sussex County. The foregoing instrument was this day presented in the office aforesaid and is, together with the certificate of acknowledgment annexed, admitted to record this .....22nd..... day of .......December........., 19.94 at .........11:03..A. M.

TESTE: _Gwynn M. Williams_ Clerk

In the Clerk's Office of the Circuit Court of
Dinwiddie County, Virginia 12-30-94
This instrument was received and, with the
certificate annexed, admitted to record 12:20PM
Teste: ANNIE L. WILLIAMS, CLERK

By _Frances T. Duke_
Deputy

5

DEED BOOK 364
continued on back        PAGE 41

2887-2

(1328)

BOOK 143 PAGE 227

THIS DEED, made this 12th day of December , 19 94 , by and between G. L. PARSON, Jr., Party of the First Part and hereinafter styled "Grantor", and Ann P. EVERETT, Party of the Second Part and hereinafter styled "Grantee".

## W I T N E S S E T H

That for and in consideration of the sum of Ten Dollars ($10.00) cash in hand paid by the Grantee to the Grantor, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Grantor does hereby bargain, sell, grant and convey with General Warranty and English Covenants of Title, unto the said Ann P. Everett, the following described real estate with the buildings and improvements thereon and the appurtenances thereunto belonging, to-wit:

1.  All that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing 50 acres, more or less, being shown and described as Tract No. 1 on a plat of survey entitled "Map Showing Property Of George Lee Parsons, Jr." made by J. C. Shearin, C.L.S., dated March 20, 1972, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Plat Book 18, at page 6, and further described on the plat of survey as revised by W. G. Chappell, C.L.S., on July 21, 1972.

2.  All that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing 161.3 acres, more or less, being shown and described as "OPEN" on the plat of survey entitled "Map Showing Property Of George Lee Parsons, Jr." made by J. C. Shearin, C.L.S., dated March 20, 1972, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Plat Book 18, at page 6, and further described as Tract 4 on the plat of survey as revised by W. G. Chappell, C.L.S., on July 21, 1972.

The above parcels being in all respects a part or portion of the Wyatt Tract which was conveyed to G. Lee Parson, Jr. from G. L. Parson, Sr. and Virginia F. Parson, his wife, by deed dated the 22nd day of March, 1960, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Deed Book 59, at page 524.

This conveyance is made subject, however, to all easements, conditions, restrictions and reservations appearing of record which affect said property.

RESERVATIONS.  The Grantor reserves and accepts from this conveyance all of the minerals within and underlying the premises, together with mining rights, privileges and immunities thereto belonging as set out in a mineral lease between the Grantor and Mary Elizabeth P. Parson to RGC (USA) Minerals, Inc., a memorandum of said lease being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia.  The Grantor specifically reserve all of the royalties and rents due under the terms of the lease.

1

BOOK 143 PAGE 228

The Grantor further reserves unto himself, his heirs and assigns from this conveyance a perpetual non-exclusive easement of right of way fifty (50) feet wide, running from State Highway Route No. 616 over and across Tract 4 to the Northeast corner of Tract No. 2, as a means of ingress and egress to the residue of the Wyatt Tract.

WITNESS the following signature and seal:

*G. L. Parson Jr.* (SEAL)

G. L. Parson, Jr.

STATE OF VIRGINIA
CITY/COUNTY OF Sussex , to-wit:

The foregoing instrument was acknowledged before me this 4th day of December , 1994, by G. L. Parson, Jr.

My term expires: August 31 1997

*Margaret W. Rose* (SEAL)
Notary Public

Grantee's Address:
26819 Courthouse Road
Stony Creek, Virginia  23882

VIRGINIA:      In the Clerk's Office of the Circuit Court of Sussex County. The foregoing instrument was this day presented in the office aforesaid and is, together with the certificate of acknowledgment annexed, admitted to record this ......22nd....... day of ......December........., 19 94 ..... at ..... 11:11..............A. M. The tax imposed by §58.1-802 of the Code has been paid in the amount of $..133.50...........

TESTE: *Gary M. Williams* Clerk

2

2887-2

BOOK **143** PAGE **232**    (1330)

THIS DEED OF GIFT, made this <u>12th</u> day of <u>December</u>, 19 <u>94</u>, by and between G. L. PARSON, Jr. and Mary Elizabeth B. PARSON, his wife, Parties of the First Part and hereinafter styled "Grantors" and Ann P. EVERETT, Trustee for Christopher Lance EVERETT and Lee Randolph EVERETT, Party of the Second Part and hereinafter styled "Grantee".

### W I T N E S S E T H

That for and in consideration of the natural love and affection the Grantors bear for their grandsons, the Grantors do hereby give, grant and convey with General Warranty and English Covenants of Title, unto Ann P. Everett, Trustee for Christopher Lance Everett and Lee Randolph Everett under agreement dated the <u>12th</u> day of <u>December</u>, 19 <u>94</u>, the following described real estate with the buildings and improvements thereon and the appurtenances thereunto belonging, to-wit:

1. All that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing 200 acres, more or less, and bounded as follows: "On the North by G. Lee Parson; on the East by W. S. Barnes; on the South by the public road leading from Stewart's to Concord Church; and on the West by R. G. Chappell and said public road leading from Stewart's to Concord Church and Wesley Barnes".

Being in all respects a part or portion of the same real estate conveyed to G. L. Parson, Jr. from G. Lee Parson, Sr. and Virgie F. Parson, his wife, by deed dated the 11th day of April, 1960, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Deed Book 59, at page 559.

2. "All that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing one hundred eighty-seven (187) acres, more or less, adjoining the land of Markham B. Chappell; Old Eppes Tract; Green Church Road; and Wyatt Mill Road", being in all respects the same land which was devised unto Nannie B. Stewart by John E. Stewart, as will be seen by reference to the first clause of his last will and testament, of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia, except a portion thereof, containing about twenty-five (25) acres, which was conveyed by Nannie B. Chappell to Markham B. Chappell by deed recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Deed Book 27, at page 232, and being in all respects the same real estate conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, from John H. Cole, Special Commissioner, by deed dated the 29th day of December, 1934, and recorded in the aforesaid Clerk's Office in Deed Book 34, at page 283.

Being in all respects the same real estate conveyed to G. L. Parson, Jr. from G. Lee Parson, Sr. and Virgie F. Parson, his wife, by deed dated the 16th day of February, 1970, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Deed Book 73, at page 600.

Mailed: JAN   3 1995
Thomas H. Rose, Jr.
Stony Creek, VA 23882

1

BOOK **143** PAGE 233

This conveyance is made subject, however, to all easements, conditions, restrictions and reservations appearing of record which affect said property.

RESERVATIONS.  The Grantors reserve and except from this conveyance all of the minerals within and underlying the premises, together with mining rights, privileges and immunities thereto belonging as set out in mineral leases between the Grantors and RGC (USA) Minerals, Inc., memorandum of which leases being of record in the aforesaid Clerk's Office.  The Grantors specifically reserve all royalties and rents due under the terms of the leases.

The Grantors reserve and except from this conveyance all of the timber and timber trees now standing, being and growing on the 200 acre tract described in paragraph 1 of this deed, together with the right to cut and remove the same at anytime during their natural lives and for three years after the death of the survivor of the two Grantors.

The Grantors further reserve and except from this conveyance the timber and timber trees now standing on the Chappell Tract containing 187 acres and described in paragraph 2 of this deed, said timber and timber trees having been conveyed to Betty P. Graham, Trustee, by timber deed of even date herewith.

WITNESS the following signatures and seals:

_G. L. Parson, Jr._ (SEAL)
G. L. Parson, Jr.

_Mary Elizabeth B. Parson_ (SEAL)
Mary Elizabeth B. Parson

STATE OF VIRGINIA
CITY/COUNTY OF Sussex , to-wit:

The foregoing instrument was acknowledged before me this 13th day of December , 1994 , by G. L. Parson, Jr. and Mary Elizabeth B. Parson, his wife.

My term expires: August 31 1997

_Margaret W. Bass_ (SEAL)
Notary Public

Grantee's Address:
26819 Courthouse Road
Stony Creek, Virginia 23882

VIRGINIA:    In the Clerk's Office of the Circuit Court of Sussex County. The foregoing instrument was this day presented in the office aforesaid and is, together with the certificate of acknowledgment annexed, admitted to record this ...22nd........ day of ...December............., 19.94.........at 11:18.... A. M.

TESTE: _Mary M. Wilkins_ .... Clerk

2

BOOK 143 PAGE 248

THIS DEED OF GIFT, made this 12th day of December, 1994, by G. L. PARSON, Jr., and Mary Elizabeth B. PARSON, his wife, Parties of the First Part and hereinafter styled "Grantors", and Julia P. BOYD, Party of the Second Part and hereinafter styled "Grantee".

W I T N E S S S E T H

That for and in consideration of the natural love and affection the Grantors bear for their daughter, Julia P. Boyd, the Grantors do hereby give, grant and convey with General Warranty and English Covenants of Title, unto the said Julia P. Boyd, the following described real estate with the buildings and improvements thereon and the appurtenances thereunto belonging, to-wit:

All those certain tracts, pieces or parcels of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing 343 acres and 379 acres and being shown and described as Tract No. 2 and Tract No. 3, respectively, on a plat of survey entitled "Map Showing Property Of George Lee Parsons, Jr." made by J. C. Shearin, C.L.S., dated March 20, 1972, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Plat Book 18, at page 6, together with a perpetual non-exclusive easement of right of way fifty (50) feet wide running from State Highway Route No. 616 across Tract 4 to the Northeast corner of Tract No. 2 for the purpose of ingress and egress from Tract No. 2 and Tract No. 3 to the public road.

Being in all respects a part or portion of the Wyatt Tract conveyed to G. Lee Parson, Jr. from G. L. Parson, Sr. and Virginia F. Parson, his wife, by deed dated the 22nd day of March, 1960, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia, in Deed Book 59, at page 524.

This conveyance is made subject, however, to all easements, conditions, restrictions and reservations appearing of record which affect said property.

RESERVATION: The Grantors reserve and except from this conveyance all of the minerals within and underlying the premises, together with mining rights, privileges and immunities thereto belonging as set out in a mineral lease between the Grantors and RGC (USA) Minerals, Inc., a memorandum of said lease being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia. The Grantors specifically reserve all royalties and all rents due under the terms of the lease.

WITNESS the following signatures and seals:

_____(SEAL)
G. L. Parson, Jr.

_____(SEAL)
Mary Elizabeth B. Parson

STATE OF VIRGINIA
~~CITY~~/COUNTY OF Sussex_____, to-wit:

Mailed: JAN 3 1995
Thomas H. Rose, Jr., Esquire
Stony Creek, VA 23882

1

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Laurence J. Graham and Betty Patrick Graham<br>PO Box 222 Oakland, CA 94604<br><br>TELEPHONE NO.: 510-435-5707    FAX NO. *(Optional):*<br>EMAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* | **ENDORSED<br>FILED<br>ALAMEDA COUNTY**<br>JUN 26 2025<br>CLERK OF THE SUPERIOR COURT<br>By _____<br>YOLANDA COPES Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS: 1221 Oak St 3rd and 4th Floors
MAILING ADDRESS: 1225 Fallon Streed
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Oakland - Administration Building

| PLAINTIFF/PETITIONER: Laurence J. Graham and Betty Patrick Graham | CASE NUMBER: 25 C V 1 2 7 5 2 4 |
|---|---|
| DEFENDANT/RESPONDENT: DuPont de Nemours, Inc., et al. | JUDICIAL OFFICER: |
| **NOTICE OF RELATED CASE** | DEPT.: |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Laurence J. Graham, et al. vs. DuPont de Nemours, Inc., et al.

   b. Case number: CGC-24-611963

   c. Court: ☐ same as above
      ☒ other state or federal court *(name and address):* San Francisco Superior Court 400 McAllister St San Francisco, CA 94102

   d. Department: 501

   e. Case type: ☐ limited civil   ☒ unlimited civil   ☐ probate   ☐ family law   ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes   ☒ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

      ☒ Additional explanation is attached in attachment 1h

   i. Status of case:

      ☐ pending

      ☒ dismissed ☐ with ☒ without prejudice

      ☐ disposed of by judgment

2. a. Title: Laurence J. Graham, et al. vs DuPont de Nemours, Inc., et al

   b. Case number: 25STCV25090

   c. Court: ☐ same as above
      ☒ other state or federal court *(name and address):* Los Angeles Superior Court 111 N. Hill St Los Angeles, CA 90012

   d. Department: 32

Page 1 of 3

| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>www.courts.ca.gov |
|---|---|---|

CM-015

| | |
|---|---|
| PLAINTIFF/PETITIONER: Laurence J. Graham and Betty Patrick Graham | CASE NUMBER: 25-CIV-127524 |
| DEFENDANT/RESPONDENT: DuPont de Nemours, Inc., et al. | |

2. *(continued)*

   e. Case type: ☐ limited civil ☒ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes ☒ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☒ Additional explanation is attached in attachment 2h

   i. Status of case:

      ☐ pending

      ☒ dismissed ☐ with ☒ without prejudice

      ☐ disposed of by judgment

3. a. Title:

   b. Case number:

   c. Court: ☐ same as above

      ☐ other state or federal court *(name and address):*

   d. Department:

   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐ Additional explanation is attached in attachment 3h

   i. Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: 06/25/2025

Laurence J. Graham and Betty Patrick Graham
_____
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

*Ley Graham ; Betty Patrick Graham*
_____
(SIGNATURE OF PARTY OR ATTORNEY)

CM-015

| PLAINTIFF/PETITIONER:<br>DEFENDANT/RESPONDENT: | CASE NUMBER:<br>25 C V 1 2 7 5 2 4 |
| --- | --- |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

**(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)**

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

   a. ☐  deposited the sealed envelope with the United States Postal Service.

   b. ☐  placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:

   a. on *(date):*

   b. from *(city and state):*

4. The envelope was addressed and mailed as follows:

   a. Name of person served:

      Street address:
      City:
      State and zip code:

   b. Name of person served:

      Street address:
      City:
      State and zip code:

   c. Name of person served:

      Street address:
      City:
      State and zip code:

   d. Name of person served:

      Street address:
      City:
      State and zip code:

☐  Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: _____

_____          ▶          _____
(TYPE OR PRINT NAME OF DECLARANT)                      (SIGNATURE OF DECLARANT)

CM-015 [Rev. July 1, 2007]                    **NOTICE OF RELATED CASE**                    Page 3 of 3

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**  

CM-015 Attachment 1 h

The San Francisco Superior Court Case CGC-24-611963 that we filed on 1/30/2024 was fraudulently removed to the US District Court for the Northern District of California, San Francisco Division and delayed for over a year by the defendants' fraudulent filings; and, the Court dismissed it without prejudice.

CM-015 Attachment 2 h

There was another case that we filed in the Los Angeles Superior Court 24STCV25090 that was also fraudulently removed but to the US District Court for the Central District of California Western Division and the Court dismissed the case without prejudice as duplicative to the case filed in the San Francisco Superior Court although it recognized that it was an action for relief under Cal. Civil Code Sec. 1692 to recover the value of personal property and punitive damages for having rescinded the ten mining leases thereby recognized that San Francisco Superior Court Case CGC-24-611963 was also an action under Cal. Civil Code Sec. 1692 to recover the value of personal property and punitive damages.

1

2　　　　　CALIFORNIA SUPERIOR COURT FOR THE COUNTY OF ALAMEDA

3

4

5

6

Laurence J. Graham and Betty Patrick Graham,

7

Plaintiffs,

8

vs.

9

10　DuPont de Nemours, Inc., et al.,

11　　　　　Defendants.

Case No.: Case No. **25 C V 1 2 7 5 2 4**

[Proposed] Order Confirming that the portion of the ten mining leases pertaining to the one-third share of the minerals conveyed to plaintiff Betty Patrick Graham by the 1997 Deed of Gift and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in said 1997 Deed of Gift has been rescinded under Cal. Civil Code Sec. 1689(b)(2)

JUN 26 2025

16　After considering the pleadings and records on file in this case, the Court confirms that Plaintiffs

17　have rescinded the portion of the ten mining leases pertaining to the one-third share of the

18　minerals conveyed to plaintiff Betty Patrick Graham by the 1997 Deed of Gift, (EXHIBIT B to

19　plaintiffs' complaint), and later recovered, as saleable minerals, from the ore extracted from the

20　ten parcels of land listed in the 1997 Deed of Gift based on a failure of consideration under Cal.

21　Civil Code Sec. 1689(b)(2) and it is ordered that defendant Iluka Resources Inc. must pay

22　$2,500,000.01 to Laurence J. Graham because he deducted it from the money demanded;

23　therefore, it is ordered that defendant Iluka Resources Inc. must pay $2,500,000.01 to plaintiff

24　Laurence J. Graham by mailing a check for said amount payable to him by certified mail to him

25　at 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 within 5 days.

26

27

28

I

1 It is further ordered, that acceptance of said $2,500,000.01 by plaintiff Laurence J. Graham shall

2 be with the reservation of all rights and claims and that plaintiffs shall maintain their action for

3 relief under Cal. Civil Code Sec 1692.

4

5 It is further ordered, that, in preparation for the jury trial, plaintiffs shall have 14 days to submit

6 their discovery proposal and the defendants shall have 14 days after said submission to reply;

7 plaintiffs may waive any of the 14 days that have not expired if they expressly state so in their

discovery proposal.

8

9 IT IS SO ORDERED,

10

11 Hon.:_____ : Signature: _____

12

13 Date:_____

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              II

JUN 2 6 2025

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br><br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>06/26/2025<br>Clad Fike, Execuxe Offxer/Clerk of the Court<br>By: _____ Deputy<br>Y. Copes |
| PLAINTIFF(S):<br>Laurence J Graham  et al | |
| DEFENDANT(S):<br>DuPont de Nemours, Inc. a Delaware Corporation | |
| **NOTICE OF CASE ASSIGNMENT** | CASE NUMBER:<br>25CV127524 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to Rule 3.734 of the California Rules of Court and Title 3 Chapter 2 of the Local Rules of the Superior Court of California, County of Alameda, this action is hereby assigned by the Presiding Judge for all purposes to:

| | |
|---|---|
| ASSIGNED JUDGE: | Joscelyn Jones |
| DEPARTMENT: | 19 |
| LOCATION: | Rene C. Davidson Courthouse |
| | Administration Building, 1221 Oak Street, Oakland, CA 94612 |
| PHONE NUMBER: | (510) 267-6935 |
| FAX NUMBER: | |
| EMAIL ADDRESS: | Dept.19@alameda.courts.ca.gov |

Under direct calendaring, this case is assigned to a single judge for all purposes including trial.

Please note: In this case, any challenge pursuant to Code of Civil Procedures section 170.6 must be exercised within the time period by law. (See Code of Civ. Proc. §§ 170.6, subd. (a.)(2) and 1013)

NOTICE OF NONAVAILABILITY OF COURT REPORTERS: Effective June 4, 2012, the court will not provide a court reporter for civil law and motion hearings, any other hearing or trial in civil departments, or any afternoon hearing in Department 201 (probate). Parties may arrange and pay for the attendance of a certified shorthand reporter. In limited jurisdiction cases, parties may request electronic recording. Amended Local Rule 3.95 states: "Except as otherwise required by law, in general civil case and probate departments, the services of an official court reporter are not normally available. For civil trials, each party must serve and file a statement before the trial date indicating whether the party requests the presence of an official court reporter."

GENERAL PROCEDURES

Following assignment of a civil case to a specific department, all pleadings, papers, forms, documents and writings can be submitted for filing at either Civil Clerk's Office, located at the Rene C. Davidson Courthouse, Room 109, 1225 Fallon Street, Oakland, California, 94612, and the Hayward Hall of Justice, 24405 Amador Street, Hayward, California, 94544 and through Civil e-filing. Information regarding Civil e-filing can be found on the courts website. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

### NOTICE OF CASE ASSIGNMENT

ASSIGNED FOR ALL PURPOSES TO

JUDGE Joscelyn Jones

DEPARTMENT 19

All parties are expected to know and comply with the Local Rules of this Court, which are available on the court's website at http://www.alameda.courts.ca.gov/Pages.aspx/Local-Rules(1) and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

Parties must meet and confer to discuss the effective use of mediation or other alternative dispute processed (ADR) prior to the Initial Case Management Conference. The court encourages parties to file a "Stipulation to Attend ADR and Delay Initial Case Management Conference for 90 Days." The court's website contains this form and other ADR information. If the parties do not stipulate to attend ADR, the parties must be prepared to discuss referral to ADR at the Initial Case Management Conference.

COURT RESERVATIONS

The use of the Court Reservation System (CRS) is now mandated in many civil courtrooms within the Alameda County Superior Court. Instead of calling or emailing the courtroom to make a reservation, parties with a case assigned to a courtroom using CRS are directed to utilize CRS to make and manage their own reservations, within parameters set by the courtrooms. CRS is available 24 hours a day, seven days a week and reservations can be made from a computer or smart phone. Please note, you are prohibited from reserving more than one hearing date for the same motion.

Prior to scheduling any motion on CRS, including any Applications for Orders for Appearance and Examination, or continuing any motion, please review the online information (if any) for the courtroom in which you are reserving. There may be specific and important conditions associated with certain motions and proceedings. Information is available on the court's eCourt Public Portal at www.eportal.alameda.courts.ca.gov.

Chad Finke, Executive Officer / Clerk of the Court

By

Y. Copes, Deputy Clerk

**NOTICE OF CASE ASSIGNMENT**



# Superior Court of California, County of Alameda
# Alternative Dispute Resolution (ADR) Information Packet

The person who files a civil lawsuit (plaintiff) must include the ADR Information Packet with the complaint when serving the defendant. Cross complainants must serve the ADR Information Packet on any new parties named to the action.

The Court *strongly encourages* the parties to use some form of ADR before proceeding to trial. You may choose ADR by:

- Indicating your preference on Case Management Form CM-110;

- Filing the Stipulation to ADR and Delay Initial Case Management Conference for 90 Days (a local form included with the information packet); or

- Agreeing to ADR at your Initial Case Management Conference.

**QUESTIONS?** Call (510) 891-6055. Email: adrprogram@alameda.courts.ca.gov
Or visit the court's website at http://www.alameda.courts.ca.gov/divisions/civil/adr

## What Are the Advantages of Using ADR?

- *Faster* –Litigation can take years to complete but ADR usually takes weeks or months.

- *Cheaper* – Parties can save on attorneys' fees and litigation costs.

- *More control and flexibility* – Parties choose the ADR process appropriate for their case.

- *Cooperative and less stressful* – In mediation, parties cooperate to find a mutually agreeable resolution.

- *Preserve Relationships* – A mediator can help you effectively communicate your interests and point of view to the other side. This is an important benefit when you want to preserve a relationship.

## What Is the Disadvantage of Using ADR?

- *You may go to court anyway* – If you cannot resolve your dispute using ADR, you may still have to spend time and money resolving your lawsuit through the courts.

## What ADR Options Are Available?

- *Mediation* – A neutral person (mediator) helps the parties communicate, clarify facts, identify legal issues, explore settlement options, and agree on a solution that is acceptable to all sides.

  o **Court Mediation Program:** Mediators do not charge fees for the first two hours of mediation. If parties need more time, they must pay the mediator's regular fees.

Some mediators ask for a deposit before mediation starts which is subject to a refund for unused time.

o **Private Mediation**: This is mediation where the parties pay the mediator's regular fees and may choose a mediator outside the court's panel.

- *Arbitration* – A neutral person (arbitrator) hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial and the rules of evidence are often relaxed. Arbitration is effective when the parties want someone other than themselves to decide the outcome.

  o **Judicial Arbitration Program** (non-binding): The judge can refer a case, or the parties can agree to use judicial arbitration. The parties select an arbitrator from a list provided by the court. If the parties cannot agree on an arbitrator, one will be assigned by the court. There is no fee for the arbitrator. The arbitrator must send the decision (award of the arbitrator) to the court. The parties have the right to reject the award and proceed to trial.

  o **Private Arbitration** (binding and non-binding) occurs when parties involved in a dispute either agree or are contractually obligated. This option takes place outside of the courts and is normally binding meaning the arbitrator's decision is final.

### Mediation Service Programs in Alameda County

Low-cost mediation services are available through non-profit community organizations. Trained volunteer mediators provide these services.  Contact the following organizations for more information:

**SEEDS Community Resolution Center**
2530 San Pablo Avenue, Suite A, Berkeley, CA 94702-1612
Telephone: (510) 548-2377  Website: www.seedscrc.org
Their mission is to provide mediation, facilitation, training and education programs in our
diverse communities – Services that Encourage Effective Dialogue and Solution-making.

**Center for Community Dispute Settlement**
291 McLeod Street, Livermore, CA 94550
Telephones: (925) 337-7175 | (925) 337-2915 (Spanish)
Website: www.trivalleymediation.com
CCDS provides services in the Tri-Valley area for all of Alameda County.

*For Victim/Offender Restorative Justice Services*
**Catholic Charities of the East Bay: Oakland**
433 Jefferson Street, Oakland, CA 94607 Telephone: (510) 768-3100 Website: www.cceb.org Mediation sessions involve the youth, victim, and family members work toward a mutually agreeable restitution agreement.

ALA ADR-001

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:       FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: | |

SUPERIOR COURT OF CALIFORNIA, ALAMEDA COUNTY
STREET ADDRESS:
MAILING ADDRESS:
CITY AND ZIP CODE:
BRANCH NAME:

Alameda County Superior Court
1225 Fallon Street
Oakland, CA 94612

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR) AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS | CASE NUMBER: |
|---|---|

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

This stipulation is effective when:

- All parties have signed and filed this stipulation with the Case Management Conference Statement at least 15 days before the initial case management conference.
- A copy of this stipulation has been received by the ADR Program Administrator, 24405 Amador Street, Hayward, CA 94544, or Fax to (510) 267-5727.

1. Date complaint filed: _____. An **Initial Case Management Conference** is scheduled for:

   Date:                Time:                Department:

2. Counsel and all parties certify they have met and conferred and have selected the following ADR process *(check one)*:

   ☐ Court mediation          ☐ Judicial arbitration

   ☐ Private mediation        ☐ Private arbitration

3. All parties agree to complete ADR within 90 days and certify that:

   a. No party to the case has requested a complex civil litigation determination hearing;
   b. All parties have been served and intend to submit to the jurisdiction of the court;
   c. All parties have agreed to a specific plan for sufficient discovery to make the ADR process meaningful;
   d. Copies of this stipulation and self-addressed stamped envelopes are provided for returning endorsed filed stamped copies to counsel and all parties;
   e. Case management statements are submitted with this stipulation;
   f. All parties will attend ADR conferences; and,
   g. The court will not allow more than 90 days to complete ADR.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____          ▶ _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF PLAINTIFF)

Date:

_____          ▶ _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF ATTORNEY FOR PLAINTIFF)

Page 1 of 2

**STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR) AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS**

Cal. Rules of Court,
rule 3.221(a)(4)

(TYPE OR PRINT NAME)                    (SIGNATURE OF ATTORNEY FOR PLAINTIFF)

**ALA ADR-001**

| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | CASE NUMBER.: |
|---|---|

Date:

_____          ▶ _____
     (TYPE OR PRINT NAME)                          (SIGNATURE OF DEFENDANT)

Date:

_____          ▶ _____
     (TYPE OR PRINT NAME)                      (SIGNATURE OF ATTORNEY FOR DEFENDANT)

Form Approved for Mandatory Use<br>Superior Court of California,<br>County of Alameda<br>ALA ADR-001 [New January 1, 2010] **STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR)**<br>**AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS** Cal. Rules of Court,<br>rule 3.221(a)(4)

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>**06/26/2025**<br>Clerk Filke/Executive Officer/Clerk of the Court<br>By: _____ Deputy<br>Y. Copes |
| PLAINTIFF:<br>Laurence J Graham  et al | |
| DEFENDANT:<br>DuPont de Nemours, Inc. a Delaware Corporation | |
| **NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>25CV127524 |

TO THE PLAINTIFF(S)/ATTORNY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (Cal. Rules of Court, 3.110(b)).

Give notice of this conference to all other parties and file proof of service.

Your Case Management Conference has been scheduled on:

| | |
|---|---|
| Date: 01/13/2026     Time: 3:00 PM     Dept.: 19 | |
| Location: Rene C. Davidson Courthouse<br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | |

TO DEFENDANT(S)/ATTORNEY(S) FOR DEFENDANT(S) OF RECORD:

The setting of the Case Management Conference does not exempt the defendant from filing a responsive pleading as required by law, you must respond as stated on the summons.

TO ALL PARTIES who have appeared before the date of the conference must:

Pursuant to California Rules of Court, 3.725, a completed Case Management Statement (Judicial Council form CM-110) must be filed and served at least 15 calendar days before the Case Management Conference. The Case Management Statement must be filed jointly by all parties/attorneys of record or individually by each party/attorney of record.

**Meet and confer**, in person or by telephone as required by Cal. Rules of Court, rule 3.724.

**Post jury fees** as required by Code of Civil Procedure section 631.

If you do not follow the orders above, the court may issue an order to show cause why you should not be sanctioned under Cal. Rules of Court, rule 2.30. Sanctions may include monetary sanctions, striking pleadings or dismissal of the action.

The judge may place a Tentative Case Management Order in your case's on-line register of actions before the conference. This order may establish a discovery schedule, set a trial date or refer the case to Alternate Dispute Resolution, such as mediation or arbitration. Check the court's eCourt Public Portal for each assigned department's procedures regarding tentative case management orders at https://eportal.alameda.courts.ca.gov.

Expedited Jury Trials

If the parties agree, they may try the case in an Expedited Jury Trial. Code of Civ. Proc. § 630.01 et seq. In short, the parties would agree to the following: 8 jurors (6 must agree); 3 peremptory challenges per side; 5-hour time limit per side, unless otherwise agreed and approved; one to two court days for completion, unless otherwise agreed and approved; high/low arrangement option; and limited right to appeal. For additional information, please see the following links:

• EJT-010-INFO* Expedited Jury Trial Information Sheet (ca.gov)
• EJT-008 Agreement of Parties (Mandatory Expedited Jury Trial Procedures) (ca.gov)
• EJT-020 [Proposed] Consent Order for Voluntary Expedited Jury Trial (ca.gov)

Form Approved for Mandatory Use<br>Superior Court of California,<br>County of Alameda<br>ALA CIV-100 [Rev. 10/2021]

**NOTICE OF**
**CASE MANAGEMENT CONFERENCE**

| SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>06/26/2025<br>Chad Finke, Executive Officer/Clerk of the Court<br>By: _Yees RC_ Deputy<br>Y. Copes |
| PLAINTIFF/PETITIONER:<br>Laurence J Graham et al | |
| DEFENDANT/RESPONDENT:<br>DuPont de Nemours, Inc. a Delaware Corporation | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>25CV127524 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the attached document upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Laurence J Graham
P.O. Box 222
Oakland, CA 94604

Betty Patrick Graham
P.O. Box 222
Oakland, CA 94604

Chad Finke, Executive Officer / Clerk of the Court

Dated: 06/26/2025

By:

_Yees RC_

Y. Copes, Deputy Clerk

**CERTIFICATE OF MAILING**